**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

SUMIT GUPTA, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

POWER SOLUTIONS INTERNATIONAL, INC., GARY S. WINEMASTER, DANIEL P. GOREY, and MICHAEL P. LEWIS,

Defendants.

Case No.: 1:16-cv-08253

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION AND OVERVIEW .......... 1

II. JURISDICTION AND VENUE .......... 5

III. PARTIES .......... 6

IV. RELEVANT NON-PARTIES .......... 11

V. CONFIDENTIAL WITNESSES .......... 13

A. CW1 .......... 13

B. CW2 .......... 14

C. CW3 .......... 14

D. CW4 .......... 14

VI. BACKGROUND ALLEGATIONS .......... 14

A. PSI's Business and Background .......... 14

B. PSI's Acquisition Of Power Professional Products, Inc. .......... 17

C. Relevant Accounting Standards .......... 18

D. PSI's Revenue Recognition Policy .......... 23

VII. DEFENDANTS' FRAUDULENT REVENUE RECOGNITION SCHEME .......... 24

A. Overview Of PSI's Pull-Forward Revenue Recognition Scheme .......... 24

B. PSI Repeatedly Recorded Revenue In Violation Of GAAP Throughout The Class Period .......... 27

1. Q2 2015, Q3 2015, And Q4 2015 – Improper Revenue Recognition Transactions Involving Moser Energy Systems .......... 27

2. Q4 2015 – Sham Transaction Involving 3PI And Mesa Natural Gas Solutions, LLC .......... 32

3. Q4 2015 – Sham Transaction Involving Green APU, LLC .......... 34

4. Defendants Engaged In Additional Bill And Hold, Warehousing And Parking Transactions For Which Revenue Was Improperly Recognized Between Q4 2013 And Q1 2015 .......... 36

C. Additional Accounting Fraud Allegations .......... 42

D. Cohen Reports PSI's Pull-Forward Revenue Recognition Practices And Other Accounting Irregularities To PSI's Senior Management And Board Of Directors, But Defendants Continue To Issue False Financial Statements .......... 44

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS RELATED TO DEFENDANTS' REVENUE RECOGNITION SCHEME ISSUED DURING THE CLASS PERIOD .......... 51

IX. DEFENDANTS' COURSE OF FRAUDULENT MISREPRESENTATIONS CONCERNING THE VALUE OF ITS ACQUIRED 3PI SUBSIDIARY .......... 75

A. PSI Acquires 3PI And Touts Its Accretion To PSI Revenue And Synergies .......... 76

B. Almost Immediately Following The Acquisition, 3PI Suffers A Dramatic Decline In Revenue And Encounters Unusually High Warranty Claims, And PSI Determines That The Trents Have Misrepresented The Financial Condition Of 3PI .......... 79

X. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS RELATED TO THE COMPANY'S ACQUISITION OF ITS 3PI SUBSIDIARY ISSUED DURING THE CLASS PERIOD .......... 83

XI. LOSS CAUSATION .......... 92

A. Phase I: May 7, 2015 - February 23, 2016 .......... 94

B. Phase II: August 4, 2016 – February 3, 2017 .......... 99

XII. POST CLASS PERIOD DISCLOSURES .......... 107

XIII. CLASS ACTION ALLEGATIONS .......... 114

XIV. ADDITIONAL SCIENTER AND CONTROL PERSON ALLEGATIONS .......... 116

A. RSM's Resignation as PSI's Auditor .......... 117

B. The Resignations of Defendants Winemaster, Lewis, Hansen, Hoffing, and Vogt .......... 118

C. PSI's Delayed Notification of the SEC Subpoena .......... 119

XV. ADDITIONAL BACKGROUND ALLEGATIONS ..... 120

A. PSI's Daily Operations ..... 120

B. Relevant Internal Controls Standards ..... 122

C. PSI's Code of Conduct ..... 125

XVI. UNDISCLOSED ADVERSE FACTS ..... 132

XVII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE) ..... 133

XVIII. NO SAFE HARBOR ..... 135

XIX. COUNTS ..... 135

XX. PRAYER FOR RELIEF ..... 140

XXI. JURY TRIAL DEMANDED ..... 141

Lead Plaintiff Richard Giunta and named plaintiff David Leibowitz (collectively, "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Power Solutions International, Inc. ("PSI" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued by and disseminated by PSI and/or its management; (c) a review of analyst reports, investor conferences, news articles and other publicly available information concerning PSI; (d) a review of pertinent court filings involving PSI; and (e) interviews of individuals with knowledge of the events described herein.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a securities class action on behalf of a class consisting of all persons and entities that purchased PSI securities between February 27, 2014, and February 2, 2017, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. PSI is purportedly a leader in the design, engineering and manufacture of emissions-certified, alternative-fuel power systems. PSI claims that it provides integrated turnkey solutions to leading global original equipment manufacturers in the industrial and on-road markets. The Company claims that its in-house design, prototyping, engineering and testing capacities allow it to customize clean, high-performance engines that run on a wide variety of fuels, including natural gas, propane, biogas, diesel and gasoline.

3. During the Class Period, Defendants were keenly focused on meeting its increasingly aggressive sales targets to create the appearance of strong growth. To create the illusion of a fast growing business, Defendants routinely and systematically engaged in extremely aggressive sales practices and fraudulent "pull-forward" revenue recognition schemes in order to prematurely recognize sales and revenue in violation of Generally Accepted Accounting Principles ("GAAP"), the SEC Rules, and the Company's own stated policies. A number of the most egregious accounting violations were engineered and directed by Defendant Gary S. Winemaster ("Winemaster"), the CEO and Co-founder of the Company. Unbeknownst to investors, Defendants engaged in a variety of fraudulent sales practices, including (i) bill and hold" transactions, in which the Company recognized revenue for products that had not shipped, (ii) "warehousing" transactions, in which the Company shipped products to third-party warehouses, where the customers were not obligated to take delivery or pay for the products until some undetermined time in the future; and (iii) "parking" transactions, in which customers accepted delivery of products, but with open-ended or "forever" payment terms, such that the customer was not obligated to make payment unless and until the customer elected to use the products at some undetermined time in the future. Defendants also engaged in sham transactions, in which the purported customers were not even aware of the orders, and did not take delivery but revenue was nonetheless recognized.

4. Furthermore, because PSI's sales forecasts were materially misleading and unreliable due to this illicit and undisclosed channel stuffing scheme, Defendants issued false and materially misleading sales, revenue, and earnings results for fiscal 2014, 2015, and the 2016 fiscal first quarter, and the guidance leading those results.

5. Additionally, Defendants repeatedly touted the complementary benefits and

synergies of its biggest acquisition to date, that of subsidiary Professional Power Products, Inc. ("3PI" or "PPPI"). The acquisition was announced on April 1, 2014, but almost immediately after the acquisition Defendants realized that they had been defrauded as to the true value of the acquired 3PI business. The Company moved quickly; within five months of the acquisition, Defendants had terminated and replaced senior management of 3PI. In response to a lawsuit filed by the former 3PI CEO and COO, PSI affirmatively alleges that it had been defrauded, but PSI nonetheless continues to hold "goodwill" for 3PI on its books without any impairment.

6. While Defendants did not explicitly disclose its problems with 3PI or the revenue recognition schemes to investors, a series of disclosures between May 7, 2015 and February 22, 2016 revealed there were some cracks in PSI's rosy growth story. For example, on August 6, 2015, PSI lowered its revenue guidance and for the first time, attributing much of this problem to 3PI. The Company's stock price fell $6.52 per share over the course of two days, or approximately 16.3%, to close at $33.59 per share on August 7, 2015, on unusually heavy trading volume. The disclosures between May 7, 2015 and February 22, 2016 collectively drove PSI's stock price from a closing price of $65.10 on May 7, 2015 to a closing stock price of $8.83 on February 23, 2016, a decline of 86.4%.

7. But PSI's façade did not truly begin to unravel until August 4, 2016, when PSI announced the postponement of its second quarter 2016 earnings release and conference call. Through a steady trickle of disclosures from August 4, 2016 – February 3, 2017, Defendants slowly revealed the true extent of the fraud, including that the Company improperly recognized *at least* $18 million of revenues from Q2 2015 through Q4 2015, and that the Company would be restating its fiscal 2014, fiscal 2015, and Q1 2016 statements as well.

8. The Company also announced that the SEC was investigating its revenue

recognition practices giving rise to the anticipated restatement, and that Company's independent registered public accounting firm had resigned, stating, among other things, ***that it could "no longer rely on management representations."*** Additionally, the Company's CEO, Defendant Winemaster and CFO, Defendant Michael P. Lewis ("Lewis") resigned as remedial measures to improve the Company's internal controls. PSI's Audit Committee, including Defendants Mary Jay J. Hansen ("Hansen"), Ellen R. Hoffing ("Hoffing"), and Mary E. Vogt ("Vogt") also resigned.

9. Each of the Individual Defendants had knowledge of the Company's revenue recognition schemes. The allegations of Defendants' various revenue recognition schemes are supported by three former employees with knowledge of the Company's practices who have provided statements as confidential witnesses, and a whistleblower complaint filed by the Company's former Chief Operating Officer Eric A. Cohen ("Cohen"). *See Cohen v. Cohen v. Power Solutions International, Inc.*, Case No. 1:17-cv-04385 (N.D. Ill. 2017) (the "Cohen Complaint"), attached hereto as Exhibit A. The Cohen Complaint alleges that after investigating several of Defendants' various revenue recognition schemes, Cohen reported his concerns about the transactions to various members of PSI senior management, including Defendant Winemaster in early 2016. When his concerns were dismissed, Cohen then reported these issues to the Board of Directors at an April 28, 2016 meeting of PSI's Board and Audit Committee, who also ignored his reports.

10. According to the Cohen Complaint, at a meeting on May 6, 2016 with Cohen, Defendant Lewis and others in preparation for PSI's upcoming Q1 2016 earnings call, Defendant Lewis admitted to the group that PSI could not legitimately meet its 2016 projected revenue guidance of $360 million; instead, using legitimate accounting methods, PSI's projected revenue

for 2016 was only $310 million. According to the Cohen Complaint, during this meeting, Defendant Lewis exclaimed that unless the Company could find a way to artificially inflate PSI's 2016 revenue figures to at least $330 million, it would "f*** the debt deal" with Wells Fargo that PSI desperately needed to stay afloat.

11. As of August 3, 2017, the Company announced it still has not completed the restatements and could not provide a time when such restated financials would be completed.

12. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was engaging in various improper "pull-forward" sales tactics to meet its aggressive revenue and earnings forecasts; (2) that the Company was improperly recognizing revenue on certain transactions; (3) that, as a result, the Company's financial statements were misstated during the Class Period and not presented in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) that the Company's acquisition of 3PI was not complementary and its value had been significantly overstated; (5) that the Company lacked adequate internal controls over financial reporting; and (6) that, as a result of the foregoing, PSI's financial statements, and Defendants' statements about PSI's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

18. Lead Plaintiff Richard Giunta, as set forth in the certification previously filed with the Court, incorporated by reference herein, purchased PSI common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Plaintiff David Leibowitz, as set forth in the certification previously filed with the Court, incorporated by reference herein, purchased PSI common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20. Defendant Power Solutions International, Inc. is a Delaware corporation with its principal executive offices located at 201 Mittel Drive, Wood Dale, Illinois 60191.

21. PSI was first founded as Power Great Lakes, Inc. in 1985 by William Winemaster and his son, Defendant Gary S. Winemaster. On April 29, 2011, Power Solutions International, Inc. became a public company upon the completion of a reverse merger transaction. The Company currently trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol PSIX.

22. Defendant Gary S. Winemaster was Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors of PSI from the Company's incorporation in 2001 until he resigned on April 6, 2017. According to the Company, Defendant Winemaster resigned "[i]n order to facilitate certain remedial measures adopted by the Company in connection with the previously announced independent internal review by the Audit Committee." Throughout the Class Period, Defendant Winemaster beneficially owned approximately 36% of PSI's outstanding shares of common stock. Defendant Winemaster is a co-founder of PSI and served as the CEO and President of Power Great Lakes (which, prior to 2001, was the parent operating company of the Company, and is currently a wholly-owned subsidiary) from 1992 through 2001. Defendant Winemaster holds a Bachelor of Science degree from the Wharton School at the University of Pennsylvania.

23. Defendant Daniel P. Gorey ("Gorey") was Chief Financial Officer ("CFO") of PSI from April 2012 until on or around October 19, 2015. Defendant Gorey also served as PSI's Senior Vice President of Finance from July 2011 to April 2012. Defendant Gorey earned a Bachelor of Science degree in Accounting from the University of Illinois and is a certified public accountant.

24. Defendant Michael P. Lewis was CFO of PSI from October 19, 2015 until his resignation effective March 4, 2017. Prior to joining PSI, Defendant Lewis was Vice President, Finance and CFO of North American Operations for Benteler Automotive, beginning in 2013. From 2010 to 2012, Defendant Lewis served as Vice President, Treasurer, and Director of Investor Relations at Visteon Corporation. Defendant Lewis began at Visteon in 2000, with increasing financial management responsibility, including Director of Mergers and Acquisitions and Assistant Treasurer. Defendant Lewis earned a Bachelor of Science degree in Information Systems from Oakland University, an MBA from Wayne State University, and an MSF from Walsh College. On February 1, 2017, Defendant Lewis agreed to take a leave of absence and relinquish his CFO duties until further notice, and then submitted a letter to PSI noticing his intent to resign his employment with PSI.

25. Defendant Jay J. Hansen ("Hansen") was a director of PSI from October 2011 until his resignation effective May 31, 2017. Defendant Hansen served as member of the Board's Audit Committee since the Audit Committee was formed in January 2012, and as the Audit Committee's Chairman since mid-2013, until his resignation. Defendant Hansen is the co-founder, President and Managing Partner of O2 Investment Partners, LLC, a private equity investment group focusing on small and middle market manufacturing, niche distribution, select service and technology businesses. Defendant Hansen also serves as a director, Chairman of the Audit Committee, and member of the Compliance and Risk Committee of Flagstar Bancorp. Defendant Hansen has Bachelor of Science degree in Economics from the Wharton School at the University of Pennsylvania. According to the Company's SEC filings, Defendant Hansen had "significant knowledge of [PSI's] industry and relevant business and financial expertise, which is important as our Board exercises its oversight responsibility regarding the quality and integrity

of our accounting and financial reporting processes and the auditing of our financial statements."

26. Defendant Ellen R. Hoffing ("Hoffing") was a director of PSI and a member of PSI's Audit Committee since September 2015 until her resignation effective May 31, 2017. Defendant Hoffing has been a director of Perrigo Company plc, a global healthcare provider, since July 2008 and currently serves as a member of its audit committee. Defendant Hoffing was COO and Co-President of Neos Therapeutics, a specialty pharmaceutical company, from September 2009 until April 2014. Defendant Hoffing previously served as President and CEO of Applied NeuroSolutions, Inc., a development stage biopharmaceutical company, from 2006 until September 2009, and chairperson of its board of directors from 2007 to January 2011. Defendant Hoffing has a Bachelor of Science degree in Accounting from the University of Illinois and an MBA from Northwestern University's Kellogg School of Management. According to the Company's SEC filings, Defendant Hoffing had "relevant business experience, and [ ] financial expertise, which is important as our Board exercises its oversight responsibility regarding the quality and integrity of our accounting and financial reporting processes and the auditing of our financial statements."

27. Defendant Kenneth Landini ("Landini") has served as a director of PSI since 2001 and, according to the Company's SEC filings, has "assisted in the development and growth of the business of our company since 1985." Defendant Landini previously served as Vice President of Finance for Power Great Lakes. Following the reverse merger that took the Company public in 2011, both Gary and Kenneth Winemaster gave Landini "gifts" of Company preferred stock. Although he is not independent according to the Company's public filings, defendant Landini served as Chairman of the Board's Audit Committee from the Audit Committee's formation in January 2012 until mid-2013, and currently serves as the Board's "Lead Outside Director."

According to PSI's Definitive Proxy Statement filed with the SEC on July 17, 2015, the responsibilities of the Lead Outside Director include, "(i) presiding at all meetings of the Board at which the Chairman of the Board is not present, including executive sessions of non-management directors, (ii) serving as a liaison between the Chairman of the Board and the non-management directors, (iii) approving information sent to the Board as a whole, (iv) calling meetings of non-management directors, (v) approving meeting agendas for the Board, (vi) approving meeting schedules for the Board and, (vii) if requested by significant stockholders of the Company, being available for consultation and direct communication with such stockholders (subject to compliance with applicable Company policies)." Landini is a partner and co-founder of Landini, Reed & Dawson, P.C., a certified public accounting and consulting firm in southeastern Michigan, which has provided tax advice and consultation services to the Company.

28. Defendant Mary E. Vogt ("Vogt") was a director of PSI since November 2011 and a member of PSI's Audit Committee from the Audit Committee's formation in January 2012 until her resignation effective May 31, 2017. Defendant Vogt has served as the President of Home Access Health Corporation, a medical device manufacturer and specialty laboratory serving the disease management, wellness, managed care and consumer markets with its suite of laboratory self-testing products, since 2008, and as its CFO from 2003 to 2008. From 1999 to 2003, Defendant Vogt served as an independent consultant assisting businesses in the manufacturing and e-commerce industries. Defendant Vogt also served, from 1995 to 1998, as the worldwide director of internal audit for the Leo Burnett Company, an advertising and marketing firm, and, from 1992 to 1995, as the Treasurer for Harley-Davidson Financial Services, a subsidiary of Harley-Davidson, Inc. Defendant Vogt holds a Bachelor of Arts degree in Economics and Management from Albion College. According to the Company's SEC filings,

Vogt has "relevant business experience as well as [ ] financial expertise, which is important as our Board exercises its oversight responsibility regarding the quality and integrity of our accounting and financial reporting processes and the auditing of our financial statements."

29. Defendants Winemaster, Gorey, Lewis, Hansen, Hoffing, Landini, and Vogt are collectively referred to hereinafter as the "Individual Defendants." Defendants Winemaster, Gorey, and Lewis may also be referred to collectively as the "Officer Defendants." Defendants Hansen, Hoffing, Landini, and Vogt may also be referred to collectively as the "Outside Director Defendants." The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, possessed the power and authority to control the contents of PSI's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. <u>RELEVANT NON-PARTIES</u>

30. Eric A. Cohen ("Cohen") was Chief Operating Officer ("COO") of PSI from April 2012 until his termination on May 16, 2016. From January 2011 through March 2012,

Cohen served as the President of Power Plant Services, a manufacturer of standard and custom aftermarket parts for turbines, generators, valves and coal handling equipment. From 2004 through 2010, Cohen was a managing partner of WHI Capital Partners, a Chicago-based private equity firm that invests in mid-size companies. Cohen earned a mechanical engineering degree from the University of Wisconsin and an MBA from Harvard Business School.

31. On June 9, 2017, Mr. Cohen filed a whistleblower complaint alleging retaliation and harassment after Cohen reported findings of GAAP, SOX, and federal securities violations to senior executives, including Defendant Winemaster and the Board of Directors and Audit Committee. *See* Exhibit A, the Cohen Complaint.

32. Kenneth Winemaster is the brother of Gary Winemaster and has served as the Company's Senior Vice President since 2001 and served as Secretary from 2001 to July 23, 2013. In addition, Kenneth Winemaster served as a director of PSI's predecessor from 2001 through November 21, 2011. Throughout the Class Period, Kenneth Winemaster beneficially owned approximately 20% of PSI's outstanding shares of common stock.

33. William Buzogany ("Buzogany") was the Company's Chief Legal Counsel and Vice President of Human Resources from February 2014 through the end of the Class Period. According to Buzogany, his job duties include "oversight responsibility for all human resource functions and company legal issues." According to the Cohen Complaint, Buzogany was Cohen's point of contact at the Company regarding Cohen's discharge. Buzogany has a Doctor of Law degree from the University of Chicago Law School.

34. Scott Christman ("Christman") was the Company's Vice President of Operations from approximately January 2012 to October 2016.

35. Craig Davis ("Davis") was, at relevant times, the Company's VP of Sales.

36. Jim Needham ("Needham") was, at relevant times, the Company's Manager of Oil and Gas.

37. Each of the individuals listed in ¶¶30-36 was a high-ranking management-level employee whose scienter is imputable to PSI. Each was subject to PSI's Code of Conduct and was required to report "any questionable accounting, financial, or auditing matters." *See* ¶¶317-322, *infra*. As discussed below, each of these individuals was aware of and/or an active participant in the fraud described herein, and their knowledge should be imputed to PSI for the purposes of assessing corporate scienter.

## V. CONFIDENTIAL WITNESSES

38. Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, including information in part obtained from former employees of PSI. Information provided by the former employees is reliable and credible because: (a) each of the witnesses worked at PSI during the Class Period; (b) each witness stated that she/he had personal knowledge of the information provided; (c) the witnesses' job titles and responsibilities show that they had personal knowledge of the information provided; (d) the witness accounts corroborate one another; and (e) the witness accounts are corroborated by other information alleged herein.

### A. CW1

39. Confidential Witness 1 ("CW1") was the Manager of Shipping and Receiving at PSI from approximately March 2013 through March 2015. When CW1 first started, it was a newly created position at the Company. CW1's job responsibilities included managing packaging and expediting, and supervising more than 30 subordinates. CW1 initially reported to Director of Materials and Facilities Gary Legler ("Legler") until approximately October or November 2014 when Legler's position was split into two roles. Thereafter, CW1 reported to

Director of Materials Mike McCormick ("McCormick"). Both Legler and McCormick reported to VP of Operations Scott Christman.

**B. CW2**

40. Confidential Witness 2 ("CW2") was the Materials & Logistics Manager for PSI from approximately November 2012 through December 2014. CW2's responsibilities included getting parts from vendors, getting those parts to the assembly lines, and getting the finished engines to customers. CW2 reported to Director of Materials and Facilities Legler.

**C. CW3**

41. Confidential Witness 3 ("CW3") was the Vice President of Advanced Product Development for PSI from approximately August 2003 until March 2017. CW3 reported directly to Defendant Winemaster. CW3's role involved all aspects of product development and CW3 also served as the liaison between engineering and sales. From approximately February 2015 until April 2017, CW3 was also the CEO of Doosan PSI, LLC, a joint venture between PSI and Doosan Infracore Co., Ltd.

**D. CW4**

42. Confidential Witness 4 ("CW4") was the Director of Information Technology for PSI between July 2012 and October 2013.

## VI. BACKGROUND ALLEGATIONS

### A. PSI's Business and Background

43. PSI is purportedly a leader in the design, engineering, and manufacture of emissions-certified, alternative-fuel power systems. PSI claims that it provides integrated turnkey solutions to leading global original equipment manufacturers in the industrial and on-road markets. The Company claims that its in-house design, prototyping, engineering, and

testing capacities allow it to customize clean, high-performance engines that run on a wide variety of fuels, including natural gas, propane, biogas, diesel, and gasoline.

44. Throughout the Class Period, the Company was controlled by brothers Gary Winemaster and Kenneth Winemaster, who collectively owned over 56% of PSI's outstanding common stock. During the Class Period, Defendant Gary Winemaster alone beneficially owned over 36% of PSI's outstanding shares of common stock. From at least fiscal 2010 through fiscal through 2014, William Winemaster, the father of Gary Winemaster and Kenneth Winemaster served as "an employee performing consulting and advisory type services for The W Group and its subsidiaries," and collected over $150,000 in annual salary in fiscal 2013 and 2014.

45. The Company's predecessor was founded in 1985 and focused then on the industrial OEM marketplace. On April 29, 2011, The W Group, Inc. ("W Group") completed a reverse merger transaction[1] with Format, Inc. ("Format"), a Nevada corporation that had nominal operations and assets. As a result of the reverse merger, Format became PSI, merged into W Group, and W Group became a wholly-owned subsidiary of PSI. In August 2011, PSI merged into its subsidiary with the same name incorporated in Delaware, thereby becoming a Delaware corporation and the sole surviving entity.

46. The Company's Audit Committee was formed in January 2012 and consisted of Mr. Landini as Audit Committee Chairman (until he was replaced by H. Samuel Greenawalt on June 17, 2012) and Defendants Hansen and Vogt. Prior to the reverse merger, the Company's predecessor was a private company and therefore was not subject to public company reporting obligations. In the Company's 2011 Form 10-K filed with the SEC on March 30, 2012, the

[1] A reverse merger is a transaction in which a private company merges into a shell corporation that was registered for the purpose of public trading, thereby avoiding the greater scrutiny it would face through an initial public offering million.

Company disclosed that it previously had little accounting and internal controls but that it had acted to enhance its accounting and internal controls, stating:

> Prior to the consummation of the reverse recapitalization, The W Group was a private operating company and, as a result of the reverse recapitalization, we became a public company subject to public company reporting obligations. As a result, we have had to, and we currently continue to, enhance and supplement our internal accounting resources with additional accounting and finance personnel with the requisite technical and public company experience and expertise, and more generally strengthen our disclosure controls and procedures and our internal control over financial reporting to enable us to accurately and timely prepare our consolidated financial statements and otherwise satisfy these reporting obligations. In particular, in June 2011, we established a disclosure and compliance committee (the "Disclosure Committee"), consisting of senior members of our finance and accounting department and other members of senior management, and adopted disclosure and compliance committee guidelines. The purpose of the Disclosure Committee is to assist our Chief Executive Officer, our Chief Financial Officer and our board of directors in compliance with the rules and regulations of the Securities and Exchange Commission, with particular focus on our reporting and public disclosure requirements under the Exchange Act and the Sarbanes-Oxley Act of 2002, as well as assisting our Chief Executive Officer and our Chief Financial Officer in fulfilling their obligations pursuant to Sections 302, 404 and 906 of the Sarbanes-Oxley Act of 2002. During the fiscal year ended December 31, 2011, we also retained additional staff in our finance and accounting department, and on July 18, 2011 we hired an additional senior financial professional with prior public company experience, thereby further strengthening the overall capabilities of our finance and accounting department. In August 2011, we created an internal accounting department and hired an internal audit manager with prior experience implementing and evaluating our compliance with Sarbanes-Oxley Act of 2002.

47. After the Company performed its annual assessment of the effectiveness of its internal control over financial reporting pursuant to Sarbanes-Oxley for fiscal year 2012, the Company's Form 10-K for fiscal year 2012, filed with the SEC on March 12, 2013 (the "FY 2012 10-K"), stated that material weaknesses in the Company's internal and financial controls were discovered, and the assessment concluded that as of December 31, 2012, the Company's internal control over financial reporting was not effective. Specifically, according to FY 2012 10-K, PSI's controls over the business system software used in PSI's aftermarket parts group

were inadequate, as: (i) all users of the software had access to add, delete, or modify any data; (ii) there were no controls in place to adequately monitor transactions within the software; and (iii) the software users were not assigned detailed security rights, and users gained access to system modules through use of passwords that were not periodically changed to ensure that only appropriate individuals had access to each module.

48. In the Company's Form 10-K for fiscal year 2013 filed with the SEC on February 28, 2014, the Company stated that it had remediated the material weaknesses identified in the FY 2012 10-K. Specifically, the Company stated:

> During the fiscal quarter ended December 31, 2013, we implemented internal control procedures to address a previously identified material weakness related to the business system software used within our aftermarket parts group. These internal controls included (a) assigning detailed security rights to the software including periodic password changes, and (b) implementing a database monitoring tool to monitor key transactions within the software. After completing our testing of design and operating effectiveness of these new procedures, we concluded that we had remediated the previously identified material weakness as of December 31, 2013.

**B. <u>PSI's Acquisition Of Power Professional Products, Inc.</u>**

49. On April 1, 2014, the Company issued a press release entitled "Power Solutions International, Inc. Announces the Acquisition of Professional Power Products, Inc." In the press release, Defendants stated that "***[i]n 2013, PPPI generated net sales and operating income of approximately $40.3 million and $7.9 million, respectively***." (Emphasis added). According to the Company, "[e]xcluding one-time transaction, integration and purchase accounting related costs, ***the transaction is expected to be accretive to the Company's results in 2014***."

50. To finance the purchase, the Company stated that it had increased its credit line:

> The Company had acquired all of the outstanding capital stock of PPPI for an initial cash purchase price of $46 million. In addition, the Company will issue to the sellers between $5 million and $15 million in the Company's common stock, valued at $76.02 per share, based upon PPPI's 2014 operating results. The cash

> portion of the transaction is being financed initially with the Company's bank credit facility. To facilitate the transaction, the Company entered into an amended and restated agreement with Wells Fargo Bank, N.A. increasing its revolving line of credit from $75 million to $90 million, among other things.

51. The Company stated that that the acquisition would "broaden[] the Company's product offerings and is expected to accelerate growth with both new and existing customers globally." Defendant Winemaster further touted the benefits of 3PI's management team and complementary product offerings, stating:

> "We are delighted with the acquisition of PPPI and the tremendous opportunity it presents us," stated Gary Winemaster, Chairman and Chief Executive Officer of Power Solutions International, Inc. "PPPI brings us a talented management team and a strong complementary product offering. This, along with PSI's expertise in power systems technology and extensive customer relationships, creates a remarkable combination that should expand our customer reach and position us very well for growth in the years ahead."

(Emphasis added.)

52. According to CW1, people started talking about the problems with 3PI in April 2014 – almost immediately after the 3PI acquisition. CW1 learned through coworkers that Eric Cohen was given both the credit and then the blame for the 3PI acquisition. According to CW1, one problem with the 3PI acquisition was that 3PI competed with PSI's best customers, such as Kohler and Generac. CW1 explained that PSI had almost daily shipments to Kohler because they were a large customer who built riding lawnmowers and generators.

### C. Relevant Accounting Standards

53. The Financial Accounting Standards Board ("FASB") is the designated private sector organization for establishing standards of financial accounting that govern the preparation of financial reports. Generally Accepted Accounting Principles are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Rules and interpretive releases of the SEC

under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. *See* Accounting Standards Codification ("ASC") ASC 105-10-05-1.

54. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are *presumed* to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

55. Staff Accounting Bulletin No. 101 ("SAB 101") *Revenue Recognition in Financial Statements*, as amended by Staff Accounting Bulletin No. 104 ("SAB 104") Topic 13, *Revenue Recognition*, as amended, and codified under ASC 605-10-S99, clearly state that revenue is realized or realizable and earned only if and when ***all*** of the following criteria are met:

(a) "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction;
(b) "Delivery has occurred or services have been rendered";
(c) "The seller's price to the buyer is fixed or determinable"; and
(d) "Collectibility is reasonably assured."

ASC 605-10-S99.

56. Additionally, FASB Statement of Concepts[2] Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises (as amended), articulates that revenues and gains should not be recognized in financial statements until they are both earned and realizable:

(a) "Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash." [FASB Statement of Concepts No. 5, 83a].

(b) "Revenues are not recognized until earned. An entity's revenue- activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." [FASB Statement of Concepts No. 5, 83b].

(c) "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)." [FASB Statement of Concepts No. 5, 84a].

57. Under its section related to Delivery and Performance, SAB 101 further states that:

> Delivery generally is not considered to have occurred unless the product has been delivered to the customer's place of business or another site specified by the customer. If the customer specifies an intermediate site but a substantial portion of the sales price is not payable until delivery is made to a final site, then revenue should not be recognized until final delivery has occurred.
>
> After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs.

[2] FASB Statements of Financial Accounting Concepts broadly cover financial reporting concepts. FASB publishes these documents to provide a general overview of accounting concepts, definitions, and ideas guiding recognition and measurement for financial reporting purposes.

58. Accordingly, a seller generally cannot recognize revenue for the sale of products if it ships the products to a third-party warehouse (or segregates the products in its own warehouse) but: (1) the seller retains title to the product, and (2) payment by the customer is dependent upon ultimate delivery to a customer-specified site.

59. In SAB 101, the Commission set forth the following criteria to be met in order to recognize revenue when delivery has not occurred. These include:

1. The risks of ownership must have passed to the buyer;

2. The customer must have made a fixed commitment to purchase the goods, preferably in written documentation;

3. The buyer, not the seller, must request that the transaction be on a bill and hold basis. The buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;

4. There must be a fixed schedule for delivery of the goods. The date for delivery must be reasonable and must be consistent with the buyer's business purpose (e.g., storage periods are customary in the industry);

5. The seller must not have retained any specific performance obligations such that the earning process is not complete;

6. The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

7. The equipment [product] must be complete and ready for shipment.

60. SAB 101 further states that "[t]he above listed conditions are the important conceptual criteria which should be used in evaluating any purported bill and hold sale. This listing is not intended as a checklist. In some circumstances, a transaction may meet all factors listed above but not meet the requirements for revenue recognition."

61. The Commission also noted in SAB 101 that in applying the above criteria to a purported bill and hold sale, the individuals responsible for the preparation and filing of financial statements also should consider the following factors:

1. The date by which the seller expects payment, and whether the seller has modified its normal billing and credit terms for this buyer;

2. The seller's past experiences with and pattern of bill and hold transactions;

3. Whether the buyer has the expected risk of loss in the event of a decline in the market value of goods;

4. Whether the seller's custodial risks are insurable and insured;

5. Whether extended procedures are necessary in order to assure that there are no exceptions to the buyer's commitment to accept and pay for the goods sold (i.e., that the business reasons for the bill and hold have not introduced a contingency to the buyer's commitment).

62. FAS 48, *Revenue Recognition When Right of Return Exists*, establishes accounting and reporting standards for revenue recognition on sales of a product when the buyer has the right to return the product. FAS 48, ¶6 provides that in such circumstances, revenue from the sales transaction should be recognized at the time of sale only if all of the following conditions are met:

> (a) The seller's price to the buyer is substantially fixed or determinable at the date of sale.
>
> ***(b) The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.***
>
> (c) The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.
>
> (d) The buyer acquiring the product for resale has economic substance apart from that provided by the seller.
>
> (e) The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.
>
> ***(f) The amount of future returns can be reasonably estimated.***

(Emphasis added).

63. SEC Staff Accounting Bulletin 104 ("SAB 104") (codified in ASC 605-10-S99) provides additional guidance that states that if a sales transaction fails to meet all of the conditions of FAS 48, as outlined above, "*no revenue may be recognized until those conditions*

*are subsequently met or the return privilege has substantially expired.*" (Emphasis added.) SAB 104 also provides other factors in addition to those listed in FAS 48, ¶8 that may preclude a registrant from making a reasonable and reliable estimate of product returns. The criteria in SAB 104 below, presented in bold print, precluded PSI from being able to make a reasonable and reliable estimate of product returns:

> The staff believes that the following additional factors, among others, may affect or preclude the ability to make reasonable and reliable estimates of product returns: (1) ***significant increases in or excess levels of inventory in a distribution channel (sometimes referred to as "channel stuffing")***, (2) ***lack of "visibility" into or the inability to determine or observe the levels of inventory in a distribution channel and the current level of sales to end users,*** (3) expected introductions of new products that may result in the technological obsolescence of and larger than expected returns of current products, (4) the significance of a particular distributor to the registrant's (or a reporting segment's) business, sales and marketing, (5) the newness of a product, (6) the introduction of competitors' products with superior technology or greater expected market acceptance, and (7) other factors that affect market demand and changing trends in that demand for the registrant's products.

SAB 104 at 66-67 (emphasis added).

### D. PSI's Revenue Recognition Policy

64. Throughout the Class Period, PSI's critical accounting policies remained substantially consistent. According to PSI's Class Period SEC filings, PSI's financial statements were presented "in accordance with generally accepted accounting principles in the U.S. ("GAAP")" and "have been prepared pursuant to the rules and regulations of the SEC."

65. PSI's revenue recognition policy was stated in Company's 2013 10-K as follows:

> *Revenue recognition*
>
> ***We recognize revenue upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured.***
>
> We classify shipping and handling charges billed to customers as revenue. Shipping and handling costs paid to others are classified as a component of cost of

sales when incurred.

66. PSI's revenue recognition policy was stated in Company's 2014 10-K as follows:

> *Revenue recognition*
>
> ***We recognize revenue upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured***. As of December 31, 2014, we had recognized revenue associated with approximately $3.2 million of undelivered product. We anticipate the collection of any unpaid balances during 2015. We did not enter into any bill and hold arrangements during 2013 or 2012.
>
> We classify shipping and handling charges billed to customers as revenue. Shipping and handling costs paid to others are classified as a component of cost of sales when incurred.

67. PSI's revenue recognition policy was stated in Company's 2015 10-K as follows:

> *Revenue recognition*
>
> We recognize revenue upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured. As of December 31, 2015 and 2014, we had recognized revenue associated with approximately $21.4 million and $3.2 million, respectively, of undelivered product. We anticipate the collection of any unpaid balances during 2016. We did not enter into any bill and hold arrangements during 2013.
>
> We classify shipping and handling charges billed to customers as revenue. Shipping and handling costs paid to others are classified as a component of cost of sales when incurred.

## VII. DEFENDANTS' FRAUDULENT REVENUE RECOGNITION SCHEME

### A. Overview Of PSI's Pull-Forward Revenue Recognition Scheme

68. Throughout the Class Period, Defendants engaged in a "pull-forward" revenue recognition scheme, in which expected revenue from future periods was recorded in earlier periods before the criteria for revenue recognition were satisfied, in violation of GAAP, SEC rules, and the Company's own stated revenue recognition policies. Defendants effectuated this

scheme through a variety of practices, including but not limited to (i) "bill and hold" transactions, in which the Company recognized revenue for products that had not shipped, in violation of the strict criteria that the SEC has established for revenue recognition in "bill and hold" transactions; (ii) "warehousing" transactions, in which the Company shipped products to third-party warehouses, where the customers were not obligated to take delivery or pay for the products until some undetermined future time when the customer requested the goods from the Company;[3] and (iii) "parking" transactions, in which customers accepted delivery of products, but with open-ended or "forever" payment terms, such that the customer was not obligated to make payment unless and until the customer elected to use the products at some undetermined time in the future. Defendants also engaged in subsequent fraudulent conduct to cover up their improper revenue recognition, including a "round-trip" revenue scheme in which Defendants agreed to buy back products from a customer that PSI did not need, solely in order to obtain that customer's agreement to pay for the original purchase of those products.

69. The existence of this scheme and these practices is confirmed by several sources, including the Cohen Complaint, the accounts of multiple confidential witnesses, and the Company's own partial admissions, which acknowledge that the full scope of Defendants' revenue recognition violations has not yet been definitively quantified. On January 5, 2017, the Company disclosed that its financial statements for fiscal year 2015 (including the second, third,

---

[3] Warehousing transactions may also be considered a form of "bill and hold" arrangement, depending on the facts and circumstances and the accounting treatment. *See* SAB 101. PSI engaged in at least two types of related transactions: those in which products were not shipped and remained at the Company, but revenue was still recognized (clearly "bill and hold"), and those in which products were shipped to third-party warehouses, not the ultimate buyer, and revenues were recognized (which may or may not have been accounted for by PSI as "bill and hold" arrangements). Regardless of the Company's characterization of these warehousing transactions, however, the recognition of revenue was improper, because, among other things, the payment and delivery terms were not fixed and determinable.

and fourth quarters within that year) and the first fiscal quarter of 2016 would need to be restated to correct errors including at least approximately $18 million in revenue erroneously recognized in 2015. On April 7, 2017, however, the Company (i) acknowledged that it would also be restating fiscal year 2014 and the first fiscal quarter of 2015, and (ii) estimated that its restatements for 2014, 2015, and 2016 would involve a shift of approximately $48 million to $74 million of recognized revenues from earlier periods to later periods, and a determination that approximately $5 million in revenue may be treated as uncollectible accounts receivable or erroneously recognized revenues from the outset. On August 3, 2017, the Company disclosed that (i) its review had been delayed by the identification of multiple material weaknesses in the Company's internal controls by the Company's new management and new auditor; (ii) the Company was reviewing prior accounting periods and had not yet definitively quantified the adjustments to net sales and corresponding items; and (iii) there could be no assurance that other kinds of errors will not be identified or impact prior accounting periods.

70. The Cohen Complaint identifies a number of specific transactions in which PSI improperly recognized revenue, including (i) a $10 million transaction in Q2 2015 with "forever" payment terms; (ii) a $4.3 million transaction in Q3 2015 in which the customer was obligated (pursuant to a secret side agreement) to pay only $3 million; (iii) a $2.98 million sham transaction in Q4 2015 with no payment terms or delivery; and (iv) a $750,000 warehousing transaction in Q4 2015 in which the customer never ordered the product. The facts and details of these transactions, as described in ¶¶72-102, make it clear that these transactions involved flagrant and deliberate violations of GAAP, SEC rules, and the Company's own revenue recognition policies, rather than mere inadvertent errors in judgment. These transactions resulted in the improper recognition of revenue totaling approximately $15 million for the second, third,

and fourth quarters of 2015, which roughly corresponds to the approximate $18 million in revenue errors for these three quarters initially acknowledged by the Company in its Form 8-K filed on January 5, 2017. The allegations in the Cohen Complaint are therefore bolstered by the similarity in magnitude of the revenue recognition errors initially admitted to by the Company for the same three quarter period.

71. However, the Company's April 7, 2017 revelation that the anticipated restatements would expand in scope makes it clear that the transactions identified by Cohen accounted for only a fraction of the improperly recognized revenue during the Class Period. As discussed in ¶¶103-114, certain disclosures in the Company's SEC filings, along with statements from confidential witnesses, confirm that Defendants engaged in the same kinds of improper bill and hold and warehousing transactions during the earlier portions of the Class Period that they engaged in during the second, third and fourth quarters of 2015.

## B. PSI Repeatedly Recorded Revenue In Violation Of GAAP Throughout The Class Period

### 1. Q2 2015, Q3 2015, And Q4 2015 – Improper Revenue Recognition Transactions Involving Moser Energy Systems

72. According to the Cohen Complaint, PSI engaged in a series of fraudulent transactions in Q2 2015 and Q3 2015 with Moser Energy Systems ("Moser"), one of PSI's largest and longest-standing customers. According to the Cohen Complaint, PSI knowingly and purposely inflated the book value of purchases and improperly recognized revenue in order to meet the Company's sales and revenue projections.

73. According to the Cohen Complaint, in June 2015, Defendant Winemaster directed PSI's Manager of Oil and Gas Needham to have Moser submit purchase orders in advance of Moser's normal needs for $10 million of PSI 21.9L units, with essentially open payment terms. According to the Cohen Complaint, this arrangement was memorialized in a secret side-letter

agreement between PSI and Moser containing "forever payment terms" whereby Moser had no obligation to make any payments to PSI at any particular time. According to the Cohen Complaint, Moser had no legitimate business need for these units, but the transaction was significant for PSI, because it resulted in PSI's Q2 2015 total reported revenue of $95 million being inflated by 12%.

74. According to the Cohen Complaint, the fraudulent June 2015 deal was part of a broader roundtrip transaction whereby Moser agreed to purchase PSI engines worth $10 million (with open or "forever" payment terms) and in exchange, in a November 2016 transaction with a paper value of $9.6 million, PSI later agreed to buy back from Moser sixty generators that contained the exact same 21.9L engines that PSI had sold to Moser in June 2015. According to the Cohen Complaint, Defendant Winemaster orchestrated this arrangement and instructed Manager of Oil and Gas Needham and VP of Advanced Products Don Wilkins to carry it out.

75. According to the Cohen Complaint, the Company never publicly disclosed this fraudulent Q2 2015 transaction, nor the related side-letter, nor the subsequent roundtrip transaction, and the Company listed the full $10 million amount for this Moser transaction as recognized revenue in its books.

76. According to the Cohen Complaint, in Q3 2015, Defendant Winemaster engineered another arrangement with Moser, whereby Moser would be invoiced and receive approximately $4.3 million of PSI units, but under a secret side agreement, would only pay PSI approximately $3 million.

77. According to the Cohen Complaint, PSI's billing department was not aware of Defendant Winemaster's arrangement, causing it to issue Moser a billing invoice for the full book amount of $4.3 million. According to the Cohen Complaint, after receiving an invoice for

the full book value rather than the discounted amount Defendant Winemaster had secretly promised, Moser contacted PSI sales representatives to clarify the amount it actually owed.

78. According to the Cohen Complaint, this issue was brought to the attention of then-CFO Lewis, who escalated it to Defendant Winemaster. Defendant Winemaster and Defendant Lewis then engineered another covert arrangement, whereby Moser was issued a separate, off-book credit for the difference between the book value and the agreed value ($1.3 million), and PSI applied that credit against the same transaction.

79. According to the Cohen Complaint, PSI never disclosed the $1.3 million side agreement, and listed the full $4.3 million paper value for this Q3 2015 Moser transaction as recognized revenue in its books.

80. The gravamen of the Cohen Complaint's allegations of improper revenue recognition by PSI in connection with its sales to Moser is corroborated by a number of additional independent sources, including (i) the account of CW3; (ii) allegations made in a recently-filed lawsuit by Moser, *Moser Engine Service, Inc. v. Power Solutions International*, No. 1:17-cv- 04258 (N.D. Ill.) (the "Moser Complaint"); and (iii) PSI's own admissions.

81. According to CW3, Moser was warehousing engines in Q2, Q3, and Q4 2015.[4] CW3 stated that shipments occurred at the end of every quarter. According to CW3, Moser said that it would pay for the engines as it used them, but PSI recognized the revenue anyway because PSI was cash strapped.

82. According to CW3, in Q2 2015, PSI offered Moser incentives with discounts. Moser's salesman was Needham, who reported to Director of Sales Craig Davis. CW3 noted

[4] Although the term "warehousing" is used here, more precisely, this is a "parking" transaction, in that the engines were stored on Moser's property rather than the facilities of a third-party warehouser.

that even though Needham reported to Davis, Defendant Winemaster had direct discussions with Needham about the Moser transactions. According to CW3, in Q3 2015, PSI offered even more incentives to Moser, and Moser began to build inventory, which was possible because Moser had a large lot. CW3 explained that in Q4 2013, however, Moser said it could not take any more engines, but Defendant Winemaster directed that engines be shipped anyway. CW3 stated that the value of the engines shipped to Moser in Q4 2015 was $10 million.

83. According to CW3, during Q3 2016, Defendant Winemaster realized that Moser had not paid for the engines that had been delivered. CW3 stated that Defendant Winemaster called a meeting at which PSI salespeople were told to help Moser sell its products. According to CW3, some PSI salespeople even made international trips to sell Moser products. CW3 recalled that at the time, "we were completely blind to [what Winemaster was doing]."

84. According to CW3, in Q4 2016, PSI purchased approximately $10 million of generators from Moser that used the same engines that PSI had sold to Moser. CW3 stated that this was done to close out the bad debt on PSI's books caused by the earlier forced sale to Moser. According to CW3, when he asked Defendant Winemaster why PSI did not just issue an RMA (*i.e.*, a return merchandise authorization), Defendant Winemaster replied that using an RMA would be like admitting guilt. CW3 noted that the SEC had started an investigation into PSI in June 2016.

85. PSI's purchase from Moser was unusual, because, as CW3 explained, PSI had a history of never buying back engines. CW3 stated that for this transaction, PSI issued a purchase order to Moser for the generators, but PSI had no buyer or letters of intent to justify the purchase. CW3 stated that CW3 knew about the purchase of the generators and the lack of any letter of intent from a customer because CW3 was consulted on how to store the generators as "long term

inventory." According to CW3, at least as through CW3's tenure, the generators were still being held at 1465 Hamilton Parkway, Itasca, and that the generators show the Moser name.

86. The Moser Complaint confirms that PSI did in fact agree to purchase sixty (60) 21.9 liter Generator Sets from Moser for $9.6 million pursuant to a purchase order dated November 30, 2016. According to the Moser Complaint, Moser was required under the terms of the agreement to deliver six units per week, assembled to PSI's specifications, over the course of several months, and Moser had delivered 36 of the 60 units ordered by PSI. The Moser Complaint further alleges that PSI has made only a down payment of $1.84 million and has breached its obligations under the agreement.

87. Taken together, the allegations of the Moser Complaint and the Cohen Complaint, along with the account of CW3, make it clear that PSI agreed to purchase the generators from Moser in 2016, because Moser was otherwise under no obligation to pay for the engines that PSI had delivered to Moser in 2015 and for which PSI had already recognized revenue. PSI then defaulted on its obligations to pay for the generators it ordered from Moser.

88. Whether the Moser transactions were intended as a round-trip revenue transaction from the very beginning, or whether PSI only later made a decision to purchase Moser generators in order to induce Moser to pay for the engines that PSI previously delivered and "parked" on Moser's lot, it is clear that PSI's recognition of revenue in connection with the 2015 Moser transactions was improper. PSI has already effectively admitted the impropriety of its revenue recognition in connection with these transactions on January 5, 2017, when PSI revealed that the Company would be restating at least $18 million in revenue for Q2 2015, Q3 2015, and Q4 2015, following an investigation of allegations made by a former employee. That former employee, it turns out, was Cohen, who raised the 2015 Moser transactions to the attention of PSI's Audit

Committee in April 2016. *See* ¶¶132-134.

89. PSI's recognition of revenue in connection with the 2015 Moser transactions violated several fundamental principles of revenue recognition codified in SAB 101 and FAS 48, including, *inter alia*: (i) the seller's price to the buyer was not fixed or determinable at the date of the sale, because payment terms constitute a component of the price, and a contract with open-ended payment terms cannot be deemed to have a fixed and determinable price;[5] (ii) collectibility was not reasonably assured, because (a) the open-ended payment terms meant that Moser was not obligated to make payment within any particular timeframe, and (b) Moser only agreed to pay $3 million for the $4.3 million worth of units in the Q3 2015 transaction;[6] (iii) the sales were contingent upon Moser's future election to use the products;[7] and (iv) future returns could not be reasonably estimated, because Moser could decide to pay for only those units it elected to use.[8]

### 2. Q4 2015 – Sham Transaction Involving 3PI And Mesa Natural Gas Solutions, LLC

90. According to the Cohen Complaint, in Q4 2015, Defendant Winemaster directed PSI subsidiary 3PI to manufacture three custom-built industrial generators in a sham transaction. While these units purportedly were to be sold to a customer named Mesa Natural Gas Solutions, LLC ("Mesa") at a price of $995,000 per unit, in reality Mesa never ordered these generators. The units were built to Defendant Winemaster's specifications, and Winemaster had no customer lined up when he ordered the units to be built to his specifications.

91. According to the Cohen Complaint, Defendant Winemaster directed Needham to tell 3PI CFO Mick Anderson that PSI would produce a purchase order for this sale, because PSI and 3PI needed the revenue to make quarter end numbers. The purported purchase order, which

[5] *See* ¶55 (SAB 101 criteria (c)); ¶62 (FAS 48 criteria (a)).
[6] *See* ¶55 (SAB 101 criteria (d)).
[7] *See* ¶62 (FAS 48 criteria (b)).
[8] *See* ¶62 (FAS 48 criteria (f)).

was dated December 29, 2015, contained no payment terms, and Mesa did not take delivery of the units. The units remained idle in 3PI's parking lot.

92. According to the Cohen Complaint, Defendant Winemaster engineered this sham transaction when he failed to find a customer after ordering them built to his own specifications, and Mesa never ordered, took delivery, or paid for the units, so the generators remained at 3PI as of Cohen's termination in May 2016.

93. According to the Cohen Complaint, PSI recognized $2.98 million in revenue on the sham Mesa transaction, which Defendant Winemaster orchestrated at the end of Q4 2015 in order to meet revenue and sales projections for fiscal year 2015.

94. PSI has already effectively admitted the impropriety of its revenue recognition in connection with the Q4 2015 Mesa transaction when, on January 5, 2017, it stated that it would be restating at least $18 million in revenue for Q2 2015, Q3 2015, and Q4 2015, following an investigation of allegations made by a former employee, Cohen. That former employee, it turns out, was Cohen, who raised the Q4 2015 Mesa transaction to the attention of PSI's Audit Committee in April 2016. *See* ¶123-124.

95. PSI's recognition of revenue in connection with the Q4 2015 Mesa transaction violated each of the fundamental criteria required for revenue recognition as codified in SAB 101: (i) no persuasive evidence of an arrangement existed, because (a) Mesa never ordered the generators, (b) the December 29, 2015 purchase order used by Defendant Winemaster to justify the order was prepared by PSI rather than Mesa, and not at Mesa's request, and (c) the entire transaction was a sham; (ii) delivery never occurred, and the units remained at 3PI's parking lot for at least four and a half months after the end of the quarter in which the revenue was recognized; (iii) the seller's price to the buyer was not fixed and determinable, because Mesa

never agreed to any price or other terms; and (iv) collectibility was not reasonably assured, because Mesa did not order the units or agree to accept delivery of them.[9]

96. PSI's recognition of revenue in connection with the Q4 2015 Mesa transaction also violated the following additional criteria required for revenue recognition in a "bill and hold" transaction,[10] as codified in SAB 101: (i) the risks of ownership did not pass to the purported buyer; (ii) the purported buyer did not make a fixed commitment to purchase the goods; (iii) the purported buyer did not request the transaction be on a bill and hold basis; and (iv) there was no fixed schedule for delivery of the goods.[11]

### 3. <u>Q4 2015 – Sham Transaction Involving Green APU, LLC</u>

97. According to the Cohen Complaint, PSI engaged in another sham transaction dated December 31, 2015, in which Green APU, LLC ("Green APU") was purportedly sold 250 engines for approximately $750,000. According to the Cohen Complaint, it was not until after the units already were manufactured that Defendant Winemaster identified Green APU as a potential purchaser in late December 2015.

98. According to the Cohen Complaint, however, Green APU had a terrible payment history with PSI and at that time, was subject to a credit hold preventing it from placing any new PSI orders. Thus, according to the Cohen Complaint, in order to book the sale before the end of Q4 2015, Defendant Winemaster ordered PSI employees to remove the credit hold and generate a purchase order dated December 31, 2015.

99. According to the Cohen Complaint, just as with the sham Mesa transaction, Green APU did not order, want, take delivery, or pay for the units. Indeed, according to the Cohen

[9] *See* ¶55 (SAB 101's general criteria for revenue recognition).
[10] These requirements apply to any transactions in which delivery has not occurred. *See* ¶59 .
[11] *See* ¶59 (SAB 101's additional required criteria for "bill and hold" transactions).

Complaint, Defendant Winemaster had ordered the units to be manufactured in order to book the sale, but Green APU was completely unaware of the transaction at the time of purported purchase and PSI employees were instructed not to tell Green APU or anyone else about the transaction. Instead, Defendant Winemaster directed the units to be sent to an offsite warehouse space acquired and paid for by PSI at a cost of $400 per month.

100. PSI already has effectively admitted the impropriety of its revenue recognition in connection with the Q4 2015 Green APU transaction when, on January 5, 2017, it stated that it would be restating at least $18 million in revenue for Q2 2015, Q3 2015, and Q4 2015, following an investigation of allegations made by a former employee. That former employee, it turns out, was Cohen, who raised the Q4 2015 Green APU transaction to the attention of PSI's Audit Committee in April 2016. *See* ¶123-124.

101. PSI's recognition of revenue in connection with the Q4 2015 Green APU transaction violated each of the fundamental criteria required for revenue recognition as codified in SAB 101: (i) no persuasive evidence of an arrangement existed, because (a) Green APU never ordered the generators, (b) the purchase order used by Winemaster to justify the order was prepared by PSI, not Green APU, and not at Green APU's request, (c) Winemaster instructed PSI employees not to tell Green APU about the transaction, and (d) the entire transaction was a sham; (ii) delivery to the customer never occurred, and the units were sent to an offsite warehouse space paid for by PSI; (iii) the seller's price to the buyer was not fixed and determinable, because Green APU never agreed to any price or other terms; and (iv) collectibility was not reasonably assured, because (a) Green APU did not order the units or agree to accept delivery of them, and (b) in any event, Green APU was on a credit hold because of its terrible payment history with PSI, and the credit hold was removed for the sole purpose of

booking the sham transaction.[12]

102. PSI's recognition of revenue in connection with the Q4 2015 Green APU transaction also violated the following additional criteria required for revenue recognition in a "bill and hold" transaction,[13] as codified in SAB 101: (i) the risks of ownership did not pass to the purported buyer; (ii) the purported buyer did not make a fixed commitment to purchase the goods; (iii) the purported buyer did not request the transaction be on a bill and hold basis; and (iv) there was no fixed schedule for delivery of the goods.[14]

#### 4. Defendants Engaged In Additional Bill And Hold, Warehousing And Parking Transactions For Which Revenue Was Improperly Recognized Between Q4 2013 And Q1 2015

103. The transactions in Q2, Q3, and Q4 2015 detailed by the Cohen Complaint only account for a fraction of the improperly recognized revenue that the Company has already admitted it will be restating. PSI has acknowledged that it prematurely recognized revenues of approximately $48 million to $74 million during FY 2014, FY 2015, and Q1 2016 and recognized an additional $5 million that it will never collect. Based on certain disclosures in PSI's SEC filings and the accounts of confidential witnesses, it is clear that the improper revenue recognition in the earlier portions of the Class Period was based on the same "pull forward" revenue scheme used to prematurely and improperly recognize revenue in the latter portions of the Class Period.

104. In its 2014 Form 10-K, PSI admitted that it recognized revenue associated with approximately $3.2 million of undelivered product through bill and hold arrangements in 2014. It its 2015 Form 10-K, PSI admitted that it recognized revenue associated with approximately

---

[12] *See* ¶55 (SAB 101's general criteria for revenue recognition).

[13] These requirements apply to any transactions in which delivery has not occurred, including transactions where products are stored at a third-party warehouse paid for by the seller. *See* ¶59 .

[14] *See* ¶59 (SAB 101's additional required criteria for "bill and hold" transactions).

$21.4 million of undelivered product through bill and hold arrangements in 2015. Though revenue may legitimately be recognized under bill and hold arrangements under certain narrow circumstances (including, among additional requirements, when the buyer requests that the transaction be on a bill and hold basis and has made a fixed commitment to purchase the goods, and when there is a fixed schedule for delivery, *see* ¶¶59), it is clear that those circumstances were not present in multiple bill and hold transactions for which the Company recognized revenue. For example, the sham $2.98 million Mesa transaction (in which Mesa did not take delivery and the units remained in 3PI's parking lots) and the sham $750,000 Green APU transaction (in which Green APU did not request or take delivery and the units were stored at a warehouse) almost certainly comprise part of the $21.4 million of bill and hold revenues recognized by PSI in 2015. Based on the above allegations in ¶¶103-104, it is also highly likely that most, if not all, of the bill and hold revenues recognized by PSI in 2014 and 2015 will be restated.

105. The accounts of two confidential witnesses, CW1 (Manager of Shipping and Receiving at PSI from approximately March 2013 through March 2015) and CW2 (Materials & Logistics Manager for PSI from approximately November 2012 through December 2014), who held managerial positions in PSI's shipping and logistics departments and worked closely with the sales staff in ensuring that buyers received their orders, further confirm that PSI engaged in a "pull forward" revenue scheme throughout the Class Period, including as far back as Q4 2013. Both CW1 and CW2 attended daily production meetings with PSI's sales stuff, including Senior Vice President Kenneth Winemaster, at which the attendees discussed projected sales, how the Company's actual sales compared to the projection, and what needed to be done to hit the

projected numbers.[15]

106. According to CW2, whenever it looked like PSI was going to have trouble making its projected numbers, Kenneth Winemaster would direct the sales people during the meetings to fill the shortfall by calling up customers with orders on the books to see if they could receive shipments earlier than scheduled. According to CW2, the engines would be built early and on the last day of the month they were put on trailers to go out the door that month, but be received by the customer in the following month. For example, CW2 stated that if a customer had on order on the books that was due on April 21, PSI would build the engines early, put the order on a truck going to the customer by March 31, and the order would arrive in early April. CW2 explained that this "pulling up" of orders occurred at both the month-end and quarter-end, and at the end of almost every month, CW2 would have to work past 11:00 p.m. to meet the month end shipping schedule. CW2 stated that he therefore regularly stayed at a hotel a block away from the Company near month-end. CW2 also stated that this practice of "pulling up" orders would accelerate towards the end of each quarter and there would be panic if PSI was not meeting forecasts.

107. According to CW1, as quarter end approached and the Company was short on making forecasted revenues, new orders would "magically" appear on the shipping schedule, and these new orders were called "drop-ins." Sometimes the drop-ins would create challenges for scheduling shipping on trucks. According to CW1, the frequency of the drop-ins varied from month to month but CW1 estimated that the volume of drop-ins each month could fill three or four trucks, which could be worth approximately $1 million. CW1 believed that these extra drop-ins were done to make the forecasted numbers for a month or quarter.

---

[15] *See* ¶¶301-309, *infra*, for a more detailed description of the meetings and shipping procedures and schedules.

108. CW1 could tell which orders were being pulled in because the orders were logged in the Epicor Enterprise Resource Planning system ("Epicor"). Although a salesperson could change a customer delivery date, the date the order was originally placed was still tracked by Epicor and could not be changed. Therefore, CW1 could see the changes made in Epicor. For example, whenever CW1 saw a new order appear that was not previously scheduled, CW1 could pull up the order in Epicor and see when the order was created and the name of the salesperson who made the change. CW1 saw these "drop-ins" appear all the time. CW1 could also detect the drop-ins by comparing a shipping list for first day of the month (by viewing old emails with spreadsheet attachments that were sent out every day) with one for the last day of the month and trace the order in Epicor to see the date it was created. CW1 explained that everything that showed up on the shipping list by the last day of the month would represent all shipments for that month. CW believed that based on the timing, most of the drop-ins were made to meet the forecasts.

109. CW1 explained that in Q4 2014, the Company was pulling in orders from Q1 2015 and Q2 2015. According to CW1, pulling in orders affected shipping coordination because it meant that CW1 had to ensure that enough of his shipping department employees were available to work on Saturdays to make sure orders went out in time. With the exception of CW1's last month at the Company, the Company made the numbers for every quarter by pulling in orders but CW1 stated that it was getting harder to make the numbers and meet forecasts because the forecasted goals became more aggressive and customers did not have space to store the excess engines. According to CW1, this process of "pulling in" orders had been going on before CW1 joined the Company. CW1 learned about the process from the Materials & Logistics Manager.

110. CW1 stated that by agreement with customers, some documents would be changed and shipping dates would be moved up so that PSI could make its numbers even though customers did not need large displacement engines at the times the orders were delivered. As an incentive, customers did not have to pay until the original payment would have been due. CW1 said that receiving the engines early put customers in a predicament and that sometime customers wanted to either cancel or return orders. CW1 and the rest of the shipping department believed that the sales people were giving discounts and concessions to customers, such as a right of return.

111. CW1 also provided details concerning PSI's warehousing practices. According to CW1, there was an incident where Bandit Industries, Inc. ("Bandit"), a manufacturer of tree care equipment such as wood chippers and grinders, became very unhappy with the Company. At the end of the fourth quarter in 2013, Director of Sales Davis directed CW1's shipping crew to have six to eight truckloads of engines shipped by XPO Logistics ("XPO"). According to CW1, the paperwork looked like the engines were being shipped directly to the customer. Days after the orders went out, CW1 was copied on a series of "animated" emails addressed to Director of Sales Davis from Bandit. CW1 believed that Kenneth Winemaster may have been copied on these emails as well. The emails from Bandit to Davis stated that Davis had sent the wrong truckload to Bandit's facility. Bandit had set up their production line expecting certain types of engines, so having the wrong engines caused a significant production delay. Davis placed the blame on the shipping department. CW1 said that it was clear from reading the emails that Davis had worked out a deal with Bandit in which all of the truckloads were being warehoused by XPO, and Davis would send truckloads of engines to Bandit as they needed them.

112. The foregoing facts support a strong inference that PSI improperly recognized

revenue in connection with the Q4 2013 Bandit transaction. The six to eight truckloads of engines were sent out at the end of the quarter so that PSI could book the revenue, but instead of being delivered to Bandit, they were warehoused at XPO. Most importantly, Davis had an arrangement with Bandit that Bandit could accept delivery of the engines that were being stored at XPO as Bandit needed them, or, in other words, whenever Bandit elected to accept delivery. At a minimum, this transaction violated the requirement that there must be a fixed schedule for delivery, which is a requirement for the recognition of revenue in any bill and hold sale (or any sale in which delivery to the buyer has not occurred, including warehousing transactions like this one).[16] Moreover, the facts and circumstances of this transaction strongly suggest that the risks of ownership had not passed to the buyer, that the buyer had not made a fixed commitment to purchase the goods, and that the buyer did not request the transaction be on a bill and hold basis; rather, PSI requested that the transaction be on a bill and hold basis so that the truckloads could ship and PSI could recognize revenue before the quarter ended. Each of these additional factors independently rendered the recognition of revenue improper under SAB 101.[17]

113. According to CW1, XPO provided warehousing services to PSI beyond the Q4 2013 Bandit incident described above. CW1 knew this because whenever Legler was not available, or upon McCormick's direction, CW1 would be asked to authorize payments to XPO. CW1 recalled one time when XPO Senior Account Executive Lori Cornwell sent an email to Denise Ball in the Company's Accounts Payable department requesting payment. CW1 stated that there were always a lot of bills involving shipping and warehouse services. One November 2014 XPO invoice from Lori Cornwell with "warehousing services" listed on the invoice showed charges of $3,100 over 90 days old, $2,800 over 60 days old, and $7,500 over 30 days old.

---

[16] *See* ¶59 (SAB 101's required criteria for "bill and hold" transactions).
[17] *See id.*

114. The accounts of CW1 and CW2, as described in ¶¶105-113, make clear that PSI's "pull forward" revenue scheme and the bill and hold, warehousing, and other transactions undergirding that scheme were endemic and long-standing. PSI had a culture of deliberately cutting corners and even engineering sham transactions in order to recognize revenue to meet its aggressive sales forecasts, and that culture was led by Defendant Winemaster, along with other high-ranking members of PSI management, including Senior Vice President Kenneth Winemaster and Director of Sales Davis. Moreover, PSI's acknowledgement that the scope of its forthcoming restatements includes FY 2014 and Q1 2015 and may extend even earlier demonstrates that the dishonest and misleading revenue recognition practices detailed in the Cohen Complaint were not isolated incidents, but extended throughout the Class Period.

### C. **Additional Accounting Fraud Allegations**

115. According to the Cohen Complaint, Cohen's investigation uncovered many additional instances of fraud and other malfeasance occurring at Defendant Winemaster's direction or with his knowledge and/or consent. According to the Cohen Complaint, these instances include PSI misleading its auditors and filing a falsified white paper inflating the value of subsidiary 3PI's acquired goodwill (claiming goodwill of $23 million when 3PI lost $8 million in prior year),[18] and PSI fraudulently grossly inflating its research and development tax credits on its federal tax filings by fabricating documents and presenting fictitious meetings to government auditors (resulting in $2.4 million in inflated tax credits in PSI's 2015 tax filings).

116. Moreover, according to the Cohen Complaint, the Company secured $135 million in loans from two banks based on the fraudulently inflated revenue and sales figures and the fundamentally false depiction of PSI's overall health. On June 29, 2016, the Company issued a

[18] *See* ¶¶214.

press release announcing that it had closed on a $135 million "senior secured credit facility" comprised of loans from TPG Specialty Lending and Wells Fargo Bank that were obtained based on these false 2015 revenue figures and 2016 projections.

117. According to the Cohen Complaint, senior PSI executives admitted during Company meetings that this financing would not have been possible if the Company furnished accurate revenue numbers and financial projections, and that without this deal the Company would have been "out of money."

118. According to the Cohen Complaint, during a May 6, 2016 meeting to prepare for an upcoming earnings call, Defendant Lewis admitted to the group (including Cohen, VP of Finance Joe Kania, Director of Investor Relations Gary Dvorchak, and others) that PSI could not legitimately meet 2016 projected revenue guidance of $360 million; instead, using legitimate accounting methods, PSI's projected revenue for 2016 was only $310 million. During this meeting, Defendant Lewis exclaimed that unless the Company could find a way to artificially inflate PSI's 2016 revenue figures to at least $330 million, it "will f*** the debt deal" that PSI desperately needed to stay afloat.

119. CW3 provided additional details regarding PSI's cash shortage and the efforts PSI made to hide its liabilities from its lenders. According to CW3, many PSI executives were on employment contracts with built in bonuses. However, in 2016 and 2017, PSI did not pay any bonuses because PSI needed the cash. CW3 stated that the bonus obligations as outlined in incentive compensation plans collectively amounted to over $1 million. CW3 believed that Gary Winemaster did not disclose these liabilities to PSI's bank, Wells Fargo, because then Wells Fargo would know that PSI was not abiding by the ratios that were part of the terms and conditions of its credit line.

### D. Cohen Reports PSI's Pull-Forward Revenue Recognition Practices And Other Accounting Irregularities To PSI's Senior Management And Board Of Directors, But Defendants Continue To Issue False Financial Statements

120. According to the Cohen Complaint, Cohen became suspicious of PSI's financial dealings in Q1 2016, after he was informed that the Company was experiencing a cash shortage and dramatic revenue fluctuations. According to the Cohen Complaint, Cohen then began an independent investigation, during which he discovered PSI was expending significant financial resources manufacturing sham transactions in order to fraudulently inflate revenue and sales figures, this misleading PSI's auditors and investors, among others. Specifically, according to the Cohen Complaint, Cohen discovered the Mesa, Green APU and Moser transactions described in ¶¶72-102, and he reported his concerns about these transactions throughout early 2016 to Defendant Winemaster, Defendant Lewis, Chief Legal Counsel and Vice President of Human Resources William Buzogany, Kenneth Winemaster, VP of Operations Scott Christman, and VP of Sales Davis.

121. According to the Cohen Complaint, these executives and employees failed to seriously investigate or address the issues raised by Mr. Cohen. Specifically, Defendant Winemaster and others told Cohen not to concern himself with these incidents.

122. Dissatisfied with the responses from Winemaster and other members of senior management, Cohen then reported these issues to the Board of Directors at an April 28, 2016 meeting of PSI's Board and Audit Committee. This meeting took place just eleven days before PSI was scheduled to release its financial results for Q1 2016 on May 9, 2016. During this meeting, Cohen presented a slide regarding pull-forward sales and gave an extensive discussion on this topic. Among other things, Cohen stated multiple times during this presentation that "we are killing ourselves," and he referred to the pull-forward sales practices as "nonsense."

123. According to the Cohen Complaint, Cohen consulted with Chief Legal Counsel

Buzogany prior to the April 28 Board meeting to discuss his presentation, and Buzogany urged Cohen not to discuss the pull-forward sales at the meeting. Upon Buzogany's request, Cohen reconfigured his slide deck to make the written portion appear more palatable; but he did not change the focus of his oral presentation to the Board. During the April 28 presentation, using the newly reconfigured slide, Cohen explained to the Board how the aggressive pull-forward sales practices were causing great harm to PSI.

124. According to the Cohen Complaint, in response to this presentation, Cohen received only silence. The Board and Audit Committee essentially ignored Cohen's report and did not pose a single comment or question following these revelations.

125. According to the Cohen Complaint, Cohen continued his investigation, which substantiated his broader concerns regarding financial malfeasance and fraud within PSI. Following his April 28 presentation, Cohen raised these and additional issues with Defendant Winemaster, Buzogany, and others within the Company, including VP of Operations Christman, VP of Sales Davis, and CFO Lewis. Once again, these reports were ignored.

126. According to the Cohen Complaint, on May 2, 2016, within five days of Cohen's April 28, 2016 presentation to the Board and Audit Committee, Defendant Winemaster handed Cohen a document that was titled as an "Action Plan," which stated Cohen had not shown "strong enough" "focus and leadership as COO on the issues plaguing 3PI[.]" In Cohen's view, the Action Plan constituted a form of retaliation against Cohen for his whistleblowing activity in connection with the Company's accounting and securities fraud.

127. On May 5, 2016, according to the Cohen Complaint, Cohen provided PSI with a point-by-point letter response to the Action Plan, supported by specific documentary evidence. According to the Cohen Complaint, the May 5 letter again advised the Board that PSI was

engaging in a wide range of unlawful practices. For example, the letter stated:

> The root cause of PSI's investor relation problem is that Gary [Winemaster] promotes overall aggressive sales targets, even though our head of sales, CFO and I all agree that sales guidance should be a more realistic number. During the Board meeting we discussed the damage done to operations by stuffing the channel at the end of each quarter to make an artificial sales target.

128. On Friday, May 6, 2016, Cohen attended a meeting with Defendant Lewis and a number of other individuals to prepare for PSI's upcoming earnings call for Q1 2016, which was scheduled to take place the following Monday, May 9, 2016. According to the Cohen Complaint, others at the meeting included VP of Finance Joe Kania and Director of Investor Relations Gary Dvorchak, among others. At this meeting, according to the Cohen Complaint, Defendant Lewis admitted to the group that PSI could not legitimately meet its 2016 projected revenue guidance of $360 million; instead, using legitimate accounting methods, PSI's projected revenue for 2016 was only $310 million. According to the Cohen Complaint, during this meeting, Defendant Lewis exclaimed that unless the Company could find a way to artificially inflate PSI's 2016 revenue figures to at least $330 million, it "will f*** the debt deal" that PSI desperately needed to stay afloat.

129. On May 9, 2016, after the close of market, PSI issued a press release reporting the Company's Q1 2016 results. As discussed below in ¶¶182, this press release contained numerous false statements. In addition to reporting materially false and misleading Q1 2016 financial results (which the Company has now admitted it must restate), it also re-reported its materially false and misleading Q1 2015 financial results (which the Company has also admitted it must restate). The press release also stated, "[W]e reiterate our prior revenue guidance which includes profitability for the full year." Specifically, the press release stated, "The Company anticipates 2016 full year net sales to be in the range of ***$350 million to $375 million*** and expects to be profitable." (Emphasis added.) Just three days earlier, Defendant Lewis had admitted to

Cohen and others that this guidance could not be achieved using legitimate accounting methods.

130. On May 9, 2016, shortly after the earnings release was issued, Defendants conducted a conference call with analysts, hosted by Defendant Winemaster, Defendant Lewis, Cohen, and new Director of Investor Relations Philip Kranz to discuss PSI's Q1 2016 results. On information and belief, Plaintiffs allege that Gary Dvorchak, an outside consultant who acted as PSI's functional head of investor relations, stepped down from his role shortly before this conference call, because he did not want to participate in or abet Defendants' fraud, and he did not want to incur potential civil and/or criminal liability for participating in the conference call and making false statements, or allowing his imprimatur to be placed on other's false statements. Plaintiffs make this allegation based on the following facts:

(i) Gary Dvorchak functioned as PSI's de facto head of investor relations since 2012. While the Cohen Complaint identifies Dvorchak as PSI's Director of Investment Relations, based on PSI's SEC filings, it appears that Dvorchak was not a PSI employee but an outside consultant providing investor relations services to PSI.[19] Dvorchak hosted every PSI earnings call from Q1 2012 through Q4 2015, with the exception of the earnings call for Q1 2015, in which no investor relations representative participated.

(ii) Philip Kranz stated on the May 9, 2016 conference call that he joined the Company as its new Director of Investor Relations in late April 2016.

(iii) According to the Cohen Complaint, Gary Dvorchak was present at the May 6, 2016 meeting during which Defendant Lewis admitted that PSI's 2016 guidance

[19] He was identified in PSI's conference call transcripts first as Senior Vice President of ICR (from Q1 2012 through Q4 2014) and then as Managing Director of The Blueshirt Group (from Q2 2015 through Q4 2015).

could not be achieved using legitimate accounting methods.

(iv) These facts suggest that Kranz was likely hired sometime between the April 28, 2016 Board meeting and the May 9, 2016 conference call, and that Dvorchak was still providing investor relations services to PSI through at least May 6, 2016, but he refused to participate in the May 9, 2016 conference call.

131. During the May 9, 2016 conference call, Defendant Winemaster said, among other false and misleading statements, "we are reaffirming our full-year guidance of revenue of $350 million to $375 million." Defendant Winemaster also stated that even though PSI's Q1 2016 results were "challenging," "we are confident that Q1 will be [the] trough of this cycle and that we can deliver improved results for the rest of the year, particularly in the second half. Importantly, our first full-year outlook remains intact." Neither Defendant Lewis nor Cohen corrected Defendant Winemaster's statements, notwithstanding Lewis's acknowledgment during the May 6, 2016 meeting that this projected guidance could not be obtained using legitimate accounting methods. Defendant Lewis also made false and misleading statements during the May 9, 2016 conference call, including repeating the net sales figure for Q4 2015 of $96.7 million, which at that point Lewis knew, or was severely reckless in not knowing, was false.

132. According to the Cohen Complaint, on May 12, 2016, Cohen emailed the Board requesting a substantive response to his May 5, 2016 letter and a meeting with Defendant Winemaster. On May 13, 2016, Cohen received a letter from Buzogany on the Board's behalf that, according to the Cohen Complaint, failed to substantively respond to the points raised in Cohen's May 5 letter, and directed Cohen to comply with the Board's Action Plan. According to the Cohen Complaint, the May 13 letter stated that, "the Board has lost confidence in [Cohen] as a leader" and "need[s] [him] to formulate projects/objectives with quantifiable monthly result

oriented goals including objectives on gaining the confidence of PSI leadership and employees."

133. According to the Cohen Complaint, in response to Buzogany's May 13 letter, Cohen prepared another detailed letter to the Board, which he first shared with Buzogany on Friday, May 13, 2016. According to the Cohen Complaint, Cohen's May 13 draft letter stated that the Board had "wholly ignore[d] and fail[ed] to respond to the facts detailed in [Cohen's] May 5, 2016 memo," and described the channel-stuffing and related harms occurring at PSI. According to the Cohen Complaint, Cohen's May 13 letter described "details and documents supporting more than a dozen instances" showing "unethical and unlawful activities engaged in at PSI[.]" According to the Cohen Complaint, Buzogany urged Cohen not to present his letter to the Board that Friday, May 13, 2016 but instead to wait until the following Monday to discuss these issues with Defendant Winemaster.

134. According to the Cohen Complaint, on the morning of Monday, May 16, 2016, Cohen met with Defendant Winemaster and discussed the contents of the letter Cohen had shared with Buzogany on Friday, May 13, 2016. Cohen alleges that he was terminated at this meeting by Defendant Winemaster and Buzogany, in part to prevent or hinder Cohen's submission of his May 13 letter to the Board.[20] According to the Cohen Complaint, Cohen then sent the Board the May 13 letter he previously had shared and discussed with Buzogany and Winemaster. Cohen alleges that then received a "threatening letter" from PSI's outside counsel in response, dated May 25, 2016.

135. According to the Cohen Complaint, after Cohen's termination, PSI issued

---

[20] According to the Cohen Complaint, at the May 16 meeting, Defendant Winemaster initially agreed with Cohen's characterization that Cohen was being forced out, and Winemaster told Cohen to leave PSI immediately. Cohen alleges, however, that once Buzogany entered the meeting, Defendant Winemaster suddenly began referring to Cohen's termination as a "resignation," despite Cohen stating, in no uncertain terms, that he had been terminated and that he did not, and would not, voluntarily resign from PSI.

misleading statements both internally and externally to hide the fact that Cohen was fired for blowing the whistle on Defendants' accounting and securities fraud. According to the Cohen Complaint, PSI circulated a "Q&A" document claiming Cohen had resigned on his own accord and implying that Cohen was an ineffective COO. Cohen alleges that the Company then held multiple "town hall" meetings to repeat such claims to employees. Cohen also alleges that within a few days of his termination, Defendant Lewis told PSI analysts that Cohen had left of his own accord, and that the Company needed a COO who could focus on operations.

136. After the May 9, 2016 conference call, while Cohen was sending letters to the Board detailing Defendants' fraud, Defendants continued to repeat and recirculate their previous false and misleading statements to investors. On or around May 12, 2016, PSI published on its website a 32 page presentation to investors, entitled "Investor Presentation, May 12-13, 2016." That presentation repeated PSI's financial guidance of $350 million to $375 million for 2016. The presentation also repeated the false statement that PSI had made $96.7 million in net sales in Q4 2015.

137. On May 25, 2016, a substantially identical version of the same 32 page presentation, making the same misstatements, was presented and/or distributed by Defendant Lewis at the 10th Annual Barrington Research Spring Conference. The presentation was also published on the Company's website on or around that time.

138. On June 1, 2016, a substantially identical version of the same 32 page presentation, making the same misstatements, was presented and/or distributed by Defendant Winemaster and Defendant Lewis at the 13th Annual Craig-Hallum Institutional Investor Conference. The presentation was also published on the Company's website on or around that time.

139. On or around June 20-21, 2016, a substantially identical version of the same 32 page presentation, making the same misstatements, was published on the Company's website.

140. It was not until August 4, 2016, when PSI issued a press release announcing a postponement of the release of its results for Q2 2016, that the Company began to reveal to the market that its financial statements might be materially misstated. *See* ¶¶260-262.

## VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS RELATED TO DEFENDANTS' REVENUE RECOGNITION SCHEME ISSUED DURING THE CLASS PERIOD

141. During the Class Period, PSI filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial statements. The following chart identifies the date, signatories, and period covered by each relevant report filed with the SEC during the Class Period:

| Form | Period | Date Filed | Signatories | Referred to Below As |
|---|---|---|---|---|
| 10-K | 2013 Fiscal Year | 2/28/2014 | Winemaster, Gorey, Landini, Greenawalt, Hansen, & Vogt | FY 2013 10-K |
| 10-Q | 2014 Fiscal First Quarter | 5/9/2014 | Winemaster & Gorey | Q1 2014 10-Q |
| 10-Q | 2014 Fiscal Second Quarter | 8/8/2014 | Winemaster & Gorey | Q2 2014 10-Q |
| 10-Q | 2014 Fiscal Third Quarter | 11/7/2014 | Winemaster & Gorey | Q3 2014 10-Q |
| 10-K | 2014 Fiscal Year | 3/13/2015 | Winemaster, Gorey, Landini, Greenawalt, Hansen, & Vogt | FY 2014 10-K |
| 10-Q | 2015 Fiscal First Quarter | 5/8/2015 | Winemaster & Gorey | Q1 2015 10-Q |
| 10-Q | 2015 Fiscal Second Quarter | 8/7/2015 | Winemaster & Gorey | Q2 2015 10-Q |
| 10-Q | 2015 Fiscal Third Quarter | 11/9/2015 | Winemaster & Lewis | Q3 2015 10-Q |
| 10-K | 2015 Fiscal Year | 2/26/2016 | Winemaster, Lewis, Landini, Hansen, Hoffing & Vogt | FY 2015 10-K |
| 10-Q | 2016 Fiscal First Quarter | 5/10/2016 | Winemaster & Lewis | Q1 2016 10-Q |

142. PSI issued the following relevant press releases during the Class Period which

highlighted figures related to the Company's performance, including revenue:

| Period | Date | Referred to Below As |
|---|---|---|
| 2013 Fiscal Year | 2/27/2014 | FY 2013 PR |
| 2014 Fiscal First Quarter | 5/8/2014 | Q1 2014 PR |
| 2014 Fiscal Second Quarter | 8/7/2014 | Q2 2014 PR |
| 2014 Fiscal Third Quarter | 11/6/2014 | Q3 2014 PR |
| 2014 Fiscal Year | 2/26/2015 | FY 2014 PR |
| 2015 Fiscal First Quarter | 5/7/2015 | Q1 2015 PR |
| 2015 Fiscal Second Quarter | 8/5/2015 | Q2 2015 PR |
| 2015 Fiscal Third Quarter | 11/9/2015 | Q3 2015 PR |
| 2015 Fiscal Year | 2/22/2016 | Q4 2015 PR |
| 2016 Fiscal First Quarter | 5/9/2016 | FY 2016 PR |

143. PSI held the following conference calls with analysts and investors at the conclusion of each fiscal quarter and fiscal year. During the conference calls, Defendants made false and/or misleading statements:

| Period | Date | Referred to Below As |
|---|---|---|
| 2013 Fiscal Year | 2/27/2014 | FY 2013 CC |
| 2014 Fiscal First Quarter | 5/8/2014 | Q1 2014 CC |
| 2014 Fiscal Second Quarter | 8/7/2014 | Q2 2014 CC |
| 2014 Fiscal Third Quarter | 11/6/2014 | Q3 2014 CC |
| 2014 Fiscal Year | 2/26/2015 | FY 2014 CC |
| 2015 Fiscal First Quarter | 5/7/2015 | Q1 2015 CC |
| 2015 Fiscal Second Quarter | 8/5/2015 | Q2 2015 CC |
| 2015 Fiscal Third Quarter | 11/9/2015 | Q3 2015 CC |
| 2015 Fiscal Year | 2/22/2016 | Q4 2015 CC |
| 2016 Fiscal First Quarter | 5/9/2016 | FY 2016 CC |

144. The Class Period starts on February 27, 2014. On that date, the Company issued a press release entitled, "Power Solutions International, Inc. Reports Fourth Quarter and Full Year 2013 Results." Therein, the Company reported net sales of $237,842,000 and a net loss of

$18,760,000 for the FY 2013, and net sales of $61,500,000 and a net loss of $3,752,000 for Q4 2013. The Company also stated, in relevant part:

> **Fourth Quarter 2013 Results**
>
> ***Net sales for the fourth quarter of 2013 were $61,500,000, an increase of 17% from $52,452,000 in the fourth quarter of 2012***. Contributing to the sales increase was continued strong growth in the Company's heavy-duty power generation systems and in aftermarket sales. . . .
>
> The net loss for the fourth quarter of 2013, which included the warrant revaluation adjustment, was $3,752,000, or $0.36 per diluted common share. This compares to net income of $745,000 or $0.08 per diluted common share for the fourth quarter of 2012, which also included a warrant revaluation adjustment. . . .
>
> "Our solid performance in the fourth quarter capped a very successful year for PSI," stated Gary Winemaster, Chairman and Chief Executive Officer of Power Solutions. "***In the quarter we sustained double-digit year-over-year sales growth***, expanded our gross margins, and grew operating income 30% year over year. We are exiting 2013 in our best financial shape ever. . . .
>
> **Full Year 2013 Results**
>
> ***Net sales for 2013 were $237,842,000, an increase of 18%, from $202,342,000 for 2012***. The net loss for 2013 was $18,760,000 or $1.92 per diluted common share, compared to net income of $6,702,000, or $0.74 per diluted common share, for 2012. . . .
>
> **2014 Outlook**
>
> The Company reiterates its previously issued outlook for sales growth in 2014. The Company continues to expect sales for the year in a range of $310 to $330 million.

(Some emphasis added.)

145. On February 28, 2014, PSI filed its Annual Report with the SEC on Form 10-K for the Company's 2013 fiscal year ("2013 Form 10-K"). The Company's 2013 Form 10-K was signed by Defendants Winemaster, Gorey, Landini, Hansen, and Vogt, and reaffirmed the Company's financial results announced in the press release issued on February 27, 2014.

146. The Company's 2013 Form 10-K also contained certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Gorey and Winemaster, which in relevant part, certified:

> 1. I have reviewed this quarterly report on Form 10-K of Power Solutions International, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):
>
> > (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
> >
> > (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

147. The statements made in ¶¶144-146 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. Additionally, the Company's Q4 2013 and FY 2013 financial statements and accompanying disclosures were materially false and misleading because the Defendants incorporated revenue from Bandit (discussed *supra* in ¶¶111-112) that should not have been recognized pursuant to GAAP.

e. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Annual Reports on Form 10-K failed to disclose the material weaknesses in internal

controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

148. The materially false and misleading statements alleged in ¶¶144-146 were made with scienter. Defendants knew, or were severely reckless in not knowing, that PSI's financial statements and results were not presented in accordance with GAAP because the very nature of the bill and hold, warehousing, parking and sham transactions involves and invokes an intent to deceive. The facts and circumstances of the particular bill and hold, warehousing, parking and sham transactions described herein support a strong inference of scienter. The widespread, repeated and egregious nature of the GAAP violations also support a strong inference of scienter. A strong inference that Defendants acted with scienter is also supported by the factors described in ¶¶292-300.

149. On May 8, 2014, after the market closed, the Company issued a press release entitled, "Power Solutions International, Inc. Reports First Quarter 2014 Results." Therein, the Company reported net sales of $66,735,000 and net income of $2,374,000 for Q1 2014. The Company also stated, in relevant part:

> **First Quarter 2014 Results**
>
> ***Net sales for the first quarter of 2014 were $66,735,000, an increase of 27% from $52,576,000 in the first quarter of 2013 and a 9% sequential increase from $61,500,000 in the fourth quarter of 2013***. Contributing to the sales increase was continued growth in the Company's heavy-duty power generation systems, forklift and aftermarket sales.
>
> "Our robust line of heavy duty engines for the oil and gas market continued to drive growth for PSI," stated Gary Winemaster, Chairman and Chief Executive Officer of Power Solutions. . . .
>
> Winemaster continued, "We are delighted with our recent acquisition of Professional Power Products and the exciting opportunities that it presents to us. PPPI's strong complementary product offering, along with our power system technology and customer relationships, creates a tremendous combination that should position us well for growth in the years ahead." . . .

> Net income for the first quarter of 2014, which included the warrant revaluation adjustment and transaction costs, was $2,374,000, or $0.19 per diluted common share. This compares to a net loss of $2,927,000 or $0.32 per diluted common share for the first quarter of 2013, which also included a warrant revaluation adjustment.

(Emphasis added.)

150. On May 9, 2014, PSI filed its Quarterly Report with the SEC on Form 10-Q for the Company's 2014 fiscal first quarter ("Q1 2014 10-Q"). The Company's Q1 2014 10-Q was signed by Defendant Gorey, and reaffirmed the Company's financial results announced in the press release issued on May 8, 2014. The Company's Q1 2014 10-Q also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Gorey and Winemaster, substantially similar to the certification described in ¶146, *supra*.

151. The statements made in ¶¶149-50 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Quarterly Reports on Form 10-Q failed to disclose the material weaknesses in

internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

152. The materially false and misleading statements alleged in ¶¶149-50 were made with scienter for the same reasons described in ¶148.

153. On August 7, 2014, the Company issued a press release entitled "Power Solutions International, Inc. Reports Second Quarter 2014 Results." Therein, the Company reported net sales of $83,378,000 and net income of $4,438,000 for the second quarter of 2014. The Company also stated, in relevant part:

> **Second Quarter 2014 Results**
>
> ***Net sales for the second quarter of 2014 were $83,378,000, an increase of 41% from $59,138,000 in the second quarter of 2013 and a 25% sequential increase from $66,735,000 in the first quarter of 2014***. Contributing to the sales increase was continued growth in the Company's heavy-duty power generation systems, aerial lift and aftermarket parts sales. Also contributing to the sales increase were sales of $7.3 million from Professional Power Products, Inc. which was acquired on April 1, 2014. . . .
>
> "We are very pleased with our results for the quarter," stated Gary Winemaster, Chairman and Chief Executive Officer of Power Solutions. "Along with strong revenue growth, we also expanded our operating margin. Our end markets remain strong and we believe current economic conditions are favorable to the execution of our plan in 2014. . . . Our acquisition this quarter of Professional Power Products, Inc. further strengthens our competitive position in this market."
>
> Net income for the second quarter of 2014, which includes the warrant revaluation adjustment and contingent consideration revaluation, was $4,438,000, or $0.39 per diluted common share. This compares to a net loss of $2,100,000 or $0.23 per diluted common share for the second quarter of 2013, which includes a warrant revaluation adjustment and a loss on debt extinguishment.

(Emphasis added.)

154. On August 8, 2014, PSI filed its Quarterly Report with the SEC on Form 10-Q for the Company's 2014 fiscal second quarter ("Q2 2014 10-Q"). The Company's second quarter 2014 Form 10-Q was signed by Defendant Gorey, and reaffirmed the Company's financial results announced in the press release issued on August 7, 2014. The Company's Q2 2014 10-Q

also contained certifications pursuant to SOX, signed by Defendants Gorey and Winemaster, substantially similar to the certification described in ¶146, *supra*.

155. The statements made in ¶¶153-153 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Quarterly Reports on Form 10-Q failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

156. The materially false and misleading statements alleged in ¶¶153-154 were made with scienter for the same reasons described in ¶148.

157. On November 6, 2014, the Company issued a press release entitled "Power Solutions International, Inc. Reports Third Quarter 2014 Results." Therein, the Company reported net sales of $93,972,000 and net income of $8,431,000 for Q3 2014. The Company also stated, in relevant part:

**Third Quarter 2014 Results**

> ***Net sales for the third quarter of 2014 were $93,972,000, an increase of 45% from $64,628,000 in the third quarter of 2013 and a 13% sequential increase from $83,378,000 in the second quarter of 2014***. Contributing to the sales increase was continued growth in the Company's heavy-duty power generation systems and aftermarket parts sales. Also contributing to net sales in the period were sales of approximately $6.3 million from Professional Power Products, Inc. which was acquired on April 1, 2014. . . .
>
> "Our results this quarter demonstrate the resilience of our business model and market opportunities," stated Gary Winemaster, Chairman and Chief Executive Officer of Power Solutions. "Solid demand across our end-markets drove strong sales growth and attractive gross margin expansion." . . .
>
> Net income for the third quarter of 2014, which includes the warrant revaluation adjustment and contingent consideration liability revaluation, was $8,431,000, or $0.68 per diluted common share. This compares to a net loss of $9,981,000 or $0.97 per diluted common share for the third quarter of 2013, which also includes a warrant revaluation adjustment. . . .
>
> **Outlook**
>
> Today, the Company reaffirmed its outlook for full-year 2014 revenue. The Company expects revenue to be in the range of $330 to $360 million.

(Emphasis added.)

158. On November 7, 2014, PSI filed its Quarterly Report with the SEC on Form 10-Q for the Company's 2014 fiscal third quarter ("Q3 2014 10-Q"). The Company's Q3 2014 10-Q was signed by Defendant Gorey, and reaffirmed the Company's financial results announced in the press release issued on November 6, 2014. The Company's Q3 2014 10-Q also contained certifications pursuant to SOX, signed by Defendants Gorey and Winemaster, substantially similar to the certification described in ¶146, *supra*.

159. The statements made in ¶¶157-158 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented

in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Quarterly Reports on Form 10-Q failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

160. The materially false and misleading statements alleged in ¶¶157-158 were made with scienter for the same reasons described in ¶148.

161. On February 26, 2015, the Company issued a press release entitled "Power Solutions International, Inc. Reports Fourth Quarter and Full Year 2014 Results." Therein, the Company reported net sales of $347,995,000 and a net income of $23,726,000 for FY 2014, and net sales of $103,910,000 and a net income of $10,321,000 for Q4 2014. The Company also stated, in relevant part:

> **Fourth Quarter 2014 Results**
>
> ***Net sales for the fourth quarter of 2014 were $103,910,000, an increase of 69% from $61,500,000 in the fourth quarter of 2013 and an 11% sequential increase from $93,972,000 in the third quarter of 2014***. Contributing to the sales increase was continued growth across all of the Company's major end markets including heavy-duty power generation systems, material handling and aftermarket parts sales. Also contributing to net sales in the period were sales of approximately $6.9 million of integrated generator systems from Professional Power Products, Inc. ("3PI"), which was acquired on April 1, 2014. . . .

> "Our strong performance in the fourth quarter concludes a year of substantial growth and achievement for PSI," stated Gary Winemaster, Chairman and Chief Executive Officer of Power Solutions. "During 2014, we grew our sales 46%, expanded our gross and operating margins and grew adjusted EPS 53% to $1.41 per share. We expanded the applications for our heavy duty generator engines, announced two major supply agreements in material handling and on-road and completed the acquisition of 3PI. We believe PSI is well-positioned for sustainable growth in the years to come. We remain focused on building products and relationships to capitalize on the global trend toward alternative fuels." . . .
>
> Net income for the fourth quarter of 2014, which includes the warrant revaluation adjustment and contingent consideration revaluation, was $10,321,000, or $0.48 per diluted common share. This compares to a net loss of $3,752,000 or $0.36 per diluted common share for the fourth quarter of 2013, which includes a warrant revaluation adjustment. . . .
>
> **Full Year 2014 Results**
>
> ***Net sales for 2014 were $347,995,000, an increase of 46%, from $237,842,000 for 2013. Net income for 2014 was $23,726,000, or $1.58 per diluted common share, compared to net loss for 2013 of $18,760,000, or $1.92 per diluted common share***. Adjusted net income for the year increased 67% to $15,739,000, or $1.41 per diluted common share, compared to $9,433,000, or $0.92 per diluted common share, last year.
>
> **2015 and 2016 Outlook**
>
> The Company reiterates its previously issued outlook for sales growth in 2015. The Company continues to expect sales for the year in a range of $480 to $500 million. The Company also confirms 2016 sales are expected to be in a range of $580 to $620 million.

(Emphasis added.)

162. On March 13, 2015, PSI filed its Annual Report with the SEC on Form 10-K for the Company's 2014 fiscal year ("2014 Form 10-K"). The Company's 2014 Form 10-K was signed by Defendants Winemaster, Gorey, Landini, Hansen, and Vogt, and reaffirmed the Company's financial results announced in the press release issued on February 26, 2015. The Company's 2014 Form 10-K also contained certifications pursuant to SOX, signed by Defendants Gorey and Winemaster, substantially similar to the certification described in ¶146,

*supra*.

163. With respect to the Company's revenue recognition policy, the Company's 2014 Form 10-K, in relevant part, further stated:

> *Revenue recognition*
>
> We recognize revenue upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured. As of December 31, 2014, we had recognized revenue associated with approximately $3.2 million of undelivered product. We anticipate the collection of any unpaid balances during 2015. We did not enter into any bill and hold arrangements during 2013 or 2012.

164. The statements made in ¶¶161-162 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Annual Reports on Form 10-K failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

165. The materially false and misleading statements alleged in ¶¶161-162 were made

with scienter for the same reasons described in ¶148.

166. On May 7, 2015, after the market closed, the Company issued a press release entitled "Power Solutions International, Inc. Reports First Quarter 2015 Results." Therein, the Company reported net sales of $86,139,000 and a net loss of $1,456,000 for Q1 2015. The Company also stated, in relevant part:

> **First Quarter 2015 Results**
>
> ***Net sales for the first quarter of 2015 were $86,139,000, an increase of 29% from $66,735,000 in the first quarter of 2014***. Contributing to the sales increase was continued growth in the Company's heavy-duty power generation systems, material handling and aftermarket parts sales. . . .
>
> The net loss for the first quarter of 2015, which includes the warrant revaluation adjustment and transaction costs, was $1,456,000, or $0.13 loss per diluted common share. This compares to net income of $2,374,000 or $0.19 per diluted common share for the first quarter of 2014, which also included a warrant revaluation adjustment and transaction costs. . . .
>
> **Second Quarter and Full Year 2015 Outlook**
>
> The Company raised its outlook for full-year 2015 sales growth to reflect the Powertrain Integration and Buck's acquisitions. PSI now expects sales to be in the range of $500 to $520 million. The Company re-affirmed previously issued 2016 guidance for sales in the range of $630 to $670 million.

(Emphasis added.)

167. On May 8, 2015, PSI filed its Quarterly Report with the SEC on Form 10-Q for the Company's 2015 fiscal first quarter ("Q1 2015 10-Q"). The Company's Q1 2015 10-Q was signed by Defendant Gorey, and reaffirmed the Company's financial results announced in the press release issued on May 7, 2015. The Q1 2015 10-Q also contained certifications pursuant to SOX, signed by Defendants Gorey and Winemaster, substantially similar to the certification described in ¶146 *supra*.

168. The statements made in ¶¶166-67 were materially false and/or misleading when

made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Quarterly Reports on Form 10-Q failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

169. The materially false and misleading statements alleged in ¶¶166-67 were made with scienter for the same reasons described in ¶148.

170. On August 5, 2015, the Company issued a press release entitled "Power Solutions International, Inc. Reports Second Quarter 2015 Results." Therein, the Company reported net sales of $94,629,000 and net income of $4,921,000 for Q2 2015. The Company also stated, in relevant part:

> **Second Quarter 2015 Results**
>
> ***Net sales for the second quarter of 2015 were $94,629,000, an increase of 13% from $83,378,000 in the second quarter of 2014***. The sales increase was driven in part by continued growth in the Company's material handling and aftermarket parts sales. . . .

> Net income for the second quarter of 2015, which includes the warrant revaluation adjustment and transaction costs, was $4,921,000, or $0.18 per diluted common share. This compares to net income of $3,883,000 or $0.34 per diluted common share for the second quarter of 2014, which included a warrant revaluation adjustment and contingent consideration revaluation. . . .
>
> **Third Quarter and Full Year 2015 Outlook**
>
> The Company now expects third quarter 2015 revenue to be in the range of $110 million to $130 million, and fourth quarter revenue to be in the range of $140 million to $160 million.

(Emphasis added.)

171. On August 7, 2015, PSI filed its Quarterly Report with the SEC on Form 10-Q for the Company's 2015 fiscal second quarter ("Q2 2015 10-Q"). The Company's Q2 2015 10-Q was signed by Defendant Gorey, and reaffirmed the Company's financial results announced in the press release issued on August 5, 2015. The Q2 2015 10-Q also contained certifications pursuant to SOX, signed by Defendants Gorey and Winemaster, substantially similar to the certification described in ¶146 *supra*.

172. The statements made in ¶¶170-71 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial

statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. Additionally, the Company's Q2 2015 financial statements and accompanying disclosures were materially false and misleading because the Defendants incorporated revenue from Moser (discussed *supra* in ¶¶72-89) that should not have been recognized pursuant to GAAP.

e. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Quarterly Reports on Form 10-Q failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

173. The materially false and misleading statements alleged in ¶¶170-71 were made with scienter for the same reasons described in ¶148.

174. On November 9, 2015, the Company issued a press release entitled "Power Solutions International, Inc. Reports Third Quarter 2015 Results." Therein, the Company reported net sales of $112,008,000 and net income of $9,109,000 for Q3 2015. The Company also stated, in relevant part:

> **Third Quarter 2015 Results**
>
> ***Net sales for the third quarter of 2015 were $112,008,000, an increase of 19% from $93,972,000 in the third quarter of 2014 and an 18% sequential increase from $94,629,000 in the second quarter of 2015***. . . .
>
> Net income for the third quarter of 2015, which includes the warrant revaluation adjustment, contingent consideration revaluation and transaction costs, was $9,109,000, or $0.03 per diluted common share. This compares to net income of $7,148,000 or $0.56 per diluted common share for the third quarter of 2014, which included a warrant revaluation adjustment and contingent consideration revaluation. . . .
>
> "This quarter was marked by both impressive achievements and opportunities for improvement," commented Gary Winemaster, Chief Executive Officer of PSI. "***We recorded the highest quarterly revenue in our history***, and expanded our product portfolio through our own R&D effort and via our recent acquisitions. Our margins, however, were pressured by manufacturing inefficiencies incurred while supporting this growth, and by the losses at our 3PI subsidiary. We have identified specific improvement actions and are putting measures in place to resolve these issues."

> Winemaster continued, "***Although in the near-term we are facing headwinds in the industries in which we participate, we have never been more enthusiastic about our long-term outlook***. We see solid growth next year in a variety of vehicle types, including school buses, RVs, and medium duty trucks to name a few. In addition, activity in China has accelerated and we continue to invest to capture a number of design-in opportunities. I am confident that we are well-positioned for the future." . . .
>
> **Fourth Quarter 2015 and Full Year Outlook**
>
> The Company now expects fourth quarter 2015 revenue to be in the range of $100 million to $110 million, which would result in full year revenue of approximately $400 million.

(Emphasis added.)

175. On November 9, 2015, PSI filed its Quarterly Report with the SEC on Form 10-Q for the Company's 2015 fiscal third quarter ("Q3 2015 10-Q"). The Company's Q3 2015 10-Q was signed by Defendant Lewis, and reaffirmed the Company's financial results announced in the press release issued on November 9, 2015. The Q3 2015 10-Q also contained certifications pursuant to SOX, signed by Defendants Lewis and Winemaster, substantially similar to the certification described in ¶146 *supra*.

176. The statements made in ¶¶174-75 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially

misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. Additionally, the Company's Q3 2015 financial statements and accompanying disclosures were materially false and misleading because the Defendants incorporated revenue from Moser (discussed *supra* in ¶¶72-89) that should not have been recognized pursuant to GAAP.

e. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Quarterly Reports on Form 10-Q failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

177. The materially false and misleading statements alleged in ¶¶174-75 were made with scienter for the same reasons described in ¶148.

178. On February 22, 2016, the Company issued a press release entitled "Power Solutions International, Inc. Reports Fourth Quarter and Full Year 2015 Results." Therein, the Company reported net sales of $389,446,000 and a net income of $14,278,000 for FY 2015, and net sales of $96,670,000 and a net income of $1,704,000 for Q4 2015. The Company also stated, in relevant part:

> **Fourth Quarter 2015 Results**
>
> ***Net sales for the fourth quarter of 2015 were $96,670,000 compared to $103,910,000 in the fourth quarter of 2014 and $112,008,000 in the third quarter of 2015***. . . .
>
> Net income for the fourth quarter of 2015, which includes the warrant revaluation adjustment, federal research tax credit, contingent consideration revaluation and transaction costs, was $1,704,000, or $0.04 per diluted common share. This compares to net income of $10,321,000 or $0.48 per diluted common share for the fourth quarter of 2014, which included a warrant revaluation adjustment and contingent consideration revaluation. . . .
>
> **Full Year 2015 Results**
>
> ***Net sales for 2015 were $389,446,000, an increase of 12%, from $347,995,000***

***for 2014.*** Net income for 2015 was $14,278,000, or $0.45 per diluted common share, compared to net income for 2014 of $23,726,000, or $1.58 per diluted common share. . . .

"***The second half of 2015 was challenging, but we consider our performance in 2015 to be a sound basis to move forward***," said Gary Winemaster, Chief Executive Officer. "***We set a record high in sales***, including meaningful revenue diversification from our on-road product as it moves from development into commercialization. . . ."

**2016 Outlook**

The Company now expects 2016 revenue to be in the range of $350 million to $375 million.

(Emphasis added.)

179. On February 26, 2016, PSI filed its Annual Report with the SEC on Form 10-K for the Company's 2015 fiscal year ("2015 Form 10-K"). The Company's 2015 Form 10-K was signed by Defendants Lewis, Winemaster, Landini, Hansen, Hoffing, and Vogt, and reaffirmed the Company's financial results announced in the press release issued on February 22, 2016. The 2015 Form 10-K also contained certifications pursuant to SOX, signed by Defendants Lewis and Winemaster, substantially similar to the certification described in ¶146 *supra*.

180. With respect to the Company's revenue recognition policy, the Company's 2015 Form 10-K, in relevant part, further stated:

*Revenue recognition*

We recognize revenue upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured. As of December 31, 2015 and 2014, we had recognized revenue associated with approximately $21.4 million and $3.2 million, respectively, of undelivered product. We anticipate the collection of any unpaid balances during 2016. We did not enter into any bill and hold arrangements during 2013.

181. The statements made in ¶¶178-79 were materially false and/or misleading when

made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. Additionally, the Company's Q4 2015 and FY 2015 financial statements and accompanying disclosures were materially false and misleading because the Defendants incorporated revenue from Mesa, Green APU and Moser (discussed *supra* in ¶¶72-102) that should not have been recognized pursuant to GAAP.

e. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Annual Reports on Form 10-K failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

182. The materially false and misleading statements alleged in ¶¶178-79 were made with scienter for the same reasons described in ¶148.

183. On May 9, 2016, the Company issued a press release entitled "Power Solutions International, Inc. Reports First Quarter 2016 Results." Therein, the Company reported net sales of $61,814,000 and a net loss of $5,251,000 for Q1 2016. The Company also stated, in relevant part:

> **First Quarter 2016 Results**
>
> ***Net sales for the first quarter of 2016 were $61,814,000 compared to $86,139,000 in the first quarter of 2015*. . . .**
>
> Net loss, which includes the warrant revaluation adjustment, was $5,251,000, or $0.49 per diluted common share for the first quarter of 2016. . . .
>
> **2016 Outlook**
>
> ***The Company reiterates the revenue guidance previously provided. The Company anticipates 2016 full year net sales to be in the range of $350 million to $375 million and expects to be profitable.***

(Emphasis added.)

184. On May 9, 2016, PSI hosted an earnings call with investors and analysts. During the call, Defendant Lewis stated, in relevant part:

> Net sales for the first quarter were $61.8 million compared to $86.1 million last year, and ***$96.7 million in the fourth quarter of 2015***. The year-over-year revenue decline marginally reflects lower heavy-duty oil and gas sales in our power generation end market, partially offset by on-road revenue.

185. During the same May 9 call, Defendant Winemaster stated, in relevant part:

> We are very enthusiastic about our outlook, especially with the fact that we can restore attractive profitability. First, ***we are reaffirming our full-year guidance of revenue in the range of $350 million to $375 million***. Our projection is driven by the ramp of the on-road and power generation, both of which are expected to primarily occur in the second half of the year. . . .
>
> In closing, we are very optimistic with the opportunity that lie ahead of us. ***We're also confident that we can improve upon our results in the first quarter to meet our full-year outlook for revenue and profitable results***. . . .
>
> (Emphasis added.)

186. On May 10, 2016, PSI filed its Quarterly Report with the SEC on Form 10-Q for the Company's 2016 fiscal first quarter ("Q1 2016 10-Q"). The Company's Q1 2016 10-Q was signed by Defendant Lewis, and reaffirmed the Company's financial results announced in the press release issued on May 9, 2016. The Q1 2016 10-Q also contained certifications pursuant to

SOX, signed by Defendants Lewis and Winemaster, substantially similar to the certification described in ¶146 *supra*.

187. The statements made in ¶¶183-85 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Quarterly Reports on Form 10-Q failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

e. That Defendants knew the guidance provided in the statements could not be achieved using legitimate accounting methods.

f. Defendant Lewis's affirmation of the Company's Q4 2015 net sales figure was materially false and misleading because that figure incorporated revenue from Mesa, Green APU and Moser (discussed *supra* in ¶¶72-102) that should not have been recognized pursuant to GAAP.

188. The materially false and misleading statements alleged in ¶¶183-85 were made with scienter for the same reasons described in ¶148. Those statements were also made with scienter because (i) the revenue recognition issues were brought to the attention of Defendant

Winemaster and the Board at the April 28, 2016 meeting of PSI's Board and Audit Committee, (ii) Cohen's May 5, 2016 letter provided additional evidence of consciousness of channel-stuffing; and (iii) Defendant Lewis acknowledged at the May 6, 2016 meeting that the Company could not achieve the guidance provided using legitimate accounting methods.

189. On or around May 12, 2016, PSI published on its website a 32 page presentation to investors, entitled "Investor Presentation, May 12-13, 2016." That presentation repeated PSI's financial guidance of $350 million to $375 million for 2016. The presentation also repeated the false statement that PSI had made $96.7 million in net sales in Q4 2015.

190. On May 25, 2016, a substantially identical version of the same 32 page presentation, making the same misstatements, was presented and/or distributed by Defendant Lewis at the 10th Annual Barrington Research Spring Conference. The presentation was also published on the Company's website on or around that time.

191. On June 1, 2016, a substantially identical version of the same 32 page presentation, making the same misstatements, was presented and/or distributed by Defendant Winemaster and Defendant Lewis at the 13th Annual Craig-Hallum Institutional Investor Conference. The presentation was also published on the Company's website on or around that time.

192. On or around June 20-21, 2016, a substantially identical version of the same 32 page presentation, making the same misstatements, was published on the Company's website.

193. The statements made in ¶¶189-192 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That the Company's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were

materially misstated because of PSI's improper revenue recognition in violation of GAAP. As discussed in detail in ¶¶72-114, *supra*, at all relevant times during the Class Period, PSI routinely and systematically engaged in an illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions. PSI's improper recognition of revenue in connection with these transactions violated GAAP and PSI's financial statements/results were therefore presumptively false and/or misleading.

b. As a result of the foregoing, PSI's financial statements/results, including the reported revenues, earnings, and other key financial measures, were materially misstated because of the Company's improper recognition of revenue.

c. As a result of the foregoing, the Company's financial results and financial statements misrepresented the Company's true financial condition, operations, earnings growth, sales forecasts, and prospects.

d. As a result of the foregoing, the Company lacked adequate internal controls over financial reporting and the false SOX certifications accompanying PSI's Quarterly Reports on Form 10-Q failed to disclose the material weaknesses in internal controls and illicit accounting scheme based on improper bill and hold, warehousing, parking and sham transactions.

e. That Defendants knew the guidance provided in the statements could not be achieved using legitimate accounting methods.

f. Defendants' affirmation of the Company's Q4 2015 net sales figure was materially false and misleading because that figure incorporated revenue from Mesa, Green APU and Moser (discussed *supra* in ¶¶72-102) that should not have been recognized pursuant to GAAP.

194. The materially false and misleading statements alleged in ¶¶189-92 were made with scienter for the same reasons described in ¶188. Those statements were also made with scienter because Cohen's May 13, 2016 letter provided additional evidence that PSI's financial statements were not presented in accordance with GAAP.

195. Defendants may be held liable for these materially false and/or misleading statements that were made with scienter.

## IX. DEFENDANTS' COURSE OF FRAUDULENT MISREPRESENTATIONS CONCERNING THE VALUE OF ITS ACQUIRED 3PI SUBSIDIARY

196. While Defendants were engaged in their systematic scheme of misstating and

prematurely recognizing revenue for PSI throughout the Class Period, Defendants simultaneously engaged in a parallel course of fraudulent misrepresentations concerning PSI's 3PI subsidiary, which PSI acquired in April 2014. Almost immediately after the acquisition, 3PI's sales declined dramatically, there was a dramatic spike in warranty claims, and PSI determined that the sellers of 3PI had misrepresented 3PI's financial condition to fraudulently induce the sale. While PSI initially retained the two individuals from whom it had purchased 3PI, Carl Trent and Kenneth Trent, to stay on as the Chief Executive Officer and the Chief Operating Officer of 3PI, respectively, within a few months, PSI installed new management, terminated the Trents, and became embroiled in a highly contentious lawsuit against them in Wisconsin state court. *See Carl L. Trent, et al. v. Professional Power Products, Inc., et al.*, Case No. 14-CV-851 (Walworth County Court, filed Oct. 24, 2014) (the "Trent Action"). Ultimately, PSI filed a counterclaim alleging that the Trents had committed fraud to artificially inflate the perceived value and acquisition price of 3PI, but PSI never mentioned this lawsuit or its counterclaim in any of its SEC filings, press releases or conference calls. Instead, Defendants soft-pedalled the problems at 3PI and omitted to disclose to investors that the subsidiary was running at a loss until August 2015, fourteen months after the acquisition.

### A. PSI Acquires 3PI And Touts Its Accretion To PSI Revenue And Synergies

197. On April 1, 2014, the Company issued a press release entitled "Power Solutions International, Inc. Announces the Acquisition of Professional Power Products, Inc." In the press release, Defendants stated that "[i]***n 2013, PPPI generated net sales and operating income of approximately $40.3 million and $7.9 million, respectively***." (Emphasis added). According to the Company, "[e]xcluding one-time transaction, integration and purchase accounting related costs, ***the transaction is expected to be accretive to the Company's results in 2014***." (Emphasis

added.)

198. To finance the purchase, the Company stated that it had increased its credit line:

> The Company had acquired all of the outstanding capital stock of PPPI for an initial cash purchase price of $46 million. In addition, the Company will issue to the sellers between $5 million and $15 million in the Company's common stock, valued at $76.02 per share, based upon PPPI's 2014 operating results. The cash portion of the transaction is being financed initially with the Company's bank credit facility. To facilitate the transaction, the Company entered into an amended and restated agreement with Wells Fargo Bank, N.A. increasing its revolving line of credit from $75 million to $90 million, among other things.

199. The Company stated that that the acquisition would "broaden[] the Company's product offerings and is expected to accelerate growth with both new and existing customers globally." Defendant Winemaster further touted the benefits of 3PI's management team and complementary product offerings, stating:

> "We are delighted with the acquisition of PPPI and the tremendous opportunity it presents us," stated Gary Winemaster, Chairman and Chief Executive Officer of Power Solutions International, Inc. "PPPI brings us ***a talented management team*** and a strong complementary product offering. This, along with PSI's expertise in power systems technology and extensive customer relationships, creates a remarkable combination that should expand our customer reach and position us very well for growth in the years ahead."

(Emphasis added.)

200. Defendants touted the 3PI acquisition as an important strategic acquisition to investors. On a May 8, 2014 conference call, Defendant Winemaster stated that 3PI would "conservative[ly]" add at least $20-$30 million to 2014 revenue:

> For some time we have been offering an outlook for 2014 revenue of $310 million to $330 million which represents growth of 30% to 38%. . . .
>
> Naturally, with the PPPI acquisition we need to update the outlook to reflect their incremental revenue. PPPI is a $30 million to $40 million a year type business right now. We do expect growth over time and we think this can be an $80 million business in two years. However, as we integrate their operations now we want to remain conservative. As such, our new outlook for the range of sales of at least $330 million to $360 million for 2014.

201. In the same May 8 conference call, Defendant Winemaster touted the complementary benefits of the 3PI acquisition in the following exchange with Philip Shen from ROTH Capital Partners:

> PHILIP SHEN, ANALYST, ROTH CAPITAL PARTNERS: I'd like to start off with the Power Systems Group. I was wondering if you could provide us the latest outlook for this business. Last quarter you talked about $75 million of revenues in '14. Ostensibly, with PPPI acquisition, through the balance of the year, that is another $25 million to $30 million. What kind of revenues for this business could we see now in 2014?
>
> GARY WINEMASTER: Are you talking about the oil and gas opportunities?
>
> PHILIP SHEN: I am, yes.
>
> GARY WINEMASTER: We gave guidance of $75 million last year for 2014. I think we feel very confident that that is a $90 million opportunity for us this year. ***With the acquisition of PPPI, I think it is very complementary. It stacks on top of the business that we have today and I think what we are trying to do is integrate it into our business plan. I think we are very confident that we will realize the same volumes that they had last year and I think going forward we feel very bullish that we will grow that business, as I said, to $80 million in the next two years***.

(Emphasis added.)

202. In the same call, Defendant Winemaster also insisted that the 3PI acquisition would not cannibalize sales and that revenue guidance was conservative during the following exchange with Walter Liptak from Global Hunter Securities, LLC:

> WALTER LIPTAK: I guess what I am trying to get at is with the guidance, it sounds like you are being conservative with the revenue numbers and with the PPPI revenue coming in. Is there anything that cannibalizes revenue on the acquisition or is it just purely being conservative and not taking up the revenue guidance by 30 to 40 --?
>
> GARY WINEMASTER: ***No, nothing is cannibalized. It is actually just the opposite. It is very synergistic***. In fact, there has been, as I alluded to, there has been some new opportunities on the engine side they have introduced to us and we have introduced some new customers to them so if anything, it is ramping but I think as you know, with almost any acquisition there is a period of integration so

> what we are trying to do is just be conservative knowing that during that period of integration that is might not be operating as efficiently as you can so we are just trying to be conservative during that integration period.

(Emphasis added.)

203. On May 21, 2014, PSI filed with the SEC a Form 8-K/A that attached as an exhibit the consolidated financial statements of 3PI for the years ended December 31, 2012 and December 31, 2013. 3PI reported net sales of $27.5 million in 2012 and net sales of $40.3 million in 2013, representing strong year-over-year growth. 3PI reported net income of $410,000 in 2012 and net income of $7.4 million in 2013.

### B. Almost Immediately Following The Acquisition, 3PI Suffers A Dramatic Decline In Revenue And Encounters Unusually High Warranty Claims, And PSI Determines That The Trents Have Misrepresented The Financial Condition Of 3PI

204. Almost immediately after the acquisition, Defendants realized that the reported financial results of 3PI for 2013—which provided the basis for the acquisition price—were likely materially overstated and therefore that the acquired 3PI business was substantially less valuable than it had been determined to be in connection with its acquisition. Defendants based this determination on the facts that: (1) 3PI's net sales of $40.3 million for 2013 were based on net sales of $14.8 million in Q4 2013, which represented a sharp increase over the three previous quarters and therefore likely represented questionable revenue recognition practices; (2) 3PI's sales dramatically decreased in the months immediately following the acquisition; and (3) 3PI immediately experienced a sharp increase in warranty claims.

205. Based on an analysis of certain disclosures in the Form 8-K/A filed on May 21, 2014, along with the pro forma disclosures in a number of PSI's subsequent SEC filings, it is possible to derive 3PI's quarterly net sales for each quarter in 2013 and 2014. The following

chart shows 3PI's net sales in thousands of dollars for each quarter in 2013 and 2014:[21]

| Pre-acquisition | | | | | Post-acquisition | | |
|---|---|---|---|---|---|---|---|
| **Q1 13** | **Q2 13** | **Q3 13** | **Q4 13** | **Q1 14** | **Q2 14** | **Q3 14** | **Q4 14** |
| 8,556 | 8,429 | 8,517 | 14,773 | 5,180 | 7,299 | 6,244 | 6,910 |

206. Thus, while 3PI had net sales of approximately $8.5 million in each of the first three quarters in 2013, its net sales suddenly jumped to approximately $14.8 million in Q4 2013. In Q1 2014, 3PI's net sales then dropped to approximately $5.2 million. This suggests that 3PI pulled forward sales from Q1 2014 to Q4 2013 in order to inflate its FY 2013 results (a practice that PSI was familiar with, as discussed in ¶¶72-114).

207. PSI realized that 3PI's financial results had been manipulated almost immediately after acquiring it. According to CW1, people at PSI began talking about the problems at 3PI in April 2014 right after the acquisition. Moreover, according to a counterclaim later filed by PSI against the Trents, the Trents, in the latter part of 2013, had caused PSI to ship large volumes of product to customers that was unfinished, known to have problems and was plainly substandard. As a result, shortly after PSI acquired 3PI, 3PI encountered unusually high warranty claims and suffered substantial damage to the company's relationship with key customers, along with dramatically diminished sales volume.

208. That PSI discovered these problems very quickly is demonstrated by a number of factors, including PSI's actions in deliberately wresting the Trents from their positions of control. By early August 2014, PSI had installed a new Vice President of Sales, Brian Cleary, who reported directly to PSI's COO, Eric Cohen.[22] According to the complaint in the Trent

[21] These calculations are derived from PSI's Form 8-K/A dated May 21, 2014 and the pro forma disclosures in PSI's Form 10-Q for Q2 2014, Form 10-Q for Q3 2014, and Form 10-K for FY 2014.
[22] On information and belief, Plaintiffs allege that Cohen was the individual responsible for the

Action, by late August 2014, PSI had systematically reduced and eliminated the authority, duties, and responsibilities of the Trents, and by September 3, 2014, the Trents were removed from their respective roles at 3PI and a new President of 3PI was appointed. On or about September 11, 2014, Cohen sent the Trents two letters confirming that they were terminated.

209. By the end of September 30, 2014, the third quarter had ended. At that point, PSI knew that 3PI's revenues for the first three quarters of 2014 had declined year-over-year as compared to each of the first three quarters of 2013. *See* ¶205. Moreover, by that time, PSI had already seen a significant spike in warranty claims. For example, in a conference call dated November 6, 2014 in which Defendants discussed PSI's Q3 2014 results, Defendant Gorey stated, "General and administrative expense was $3.9 million, an increase from $3.2 million last year due mainly to additional G&A expenses from 3PI." In light of the averments of PSI's counterclaim in the Trent Action, this 22% increase in G&A expenses was very likely a function of 3PI warranty claims.

210. By October 24, 2014, the Trents filed the initial complaint in the Trent Action, alleging that they had been terminated in violation of the provisions in their respective employment agreements. PSI subsequently filed a counterclaim on April 27, 2015 alleging, *inter alia*, that the Trents had fraudulently misrepresented 3PI's financials, resulting in an acquisition price that PSI estimated to be $15 to $20 million higher than was warranted.

211. Despite the fact that PSI determined that it had been defrauded by the sellers of 3PI, PSI never disclosed that fact to its public investors. PSI never mentioned the existence of the Trent Action or PSI's allegations in its counterclaim in any SEC filing, press release or

---

due diligence on the 3PI acquisition and for leading the integration. According to CW4, Cohen had put together the acquisition of 3PI. According to CW1, Cohen was given both the credit and the blame for the acquisition. In a conference call dated August 7, 2014, Defendant Gorey stated that Cohen's team was "heading up" the integration of 3PI.

conference call. The counterclaim is publicly available from the docket of the Walworth County Circuit Court, but without PSI giving any publicity to the allegations buried in its counterclaim in what appears to be a routine state court breach of contract action, it is unsurprising that those allegations have not received any apparent attention by shareholders.

212. Moreover, PSI's counterclaim alleges that the Trents, when they were terminated from 3PI, failed and refused to return to PSI confidential, proprietary customer information belonging to 3PI (and therefore belonging to PSI). PSI sent a letter dated September 11, 2014 demanding the return of such information. Therefore, PSI knew at least as of September 11, 2014 that the transition from management by the Trents was not a smooth one, yet, as discussed below, Defendants continued to issue statements regarding the 3PI acquisition and integration that were materially misleading in light of the removal of the Trents and the underlying allegations in the Trent Action.

213. Moreover, Defendants' statements about the complementary nature of the 3PI acquisition and Defendant Winemaster's assurances that, with respect to revenues, "nothing is cannibalized" were false and misleading because, according to CW1, 3PI competed with some of PSI's best customers, such as Kohler and Generac. Defendants should have known that such competition occurred well before the acquisition was consummated based on PSI's due diligence of 3PI acquisition. These dis-synergies overwhelmed the purported synergies cited by Defendants and were deliberately ignored.

214. Finally, according to the Cohen Complaint, PSI misled its former auditor, RSM, by filing a falsified whitepaper inflating the value of 3PI's acquired goodwill, claiming goodwill of $23 million when 3PI lost $8 million in the prior year. In PSI's FY 2014 Form 10-K, PSI in fact recorded goodwill for 3PI in the amount of $23,546,000. That Form 10-K was filed on

February 26, 2015, just two months before PSI filed its counterclaim in the Trent Action alleging that it had been defrauded by the Trents as to the financial condition of 3PI. In light of Cohen's inside knowledge of 3PI's operations and PSI's corrective disclosures discussed below, in which PSI blamed significant losses at 3PI for dragging down the performance of the Company as a whole, Cohen's allegation is compelling.

## X. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS RELATED TO THE COMPANY'S ACQUISITION OF ITS 3PI SUBSIDIARY ISSUED DURING THE CLASS PERIOD

215. After the market closed on May 8, 2014, PSI held a conference call with analysts and investors to discuss its Q4 2014 results. Therein, Defendants touted the 3PI acquisition as an important strategic acquisition to investors. Defendant Winemaster stated that 3PI would "conservative[ly]" add at least $20-$30 million to 2014 revenue:

> For some time we have been offering an outlook for 2014 revenue of $310 million to $330 million which represents growth of 30% to 38%. Our strong start to the year this quarter reinforces our confidence in that outlook.
>
> Oil and gas demand remains very strong and the NACCO Material Handling Group deal is ramping. Naturally, with the PPPI acquisition we need to update the outlook to reflect their incremental revenue. ***PPPI is a $30 million to $40 million a year type business right now***. We do expect growth over time and we think this can be an $80 million business in two years. ***However, as we integrate their operations now we want to remain conservative. As such, our new outlook for the range of sales of at least $330 million to $360 million for 2014***.

(Emphasis added.)

216. In the same May 8 conference call, Defendant Winemaster touted the complementary benefits of the 3PI acquisition in the following exchange with Philip Shen from ROTH Capital Partners:

> PHILIP SHEN, ANALYST, ROTH CAPITAL PARTNERS: I'd like to start off with the Power Systems Group. I was wondering if you could provide us the latest outlook for this business. Last quarter you talked about $75 million of revenues in '14. Ostensibly, with PPPI acquisition, through the balance of the year, that is another $25 million to $30 million. What kind of revenues for this business could

> we see now in 2014?
>
> GARY WINEMASTER: Are you talking about the oil and gas opportunities?
>
> PHILIP SHEN: I am, yes.
>
> GARY WINEMASTER: We gave guidance of $75 million last year for 2014. I think we feel very confident that that is a $90 million opportunity for us this year. ***With the acquisition of PPPI, I think it is very complementary***. It stacks on top of the business that we have today and I think what we are trying to do is integrate it into our business plan. ***I think we are very confident that we will realize the same volumes that they had last year*** and I think going forward we feel very bullish that we will grow that business, as I said, to $80 million in the next two years.

(Emphasis added.)

217. During this same call, Defendant Winemaster insisted that the 3PI acquisition would not cannibalize sales and that revenue guidance was conservative during the following exchange with Walter Liptak from Global Hunter Securities, LLC, and Defendant Winemaster:

> WALTER LIPTAK: I wonder about -- the growth rate was a little bit better than I expected for core V6. Are you expecting revenue growth in total to accelerate?
>
> GARY WINEMASTER: If we look at where we are and I think when we talked about some of the guidance for '14 we still are very bullish in tracking as we thought. When we look out to what we see for '15, we will eventually give guidance for '15 but '15 is more, I believe will be more exciting than '14. We've got some very long term programs that we have been working on that will be realized next year and give us every indication that things will continue.
>
> WALTER LIPTAK: I guess what I am trying to get at is with the guidance, it sounds like you are being conservative with the revenue numbers and with the PPPI revenue coming in. ***Is there anything that cannibalizes revenue on the acquisition or is it just purely being conservative and not taking up the revenue guidance by 30 to 40 --?***
>
> GARY WINEMASTER: ***No, nothing is cannibalized. It is actually just the opposite. It is very synergistic.*** In fact, there has been, as I alluded to, there has been some new opportunities on the engine side they have introduced to us and we have introduced some new customers to them so ***if anything, it is ramping*** but I think as you know, with almost any acquisition there is a period of integration so what we are trying to do is just be conservative knowing that during that period of integration that is might not be operating as efficiently as you can so we are just

> trying to be conservative during that integration period.

(Emphasis added.)

218. The statements made in ¶¶215-217 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. By May 8, 2014, 3PI had already recorded Q1 2014 sales that were substantially lower than 3PI's Q1 2013 sales, which had followed abnormally high sales in Q4 2013. Defendants' adjustment to its guidance, therefore, from $30-$40 million in revenue accretion to $20-$30 million was not conservative, but necessary in light of the evidence that 3PI would not be as accretive to revenue as 3PI's reported 2013 financial results implied.

b. 3PI competed with PSI's best customers, such as Kohler and Generac. The prospect for dis-synergies and revenue cannibalization, therefore, was high, because PSI would either have to sell to PSI's competitors or sacrifice revenue.

219. The materially false and misleading statements alleged in ¶¶215-217 were made with scienter. Defendants knew, or were severely reckless in not knowing, that 3PI's Q4 2013 results were anomalous and likely involved some form of "pull forward" revenue techniques, particularly because Defendants were practiced in these techniques. Defendants knew, or were severely reckless in not knowing, that Kohler and Generac were competitors of 3PI.

220. On August 7, 2014, PSI hosted an earnings call with investors and analysts. During the call, Mr. Cohen touted the 3PI acquisition's growth potential:

> We closed the 3PI acquisition at the start of the quarter and have been busy integrating our operations. Importantly, we expect 3PI to run as an autonomous division for the foreseeable future. Their headquarters will remain in Darien, Wisconsin, which will be able to support their growth.
>
> As Gary mentioned, ***we are going to market together in a synergistic manner which is quite valuable. To help capitalize on growth opportunities, we hired Brian [Cleary] into the newly created role of VP of Sales at PPPI***. Brian has considerable experience in the power generation integration basis. His deep contact base is already driving new quotes to PPPI.
>
> Also to support future operations, we hired John [Pomisoll] as new VP of

> Operations. John was previously leading operations and operational improvement at a competitor.
>
> Finally, our VP of Marketing, Jeremy Lisseris, has been spending a lot of time at PPPI working on updating and integrating our marketing materials and go-to-market plans.
>
> As you can imagine, this level of integration activity and the general disruptions associated with any acquisition can impact sales growth. As Dan will mention, ***PPPI sales this quarter were below the pace they demonstrated last year***. This was not unexpected by us during the first few quarters after the acquisition.
>
> ***We remain quite optimistic because we bought PPPI for what they can become for us, not strictly for what it is today. We see PPPI as a growth platform*** to expand our success in heavy-duty engines. We're working extensively to refine and expand their capabilities so that it can be an $80 million a year business for us down the road.

(Emphasis added.)

221. The statements made in ¶220 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the facts identified in ¶218 and the following additional facts:

a. By August 7, 2014, 3PI had not just recorded one quarter that was below the pace demonstrated the prior year, but two quarters in a row.

b. Brian Cleary was introduced to his new role for the primary purpose of disempowering and displacing the Trents, whom PSI had already determined were dishonest and/or incompetent and would need to be removed.

222. The materially false and misleading statements alleged in ¶¶220 were made with scienter for the same reasons identified in ¶219. In addition, Defendants knew, or were severely reckless in not knowing, that after two consecutive quarters of performance that were below the pace of the previous year (preceded by unusually strong results in Q4 2013), it was highly unlikely that the reported financial performance of 2013 would be repeated. Defendants also knew, or were severely reckless in not knowing that the Trents had likely manipulated 3PI's financial results and were now in the process of removing the Trents.

223. On November 6, 2014, PSI hosted a conference call with investors and analysts. During the call, Mr. Cohen stated:

> Let me turn to the 3PI acquisition and describe some of the elements of the integration plan that we are now implementing. ***We have installed PSI managers alongside the existing 3PI management team. And in some instances, we have seen 3PI personnel move on, which is normal.*** For engineering, we have moved their systems on to a common IT software infrastructure, so we expect better designs and manufacturability going forward. We are recruiting sales and engineering staff to beef up our ability to design and quote to the demanding specs we see coming in. We have identified $500,000 of annual mature savings right off the bat and seen even larger savings potential with design improvements.
>
> As we mentioned earlier, the integration process should last until the fourth quarter. However, we believe these changes will bear fruit. For instance, as we leverage existing PSI relationships, our (inaudible) has recently increased, up 30% sequentially from Q2. This is a very positive indicator that ***the business is beginning to ramp.*** We also are starting to see growth in demand for combined heat and power systems (inaudible) 3PI as an unique technology advantage.

(Emphasis added.)

224. During the question and answer portion of the call, the following exchange occurred between Defendant Winemaster and Eric Stine, a research analyst at Craig-Hallum Capital Group LLC:

> ERIC STINE: Okay. Got it. And then last thing, just maybe 3PI, I mean I know you did provide some color there. You've had it for about six months. Just some discussion about maybe some of the positive surprises on some of the negatives and just what your updated thoughts are on the growth opportunity multi-year?
>
> GARY WINEMASTER: Yes. So, as we have mentioned earlier when we acquired the business, we really acquired it for a long term strategy opportunity. At the time when we acquired it, we'd mentioned that we would spend throughout the entire year really integrating it and going through that process, and so that's as expected. Some of the things that you learn or some of the surprises were, during the -- we've learned that ***during the sales process that some of the sales relations, they've became strained***. Also the way they went to market was very much more remittance in oil of a smaller private company, more passive, they waiting for the phone to ring and get the opportunities. It's much different the way we go to market.
>
> We go to market in a very aggressive fashion trying to figure out what problems

> and needs the customer has and then making sure we fulfill those solutions in a way that benefits both us and the customers. So, we really had to retool their sales process in the way they go to market as well as repairing some relationships with some customers. That we intuitively look at this period as a building year. As we get into next year, we're going to continue to see the ramp, and we're seeing that already with the core volume and great feedback from customers currently.
>
> ***We still feel comfortable with the multi-year numbers and we mentioned we see this growing into $80 million a year opportunity. Right now, we see no reason why that won't happen.*** What we're doing this year and as we get into first quarter next year, will finish building a very strong foundation. We brought in some real superstars in the industry that are on Board. ***Morale is very high and the entire team is very excited about the opportunities.***

(Emphasis added.)

225. The statements made in ¶¶223-224 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the facts identified in ¶¶218, 221 and the following additional facts:

a. By November 6, 2014, 3PI had recorded three quarters in a row that were below the pace of the prior year.

b. By September 11, 2014, PSI had terminated the Trents. This did not involve a "normal" placement of new PSI managers "alongside the existing 3PI management team."

c. By September 11, 2014, PSI had sent a letter to the Trents demanding they "immediately return all Company [3PI] property including, but not limited to computers, phones, chargers, company files and papers, company credit cards, keys and access to cards to the Company [3PI] HR department." By November 6, 2014, the Trents either refused to comply with this instruction in its entirety or returned certain devices that had been intentionally scrubbed of massive amounts of data.

d. By November 6, 2014, if not sooner, PSI had discovered that the Trents had been concealing or otherwise altering certain customer orders, including at least one order of $1.2 million that had been canceled well before the sale of 3PI to PSI but continued to be recorded as an open order.

e. By November 6, 2014, if not sooner, PSI had discovered that 3PI had received an unusually high volume of warranty claims, as evidence by the significant spike in general and administrative expenses attributed to 3PI in Q3 2014.

226. The materially false and misleading statements alleged in ¶¶223-224 were made with scienter for the same reasons identified in ¶¶219, 222. In addition, Defendants knew, or were severely reckless in not knowing, the facts identified in the foregoing paragraph because by November 6, 2014, Defendants had removed the Trents and assumed control of 3PI.

227. On February 26, 2015, PSI hosted a conference call with investors and analysts. During the question and answer portion of the call, the following exchange occurred between Defendant Winemaster and Walter Liptak, a research analyst from Global Hunter Securities LLC:

> WALTER LIPTAK, ANALYST, GLOBAL HUNTER SECURITIES, LLC: Great end to the year. I wanted to ask about the second-half shipments. As we look at your revenue trends, it seems pretty normal that you kind of ramp throughout the year. And I just wanted to ask, how much of the -- you talked before about Navistar, how much it's going to ramp. And maybe with 3PI, how much that is going to ramp in the back half?
>
> GARY WINEMASTER: Well, what we believe is that we are going to see about $30 million in on-highway revenue for the Company in 2015, most of which will be in the third and fourth quarters. ***We are seeing 3PI with substantial quotes out there. And we believe that we are going to get to a point where we are going to be a $10 million a quarter business, probably by the third quarter.***

(Emphasis added.)

228. The statements made in ¶227 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the facts identified in ¶¶218, 221, 225 and also failed to disclose that by February 26, 2014, 3PI had recorded four quarters in a row that were below the pace of the prior year, and the only quarter that 3PI ever had revenues of at least $10 million was Q4 2013, which by now Defendants should clearly have recognized was only obtained by channel stuffing. Defendant Winemaster's statement, therefore, that 3PI would "probably" be a $10 million a quarter business by the third quarter of 2016 lacked a reasonable basis.

229. The materially false and misleading statements alleged in ¶227 were made with scienter for the same reasons identified in ¶¶219, 222, 226.

230. With respect to 3PI's goodwill, PSI's 2014 Form 10-K, filed on March 13, 2015, stated in relevant part:

> ***On April 1, 2014, the company acquired Professional Power Products, Inc., a leading designer and manufacturer of large, custom engineered integrated electrical power generation systems serving the global diesel and natural gas power generation markets. Assets recorded in the company's consolidated balance sheet as of December 31, 2014, as a result of this acquisition were approximately $60.7 million, of which approximately $44.9 million represented goodwill and intangibles.***
>
> * * *
>
> Goodwill and other intangible assets are not amortized, but are reviewed annually or more frequently if indicators arise, for impairment. The Company's evaluation of goodwill impairment involves first assessing qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit, as defined below, is less than its carrying amount. The Company may bypass this qualitative assessment, or determine that based on its qualitative assessment considering the totality of events and circumstances (including macroeconomic factors, industry and market considerations, current and projected financial performance, a sustained decrease in our share price, or other factors), that additional impairment analysis is necessary. This additional analysis involves comparing the Company's market capitalization relative to the carrying value of its equity and other factors deemed appropriate by management as of December 31, 2014. However, actual fair values that could be realized in a transaction may differ from those used to evaluate the potential impairment of goodwill.
>
> ***Goodwill was evaluated for impairment at the reporting unit level, which was defined as the operating segment level. At December 31, 2014, goodwill recorded on the Company's consolidated balance sheet was $23,546,000. The Company's fair value measurement test, performed annually as of October 1, 2014, revealed no indications of impairment.***

(Emphasis added.)

231. The statements made in ¶230 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the facts identified in ¶¶218, 221, 225, 228 and also failed to disclose the

following additional facts:

a. PSI had filed a falsified white paper to inflate the value of its subsidiary 3PI, and claiming goodwill of $23,546,000 was not proper given that 3PI lost $8 million in the previous year.

b. Goodwill should have been impaired on the basis of 3PI's consistently poor performance below expectations since the time it was acquired by PSI.

c. PSI had already determined that the Trents had "engaged in a course of conduct intended to artificially inflate the perceived value of PPPI in order to secure a substantially higher than warranted price in an amount . . . estimated to be in excess of $10,000,000 and likely in the range of $15,000,000 to $20,000,000," as PSI alleged in its counterclaim in the Trent Action filed just a month and a half after the 2014 Form 10-K was filed.

d. Even if PSI had not yet formally made the determination described in (c), it had access to all of the facts necessary to make that determination.

232. The materially false and misleading statements alleged in ¶230 were made with scienter for the same reasons identified in ¶¶219, 222, 226. In addition, Defendants knew, or were severely reckless in not knowing, that 3PI's goodwill value should have been impaired, as of December 31, 2014, by February 26, 2015.

233. On May 7, 2015, PSI held a conference call with investors and analysts. During the call, Defendant Cohen stated, in relevant part:

> Beyond the important initiatives Gary covered, a key focus in the quarter was to drive improvements at 3PI. ***We hired a new COO for that group, Tom Smith, and he's off to a great start.*** Tom's background is perfectly suited to drive growth at 3PI. He's worked in the energy industry for over 30 years, focused mostly on green cogen and distributed generation systems. His entrepreneurial instincts are strong and having founded and sold two power service companies. He's already making an impact using his network to bring in business. His expertise in combined heat and power cogen is also creating new opportunities for 3PI. We expect cogen systems to be a robust opportunity for 3PI in the years ahead and see that market starting to develop now.
>
> ***Looking at 3PI operations, we are very excited about progress we made this quarter.*** We completed a major project redesign and are now applying for patents for many of the innovations, the first time 3PI's attempted to patent its work.
>
> We've created a module of design that enables us to do a customization for which

> we are known more quickly and efficiently. We believe we can reduce the cost of our systems by 20% with this new design. Customers certainly appreciate the benefit, since our quoting levels continue to ramp with quotes and proposals again far ahead of last quarter.

234. The statements made in ¶233 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the facts identified in ¶¶218, 221, 225, 228, 231, and also failed to disclose the following additional facts:

a. PSI had filed a counterclaim in the Trent Action alleging, among other things, that Trents had "engaged in a course of conduct intended to artificially inflate the perceived value of PPPI in order to secure a substantially higher than warranted price in an amount . . . estimated to be in excess of $10,000,000 and likely in the range of $15,000,000 to $20,000,000."

b. Defendants had full knowledge of all the facts alleged in the counterclaim filed in the Trent Action.

235. The materially false and misleading statements alleged in ¶233 were made with scienter for the same reasons identified in ¶¶219, 222, 226, 232. In addition, Defendants knew, or were severely reckless in not knowing, all the facts alleged in the counterclaim filed in the Trent Action.

## XI. LOSS CAUSATION

236. The truth regarding PSI's financial condition and/or the true extent of the fraudulent revenue recognition scheme and/or the truth about PSI's 3PI subsidiary was partially revealed, and/or the concealed risks materialized, on or about: May 7, 2015, August 5, 2015, October 28, 2015, February 22, 2016, August 4, 2016, August 15, 2016, August 18, 2016, January 5, 2017, February 3, 2017. As a direct result of these partial disclosures, the price of PSI's stock declined precipitously on heavy trading volume.

237. Defendants' multiple frauds were thus not revealed to the market all at once, but instead unraveled over a period of many months through a series of partial corrective disclosures

and partial materializations of concealed risks. Broadly speaking, the truth was revealed in two phases: a series of disclosures between May 7, 2015 and February 22, 2016 ("Phase I"), and a series of disclosures between August 4, 2016 and February 3, 2017 ("Phase II").

238. Phase II is perhaps more readily understood, as it involved a direct revelation of Defendants' accounting fraud. It began on August 4, 2016, when PSI announced a delay in the filing of its Q2 2016 results, the first suggestion to the market that PSI's financial statements were materially misstated. This was followed by PSI's announcement on August 15, 2016 that the delay was due to a review of allegations made by a former employee about revenue recognition issues, and then an announcement on August 18, 2016 that the continuing delay had resulted in a late filing notice from the NASDAQ. On January 5, 2017, PSI confirmed the market's fears when it announced that it would be restating its financial results for FY 2015 (and Q2, Q3, and Q4 2015 within that year), as well as Q1 2016. On February 3, 2017, however, the expanded scope of Defendants' fraud was revealed; PSI announced that its auditor had resigned, withdrawn its audit opinions for 2014 in addition to 2015, and concluded that it could no longer rely on the representations of management. These partial corrective disclosures collectively drove PSI's stock price from a closing price of $15.96 on August 3, 2016 to a closing stock price of $2.80 on February 3, 2017, a decline of 82.4%.

239. Even before those Phase II corrective disclosures, began, however, a series of disclosures in Phase I caused much of the artificial inflation in PSI's stock price from Defendants' frauds to be gradually removed due to a series of partial materializations of risks and corrective disclosures. On May 7, 2015, PSI announced Q1 2015 results that were generally considered solid by analysts, but also lowered its guidance for Q2 2015. This constituted a partial materialization of the risk concealed by Defendants' "pull forward" revenue recognition

scheme, as the pulling forward of sales into Q1 2015 and earlier periods caused the outlook for Q2 2015 and future periods to weaken. On August 5, 2015, October 28, 2015, and February 22, 2016, PSI announced further disappointing results and guidance (for Q2 2015, Q3 2015, and Q4 2015, respectively), the risks of which had been concealed by Defendants' "pull forward" revenue scheme and/or Defendants' misrepresentations about 3PI. These partial materializations of concealed risks and corrective disclosures collectively drove PSI's stock price from a closing price of $65.10 on May 7, 2015 to a closing stock price of $8.83 on February 23, 2016, a decline of 86.4%.

### A. Phase I: May 7, 2015 - February 23, 2016

240. On May 7, 2015, after the market closed, the Company announced strong Q1 2015 revenues but lowered 2Q 2015 guidance to below-consensus estimates, stating that "the Company expects second quarter 2015 revenue to grow modestly compared to second quarter 2014, and to be in a range similar to first quarter 2015."

241. On this news, the Company's stock price fell $6.68 per share, or 10.26%, to close at $58.42 per share on May 8, 2015, on heavy trading volume.

242. Research analysts expressed concern over the Company's guidance. For example, on May 8, 2015, Lake Street Capital Markets ("Lake Street") lamented the Company's "disappointing Q2 outlook that was well below consensus, which implies a significant ramp in Q3" and stated that "Q2 revenue guidance of $86 million was well below the consensus estimate of $108 million… ." Also on May 8, 2015, Piper Jaffray observed that "2015 gross margin commentary implies downside vs. last quarter's full-year expectation (of ~20%), and recent M&A will drive both higher interest expense and lower margins vs. our original forecast." Piper Jaffray further noted that "[t]he jury is out on the most recent purchases (Buck's and Powertrain

Integration), but we believe the PPPI acquisition has missed expectations."

243. Defendants' reduction of revenue guidance after a purportedly strong Q1 2015 was a partial materialization of a risk concealed by premature revenue recognition in earlier periods. Specifically, the Company's disclosure of lowering of Q2 2015 revenue guidance was a result of the Company's pull-forward revenue recognition scheme. The pulling forward of revenue from Q1 2015 to Q4 2014 and from Q2 2015 to Q1 2015 caused a "reverse domino effect." If revenue from future periods is continually cannibalized, eventually future periods will suffer and that is the risk that materialized here. The practice of channel stuffing in preceding quarters resulted in cannibalizing Q2 2015 sales.

244. On August 5, 2015, after the market closed, the Company announced earnings results for Q2 2015 and reduced full year 2015 guidance, citing, among other things, problems with PPPI. The Company, in relevant part, stated:

> The Company now expects third quarter 2015 revenue to be in the range of $110 million to $130 million, and fourth quarter revenue to be in the range of $140 million to $160 million. The reduced full year guidance reflects challenging conditions in the oil and gas end market, a delay in one new heavy duty program, and ***a slower than expected recovery at the 3PI subsidiary***.

(Emphasis added.)

245. Research analysts expressed concern and surprise over the Company's reduced guidance and disclosure of problems with 3PI. For example, on August 5, 2015, Piper Jaffray, noted that one of "two problematic issues in 2Q15" was the disclosure of "apparent miscues at PPPI - a recently acquired company - were unexpected." Perhaps more surprising was the negative impact of the 3PI acquisition on margins. Piper Jaffray further explained that "[c]ompany-wide gross margin was 18.4% in 2Q15 - but if not for miscues at PPPI, gross margin would have been nearly 20%. PSIX has taken aggressive action to address the problem, but it's

hard to predict when PPPI might bounce back."

246. Similarly, on August 6, 2015, Lake Street observed that "Management reduced its guidance to $430-$470 million in 2015 and $550-$570 million in 2016, down from $500-$520 million and $630-$670 million, respectively." Lake Street further stated that "[t]he company also noted it was reducing its 2015 outlook due to lower activity at 3PI (by $15 million)." Also, on August 6, 2015, Roth Capital Partners ("Roth Capital") cited the "[d]ifficult results at 3PI were a (150bps) drag on gross margins and a ($2m) hit to company income." Roth Capital felt comforted by Defendants' false assurances, stating that "3PI was a ($0.13) EPS drag in 2Q15, and mgmt states it has already taken actions to fix this," but noted that "we expect profit remediation at 3PI before committing to serve pent-up demand."

247. On August 7, 2015, PSI filed its 2Q 2015 10-Q.

248. On these news, the Company's stock price fell $6.52 per share over a two day period, or approximately 16.3%, to close at $33.59 per share on August 7, 2015, on unusually heavy trading volume.

249. Even though the Defendants were aware of problems with 3PI's management and financial statements as early as August 2014 (if not several months earlier), Defendants concealed the problems at 3PI with the integration, management disputes, inaccurate financials, and its effect on sales and margins, until August 6, 2015. Moreover, Defendants' further reduction of revenue guidance for Q3 2015 and Q4 2015 after such purportedly strong revenues in Q4 2014 and Q1 2015 was a partial materialization of a risk concealed by premature revenue recognition in earlier periods. Defendants were stuck in an unsustainable cycle of channel stuffing, such that Q2 2015 sales were cannibalizing sales from Q3 2015 and Q4 2015. As part of Defendants' efforts to meet their sales forecasts, Defendant Winemaster also orchestrated the

fraudulent Moser transactions described in ¶¶72-89, *supra*. Accordingly, the decline in PSI's stock price from August 6-7, 2015, was due to partial materializations of concealed risks and/or partial corrective disclosures related to (1) the problems at 3PI; and (2) the undisclosed revenue recognition schemes and channel stuffing from preceding quarters cannibalizing sales from Q3 2015 and Q4 2015.

250. On October 28, 2015, the Company pre-announced earnings for Q3 2015. Even though Defendant Winemaster stated that "[o]ur consolidated results reflect the highest quarterly sales in the history of PSI, with growth of approximately 18% from the second quarter", he admitted that the quarter still experienced a shortfall relative to consensus estimates and attributed the problems primarily to 3PI. Therein, Defendant Winemaster, in relevant part, stated:

> Our acquisition of Professional Power Products, Inc. (3PI), however, is not yet performing to our expectations, and was the primary factor for the shortfall for the quarter relative to consensus estimates. We continue to make progress toward integrating 3PI into our business, and expect to bring 3PI to a break-even run rate by year end.

251. On this news, the Company's stock price fell $2.77 per share, or 12.97%, to close at $18.59 per share on October 28, 2015, on unusually heavy trading volume.

252. In response, Lake Street commented on October 29, 2015 that "PSI is struggling with the 3PI acquisition" and found that "EPS of $0.04 was well short of our $0.24 estimate due to continuing losses at the 3PI segment." Also on October 29, 2015, Roth Capital observed that PSI's "net income and EPS were below forecasts on turnaround headwinds at 3PI. Management now targets 3PI breakeven by the end of 2015." Roth Capital further noted that "[t]he 3PI acquisition was a ($0.13) EPS drag in 2Q15. Management attributed the 3Q15 earnings weakness primarily to a delayed return to breakeven at 3PI, which is now targeted for the end of

2015."

253. Defendants' partial admission as to problems with the 3PI subsidiary was a partial materialization of risk and/or partial corrective disclosure about the problems at 3PI. In addition, Defendants attributed all of the shortfall to PSI, but in the stock decline was also a partial materialization of risk due to preceding quarters cannibalizing sales from Q3 2015.

254. On February 22, 2016, after the market closed, the Company announced Q4 2015 and full year 2015 earnings, stating that "[n]et sales for the fourth quarter of 2015 were $96,670,000 compared to $103,910,000 in the fourth quarter of 2014 and $112,008,000 in the third quarter of 2015" and an "[o]perating loss of $738,000 in the current quarter compares to operating income of $9,111,000 in the fourth quarter of 2014 and $1,388,000 in the third quarter of 2015." The Company also lowered 2016 revenue guidance to be in the range of $350 million to $375 million.

255. In response, Piper Jaffray cut its price target on February 22, 2016 and stated, "4Q15 revenue of $96.7M fell short of PJC/Street estimates of $105.4M/$103.3M. Revenue also missed 4Q15 guidance, which was $100M-$110M."

256. On February 23, 2016, Lake Street commented that "[r]esults were weak and guidance was disappointing." Lake Street observed that "PSI made good improvements at its 3PI business, which was acquired in early 2014. The company noted it reached break-even on a run-rate basis ending Q4, which is a meaningful improvement over the $1.6 million loss in Q3."

257. Also on February 23, 2016, Roth Capital observed that PSI's "[l]owered revenue guide was weaker than expected" but found some comfort that "[t]he 3PI turnaround is on track, with EBITDA breakeven achieved in Dec-2015 and good visibility for a profit contribution in 2016. Mgmt expects 3PI to contribute 10%-15% of company revenue in 2016, pointing to stable

revenue to possibly over 25% growth."

258. On this news, the Company's stock price fell $1.93 per share, or 17.94%, to close at $8.83 per share on February 23, 2016, on unusually heavy trading volume. Once again, the worse than expected revenues were a partial materialization of a risk concealed by Defendants' pull-forward revenue scheme.

259. Accordingly, as described above, these partial materializations of concealed risks and/or corrective disclosures during Phase I (between May 7, 2015 and February 22, 2016) collectively drove PSI's stock price from a closing price of $65.10 on May 7, 2015 to a closing stock price of $8.83 on February 23, 2016, a decline of 86.4%. Although the market was aware of problems at PSI and the lowered revenue guidance, they were not aware of the full extent of Defendants' multiple frauds until Phase II.

### B. <u>Phase II: August 4, 2016 – February 3, 2017</u>

260. On August 4, 2016, the Company announced that it was postponing its second quarter 2016 earnings release.

261. On this news, the Company's stock price fell $1.66 per share, or 10.4%, to close at $14.30 per share on August 4, 2016.

262. The Company's postponing of its second quarter 2016 earnings release was a partial materialization of the risk and/or a partial corrective disclosure arising from the Company's fraudulent revenue recognition scheme. At this point, however, the investing public had only notice of potential problems.

263. On August 15, 2016, after the market closed, the Company announced that its Q2 2016 results would be delayed further, that the cause of the delay was an "ongoing review of allegations made by a former employee," and that "[t]he review is primarily focused on certain

transactions involving revenue recognition."

264. In response, Lake Street announced it was lowering its rating "to reflect the uncertainty due to questions surrounding revenue recognition which has resulted in a Q2 reporting delay."

265. On this news, the Company's stock price fell $1.52 per share, or 9.85%, to close at $13.91 per share on August 16, 2016, on unusually heavy trading volume.

266. The Company's vague disclosure that its second quarter 2016 earnings release would be delayed due to revenue recognition was a partial materialization of the risk and/or a partial corrective disclosure arising from the Company fraudulent revenue recognition scheme. At this point, however, the investing public was still only informed of potential problems of undisclosed scope.

267. On August 18, 2016, the Company announced that it had received a delinquency notice from the Nasdaq Stock Market, stating that the Company was not in compliance with Nasdaq Listing Rule because the Company did not timely file its Quarterly Report on Form 10-Q for 2Q 2016. Because this announcement raised the prospect that the Company might be delisted due to a serious problem with its financial statements (a risk that ultimately materialized after the end of the Class Period), the market once again reacted adversely.

268. On this news, the Company's stock price fell $1.58 per share, or 11.63%, to close at $12.01 per share on August 19, 2016, on moderately heavy volume. This reaction constituted another partial materialization of concealed risks associated with misstated financial statements.

269. On January 5, 2017, the Company filed a Current Report on Form 8-K with the SEC. Therein, the Company, in relevant part, stated:

> **Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

As previously announced, the Audit Committee of the Board of Directors (the "Audit Committee") of Power Solutions International, Inc. (the "Company") has been overseeing an independent internal review concerning the Company's financial reporting. This internal review is being conducted with the assistance of independent counsel and forensic accounting professionals engaged by the Audit Committee. On December 28, 2016, the Audit Committee reached preliminary findings in respect of the independent internal review and discussed its findings with the full Board of Directors and the Company's senior management. These findings were subsequently described to RSM US LLP, the Company's independent registered public accounting firm, on December 29, 2016.

On December 28, 2016, following its consideration of the Audit Committee's preliminary findings and in consultation with the Company's external legal counsel, the Company's senior management in consultation with the Audit Committee and Board of Directors, determined that the Company's previously issued consolidated financial statements for (i) the fiscal year ended December 31, 2015 and the second, third and fourth fiscal quarters within such fiscal year, and (ii) the fiscal quarter ended March 31, 2016, as reported in the Company's Annual Report on Form 10-K and the Quarterly Reports on Form 10-Q (collectively the "Prior Financial Statements"), should be restated to reflect the impact of certain errors involving revenue recognition. Accordingly, the Prior Financial Statements and related reports of RSM US LLP and the Company's other communications of the financial results should no longer be relied upon. Similarly, management's report on the effectiveness of disclosure controls and procedures and internal control over financial reporting, in each case for the relevant periods, and related reports of RSM US LLP should no longer be relied upon.

The Company anticipates that it will file restated financial statements covering the affected fiscal periods as soon as practicable. Based on the preliminary findings to date, the Company preliminarily anticipates that the restatements will focus on the timing of revenue recognition in accordance with generally accepted accounting principles and is expected to result in restating certain revenues, expenses and related balance sheet accounts as reported in prior periods. The anticipated adjustments are expected to reduce net sales previously recognized in the second, third and fourth quarters of 2015. The Company is working diligently to quantify the expected adjustments and have them audited or reviewed by its independent registered public accounting firm. The Company is unable at this time to quantify definitively the impact of the adjustments on the Prior Financial Statements. The errors identified based on the transactions reviewed to date include at least approximately $18 million in revenue erroneously recognized in the Company's 2015 consolidated financial statements. While the estimated net sales adjustments reflect the current assessment of the accounting errors, there can be no assurance that the final adjustments that are made as part of the restatement will not differ materially from the estimated adjustments. Nor can we provide assurance that other errors will not be identified or impact prior accounting periods.

> Management has evaluated the effect of the revenue recognition errors and has concluded that a material weakness in internal controls over financial reporting existed during each of the periods requiring a restatement. Management's evaluation of the controls and procedures is ongoing, and there can be no assurance that the Company will not identify other deficiencies in controls or that those deficiencies, if identified, will not constitute additional material weaknesses. The SEC's enforcement staff informed the Company that it was conducting an investigation and issued a subpoena requiring the production of documents and information. Based on the subpoena, the Company believes the focus of the inquiry concerns, among other things, revenue recognition practices which resulted in the accounting errors giving rise to the restatements reported herein. The Company, at the direction of the Audit Committee and with the assistance of independent counsel and the forensic accounting professionals engaged by it, is cooperating fully with the SEC enforcement staff's investigation.
>
> The Audit Committee and the Company's management have discussed the matters disclosed in this Current Report on Form 8-K pursuant to Item 4.02(a) with the Company's independent registered public accounting firm.

270. On this news, the Company's stock price fell $0.96 per share, or 11.59%, to close at $7.32 per share on January 5, 2017, on unusually heavy trading volume.

271. In response, Lake Street stated on January 6, 2017 that "PSI announced it found errors in its revenue recognition that overstated Q2 – Q4 2015 revenue by roughly $18 million. It also announced a new, related, SEC investigation. We believe the mistated revenue will shift into 2016. This will require a restatement that we estimate will take an additional 2-3 months to complete."

272. Similarly, Roth Capital reiterated that "Power Solutions disclosed in an 8-K filing that external advisors have reached preliminary findings of their accounting review, and results have been shared with PSI's Board of Directors, executive management, and its external accounting firm. Around $18m in revenue will be moved between periods, reducing revenue for 2Q15-4Q15, with no impact on net cash or net revenue. This allows PSI to move into the final phase where management will work with auditors to develop and release restated 2Q15-1Q16

financial statements. The 10-K for 2016 is due by mid- March 2017."

273. The Company confirmed the market's fears when it announced that it would be restating its financial results for FY 2015 (and Q2, Q3, and Q4 2015 within that year), as well as Q1 2016. At that point, however, the Company was only able to say that the impact would be at least $18 million erroneously recognized in 2015. In addition, the Company revealed that the SEC's enforcement staff was conducting an investigation and issued a subpoena requiring the production of documents and information. These disclosures were a partial materialization of the risk and/or a partial corrective disclosure arising from the Company fraudulent revenue recognition scheme. At this point, however, the investing public was not aware of the full extent of the fraud.

274. On February 3, 2017, the Company filed a Current Report on Form 8-K with the SEC. Therein, the Company, in relevant part, stated:

> **Item 4.01. Changes in Registrant's Certifying Accountant**
>
> By letter dated (and received) January 27, 2017, RSM US LLP ("RSM") notified the Audit Committee of the Board of Directors (the "Audit Committee") of Power Solutions International, Inc. (the "Company") of its resignation as the Company's independent registered public accounting firm.
>
> The previously issued reports of RSM on the Company's consolidated financial statements for the fiscal years ended December 31, 2015 and 2014 contained no adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.
>
> During the fiscal years ended December 31, 2015 and 2014, and the subsequent period through January 27, 2017, the date of RSM's resignation, there were no disagreements with RSM on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of RSM, would have caused RSM to make reference to the subject matter of the disagreements in their reports. In its letter to the Audit Committee in which it resigned as our independent registered public accounting firm, RSM communicated that it had identified the following "reportable events" (as defined in 304(a)(1)(v) of Regulation S-K) based on information provided to RSM by the Audit Committee in connection

with its "ongoing independent investigation" concerning the Company's financial reporting: (i) there are material weaknesses in the Company's internal control over revenue recognition and, more broadly, in its overall control environment and (ii) RSM can no longer rely on management representations.

The Audit Committee discussed with RSM the reasons for its resignation and authorized RSM to respond fully to all inquiries from the Company's successor independent registered public accounting firm.

The Company is in the process of considering and implementing remedial measures, with a view toward improving internal control practices and overall environment. The Company is committed to making changes needed to enhance and maintain an effective control environment.

In accordance with Item 304(a)(3) of Regulation S-K, the Company provided RSM with a copy of the statements set forth in this Item 4.01 prior to the filing of this Report. The Company requested that RSM furnish the Company with a letter addressed to the SEC stating whether RSM agrees with the above statements in this Item 4.01 as required by SEC rules. RSM has furnished the requested letter, and it is attached as an Exhibit 16.1 to this Report. The Audit Committee is currently seeking a new independent registered public accounting firm.

**Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

The Information contained in Item 4.01 of this Report is incorporated herein by reference.

The Company previously reported in its Form 8-K Current Report filed on January 5, 2017 that the Company's senior management in consultation with the Audit Committee and Board of Directors, determined that the Company's previously issued consolidated financial statements for (i) the fiscal year ended December 31, 2015 and the second, third and fourth fiscal quarters within such fiscal year, and (ii) the fiscal quarter ended March 31, 2016 should be restated to reflect the impact of certain errors involving revenue recognition and, accordingly, should no longer be relied upon. The Company also reported that management's report on the effectiveness of disclosure controls and procedures and internal control over financial reporting, in each case for the relevant periods, and the related reports of RSM should no longer be relied upon.

RSM has separately notified the Company in its letter dated January 27, 2017 that it has recalled RSM's previously issued audit reports on the Company's consolidated financial statements and internal control over financial reporting for the fiscal years ended December 31, 2014 and 2015.

RSM has advised the Company that, based on information it received from the

Audit Committee in connection with the aforementioned independent investigation, it determined that there are material weaknesses in the Company's internal control over revenue recognition and overall control environment and that it could no longer rely on management representations. As such, RSM determined that its 2014 audit report and its interim review of the first quarter of 2015 could no longer be relied upon. Therefore, the Company's previously issued consolidated financial statements for (i) the fiscal year ended December 31, 2014 and (ii) the fiscal quarter ended March 31, 2015 should no longer be relied upon. In addition, management's report on the effectiveness of disclosure controls and procedures and internal control over financial reporting, in each case for the foregoing relevant periods, should no longer be relied upon.

As of January 27, 2017, RSM had not completed an interim review of the Company's financial statements for the quarters ended June 30 and September 30, 2016, nor had RSM performed audit procedures or issued any reports on the Company's financial statements for the fiscal year ended December 31, 2016.

The Company's Audit Committee discussed the matters described in this Item 4.02 with representatives of RSM. In accordance with Item 4.02(c) of Form 8-K, the Company provided RSM with a copy of the statements set forth in this Item 4.02 prior to the filing of this Report with the SEC. The Company requested that RSM furnish the Company with a letter addressed to the SEC stating whether RSM agrees with the above statements in this Item 4.02 as required by SEC rules. RSM has furnished the requested letter, and it is attached as an Exhibit 16.1 to this Report.

As disclosed in its prior filings with the SEC, the Audit Committee has been overseeing an independent internal review concerning the Company's financial reporting. This internal review is being conducted with the assistance of independent counsel and forensic accounting professionals engaged by the Audit Committee and is ongoing. There can be no assurance that the Company will not identify other accounting errors or additional deficiencies in internal controls as a result of the Audit Committee's ongoing internal review or otherwise, or that any additional deficiencies, if identified, will not constitute additional material weaknesses. The Company will continue its efforts to improve its internal controls while seeking its successor independent registered public accounting firm.

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers: Compensatory Arrangements of Certain Officers**

On February 1, 2017, Michael P. Lewis, Chief Financial Officer of the Company, agreed to take a leave of absence and relinquish his duties until further notice. On February 1, 2017, Mr. Lewis also submitted a letter to the Company noticing his intent to resign his employment with the Company, effective March 4, 2017, citing good reasons for the resignation under the terms of his employment

agreement with the Company. As of the date of this Report, the Company has not responded to Mr. Lewis' letter.

On February 1, 2017, the Board retained Timothy J. Cunningham of Randstad Professionals US, LP (d/b/a Tatum), a leading executive consulting services firm, to serve in an interim role as the Company's Chief Financial Officer. Mr. Cunningham, age 63, has over thirty years of professional experience in providing financial consulting services. He has been associated with Tatum since 2005. Mr. Cunningham has served in interim officer roles as chief financial officer for such companies as Schawk, Inc., a business services, manufacturer and marketing services firm, Dental Services Group, a dental services and products firm, and Pregis Corporation, a global manufacturer of protective and specialty packaging products. He has extensive experience in a broad range of industries, including, steel, packaging, consumer products, and advertising. The Company will pay Tatum fees based on hourly rates at the rate of $250/hour and $350/hour for hours greater than 40.

**Item 7.01. Regulation FD Disclosure**

The Company has initiated a process to explore the strategic alternatives available to the Company with a view toward improving its long-term capital structure and liquidity and maximizing shareholder value. Strategic alternatives may include, but are not limited, to a potential financing, refinancing, in-court and out-of-court restructuring, or a merger, acquisition, joint venture, divestiture, or other disposition of some or all of the Company's assets outside of the ordinary course of business.

No definitive schedule to complete its review of strategic alternatives has been established. There can be no assurance that this process will result in a transaction, or if a transaction is undertaken as to its terms or timing. As a matter of policy, the Company does not comment on or provide the market with updates as to the status of any informal expressions of interest or formal proposals or offers presented to the Company from time to time, or the course of discussions with any prospective counterparties, nor will it comment upon any rumors with regard to either of the foregoing or make a further announcement regarding the Company's consideration of any proposal or other expressions of interest until such time, if ever, that it enters into a definitive agreement for a completed transaction or is otherwise required to make an announcement.

275. On this news, the Company's stock price fell $4.74 per share, or 62.86%, to close at $2.80 per share on February 3, 2017, on unusually heavy trading volume.

276. On February 3, 2017, the expanded scope of Defendants' fraud was revealed. This was not a case of innocent mistakes in revenue recognition; PSI announced that its auditor

had resigned, withdrawn its audit opinions for 2014 in addition to 2015, and concluded that it could no longer rely on the representations of management. Moreover, Defendant Lewis had agreed take a leave of absence and relinquish his duties until further notice, further supporting the market's suspicion of intentional fraud. These disclosures were a partial materialization of the risk and/or partial corrective disclosure arising from the Company fraudulent revenue recognition scheme. At this point, however, the investing public understood the extent of the fraud had expanded to the 2014 financial statements and involved the dishonesty of the most senior executives at PSI.

## XII. <u>POST CLASS PERIOD DISCLOSURES</u>

277. After the Class Period ended, a number of further disclosures related to PSI's forthcoming restatements and related matters were issued.

278. On February 10, 2017, after the market closed, the Company issued a press release entitled "Power Solutions International Announces Receipt of Nasdaq Listing Determination; To Request Hearing." Therein, the Company, in relevant part, stated:

> Power Solutions International, Inc. ("the Company") (Nasdaq:PSIX), a leader in the design, engineer and manufacture of emissions-certified, alternative-fuel power systems, announced that on February 6, 2017, the Company received notice from the Staff of the Listing Qualifications Department of The NASDAQ Stock Market LLC ("Nasdaq") indicating that, based upon the Company's continued non-compliance with the filing requirement set forth in Nasdaq Listing Rule 5250(c)(1), the Company's securities would be subject to delisting from Nasdaq unless the Company timely requests a hearing before the Nasdaq Hearings Panel (the "Panel"). As previously disclosed, the Staff granted the Company an extension through February 6, 2017 to file its Quarterly Reports on Form 10-Q for the quarters ended June 30, 2016 and September 30, 2016 with the Securities and Exchange Commission, which deadline the Company was unable to meet.
>
> The Company intends to timely request a hearing before the Panel, which request will automatically stay the suspension of trading in the Company's common stock for at least 15 days. In connection with its request for a hearing, the Company also intends to request that the Panel determine to further stay any suspension of trading at least pending the ultimate outcome of the hearing. The Company

anticipates receipt of a determination with respect to the stay request by February 28, 2017.

At the hearing, the Company will present its plan to evidence full compliance with Nasdaq's filing requirement and request an extension of time to do so. The Panel has the discretion to grant the Company an extension through August 7, 2017; however, there can be no assurance that the Panel will extend the stay of the trading suspension beyond the automatic 15 day period or ultimately grant the Company's request for continued listing on Nasdaq.

279. On March 27, 2017, the Company issued a press release entitled "Power Solutions International Announces Strategic Investment and Collaboration Agreement With Weichai America Corp." Therein, the Company, in relevant part, stated:

*Weichai America Corp. to invest $60 million in Power Solutions*

*Significantly strengthens Power Solutions financial position with new equity capital and establishes substantial strategic growth and cost savings opportunities*

Power Solutions International, Inc. ("PSI" or the "Company") (Nasdaq:PSIX), a leader in the design, engineer and manufacture of emissions-certified, alternative-fuel power systems, announced today a share purchase agreement with Weichai America Corp. ("Weichai America"), who will invest $60 million in PSI through a combination of newly issued common equity and preferred shares. Weichai America is a fully owned subsidiary company of Weichai Power Co., Ltd. (HK2338, SZ000338) ("Weichai"), a China-based leading global designer and manufacturer of diesel engines, having sold more than 4 million heavy duty diesel engines, with products sold in more than 110 countries around the world.

The two companies have also agreed to a strategic collaboration agreement under which they will work together to accelerate market penetration opportunities for each company's respective product lines across various geographic markets and end user segments. Through the alliance, PSI will gain access to Weichai's international manufacturing facilities and supply chain network.

Gary Winemaster, chairman and chief executive officer of PSI, commented, "The opportunity to partner with a global leader like Weichai enables PSI to strengthen our capital structure and significantly accelerate our growth trajectory. Through this alliance, we will dramatically expand adoption of our engines and technologies for transportation, power generation, and industrial applications within our current markets, including China, the world's largest market opportunity. In addition, through access to Weichai's extensive and complementary product offering, we will greatly expand our range of products,

> increasing the size of our overall addressable market across all of our end user segments. The combination of a broader and deeper product set, enhanced financial strength and expanded geographic reach will enable PSI to better serve a larger customer base and deliver long-term shareholder value. Lastly, it positions us nicely to exceed our original long-term sales target of $1 billion."

280. On March 29, 2017, the Company issued a press release entitled "Power Solutions International Announces Receipt of Additional Notice From Nasdaq." Therein, the Company, in relevant part, stated:

> Power Solutions International, Inc. ("the Company") (Nasdaq:PSIX), a leader in the design, engineer and manufacture of emissions-certified, alternative-fuel power systems, announced that on March 23, 2017, the Company received an additional notice from the Staff of the Listing Qualifications Department of The NASDAQ Stock Market LLC ("Nasdaq") based upon the Company's continued non-compliance with the filing requirement set forth in Nasdaq Listing Rule 5250(c)(1). Specifically, the letter stated that since the Company has not yet filed its Form 10-K for the year ended December 31, 2016, this matter serves as an additional basis for delisting the Company's securities from The NASDAQ Stock Market.
>
> As previously disclosed, the Company requested a hearing before the Nasdaq Hearings Panel (the "Panel"), which was held on March 9, 2017. At this hearing, the Company requested an automatic stay of suspension in trading in the Company's common stock, which was granted pending the issuance of a final Panel decision. The Company also shared its plan to evidence full compliance with Nasdaq's filing requirement and requested an extension of time to do so. The Panel has the discretion to grant the Company an extension through August 7, 2017; however, there can be no assurance that the Panel will ultimately grant the Company's request for continued listing on Nasdaq.

281. On April 7, 2017, the Company filed a Current Report with the SEC on Form 8-K. Therein, the Company, in relevant part, stated:

> Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.
>
> On April 5, 2017, in light of the findings made by the Audit Committee of the Board of Directors (the "Audit Committee") of Power Solutions International, Inc. (the "Company") discussed below in Item 7.01 of this Form 8-K, the Company's senior management, in consultation with the Audit Committee and Board of Directors, determined that the Company's previously issued consolidated financial statements for the fiscal year ended December 31, 2014 and

first fiscal quarter ended March 31, 2015 should be restated to reflect the impact of certain errors involving revenue recognition. The foregoing financial statements, management's report on the effectiveness of disclosure controls and procedures and internal control over financial reporting for the fiscal year and related reports of the Company's former independent registered public accounting firm (which as previously disclosed were withdrawn) should no longer be relied upon. The Company's chief financial officer has discussed the determination to restate the 2014 fiscal year and 2015 first fiscal quarter financial statements with its current independent registered public accounting firm.

As previously disclosed, the Company concluded that it will restate its consolidated financial statements for (i) the fiscal year ended December 31, 2015 and the second, third and fourth fiscal quarters within such fiscal year, and (ii) the fiscal quarter ended March 31, 2016.

The Company continues to assess errors in the timing of revenue recognition and other potential adjustments in accordance with generally accepted accounting principles in light of the findings of the Audit Committee. Based on its current assessment, the Company expects its restated financial statements for the 2014, 2015 and 2016 fiscal years (and the quarterly periods within such fiscal years) will reflect adjustments that may (i) result in a shift of recognized revenues from prior periods to subsequent periods in the aggregate amount of approximately $48 million to $74 million for the three year period reflecting an increase in revenues recognized in certain periods and a decrease in revenues in other periods and (ii) reflect a determination that recognized revenues in the aggregate amount of approximately $5 million for the three year period may be treated as uncollectible accounts receivable or erroneously recognized revenues from the outset. While the estimated revenue adjustments reflect the current assessment of the accounting errors, there can be no assurance that the final adjustments that are made as part of the restatements will not differ materially from the estimated adjustments. Nor can the Company provide assurance that other errors will not be identified or that prior accounting periods during the course of the Company's review and restatement will not be impacted.

Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On March 31, 2017, the Company closed on the transactions governed by its previously reported Share Purchase Agreement with Weichai America Corp. ("Weichai"), dated as of March 20, 2017 (the "Purchase Agreement"). In accordance with the Purchase Agreement, Gary Winemaster stepped down as Chairman of the Board effective April 1, 2017, and Shaojun Sun was elected as the new Chairman.

In order to facilitate certain remedial measures adopted by the Company in

connection with the previously announced independent internal review by the Audit Committee, Gary Winemaster resigned as chief executive officer and president of the Company effective April 6, 2017, and has transitioned to a new non-executive role as chief strategy officer focused on developing and facilitating the Company's relationship with Weichai Power Co., Ltd., an affiliate of Weichai, under the Strategic Collaboration Agreement that was entered into in connection with the Purchase Agreement. Mr. Winemaster also has resigned from the Company's Board of Directors effective April 6, 2017.

On April 6, 2017, the Board of Directors appointed Raymond C. Anderson of Huron Consulting Services LLC, a leading consulting firm, to serve in an interim role as the Company's chief executive officer. Mr. Anderson, age 51, has over twenty years of professional experience in providing consulting services and acting in a variety of leadership roles. He has been associated with Huron since 2010. Mr. Anderson has served in a variety of interim officer and board roles in a wide number of industries at both public and private entities. His public company experience includes former service as a board member and chairman of the audit committee of Youbet.com, Inc., an online gaming company, and chief financial officer of USA Floral Products, Inc., a floral products distributer. The Company will pay Huron fees for Mr. Anderson's services based on an hourly rate of $640 per hour. The Company intends to engage an executive search firm and consult other sources to conduct a search for a new, permanent chief executive officer.

Item 7.01 Regulation FD Disclosure.
Audit Committee Independent Internal Review

As previously disclosed, the Audit Committee has been overseeing an independent internal review relating to allegations made by a former employee concerning the Company's financial reporting and standards for revenue recognition. The Audit Committee has substantially completed and finalized its principal findings with respect to its review. The principal findings include a determination that certain practices of the Company's sales and accounting functions resulted in revenue recognition not in accordance with generally accepted accounting principles; that there was not an appropriate tone at the top; that senior sales management did not sufficiently supervise sales staff; and that management did not elevate revenue recognition practice concerns to the Audit Committee.

The Audit Committee has made a number of recommendations, which were communicated to management and are in the process of implementation or, in certain cases, have been implemented. These include, in addition to the recommendations of the Audit Committee discussed above, among other things:

- replacement of the chief financial officer and the appointment of an interim chief financial officer;

> - taking corrective actions with respect to certain sales and accounting personnel;
> - hiring of a sales auditor and chief compliance officer;
> - additional training in revenue recognition for sales and accounting staff;
> - additional training for all employees on the Company's compliance/ethics hotline;
> - adoption of a more detailed revenue recognition policy;
> - enhancement in disclosure controls, including for the preparation of disclosures required in the Company's annual and quarterly reports and the review of doubtful accounts; and
> - enhancement in sales controls, oversight, policies and procedures, and an assessment of incentive compensation structure for sales personnel.
>
> The Board of Directors and senior management have agreed to and are working diligently to implement the Audit Committee's recommendations.

282. On April 18, 2017, the Company issued a press release entitled "Power Solutions International Announces Receipt of Nasdaq Delisting Notice; Common Stock Expected to Be Quoted on the OTC Pink Market." Therein, the Company, in relevant part, stated:

> Power Solutions International, Inc. ("the Company") (Nasdaq:PSIX), a leader in the design, engineer and manufacture of emissions-certified, alternative-fuel power systems, announced that on April 17, 2017, the Company received notification from The NASDAQ Stock Market LLC ("Nasdaq") that the Hearings Panel has determined to delist the Company's common stock from Nasdaq, and will suspend trading in the shares effective at the open of business on April 19, 2017. The Nasdaq Hearings Panel's determination was made in connection with the Company's non-compliance with Securities and Exchange Act ("SEC") filing requirements as set forth in Nasdaq Listing Rule 5250(c)(1).
>
> Following the suspension of trading on Nasdaq, the Company expects its common stock will be quoted on the OTC Pink market electronic quotation service operated by OTC Markets Group Inc. until such time as the Company becomes current in its reporting obligations with the SEC and seeks to relist the common stock on a national exchange. The common stock will continue to trade under the symbol PSIX. For quotes or additional information on the OTC Pink market,

> please visit http://www.otcmarkets.com.
>
> Ray Anderson, interim chief executive officer, commented, "While we are disappointed with the Nasdaq delisting, it does not in any way impact our strategic collaboration agreement with Weichai, our business activities, or our valued relationships with customers, suppliers and employees. We remain focused on driving the adoption of our engines and technologies across the globe as we strive to generate sustainable sales growth and profitability. At the same time, we continue to diligently work to restate our financials and become current with our reporting obligations with the SEC. Once that process is complete, we will seek to relist the Company's common stock on a major exchange. We are appreciative of Weichai's support as we work to become compliant and look forward to executing on the multiple growth and cost savings opportunities we believe we can achieve through our partnership."
>
> The Company currently anticipates completing the restatement and becoming current with all of its SEC filings by August of 2017; however, there can be no assurance that the process will be completed by that time.

283. On May 22, 2017, the Company filed a Current Report with the SEC on Form 8-K. Therein, the Company, in relevant part, stated:

> Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.
>
> On May 17, 2017, Power Solutions International, Inc. (the "Company") completed its previously announced search for a new, permanent chief executive officer and in connection therewith, the Company's Board of Directors (the "Board") appointed John P. Miller as chief executive officer and president of the Company. Mr. Miller's appointment was effective immediately upon the resignation of Raymond C. Anderson as interim chief executive officer. The Company expects to enter into an employment agreement with Mr. Miller, a description of which will be provided in an amendment to this Form 8-K.
>
> * * *
>
> On May 17, 2017, Jay J. Hansen, Ellen R. Hoffing and Mary E. Vogt notified the Board of their resignation as directors, including as members of the audit committee of the Board, effective as of May 31, 2017 or earlier if the Company elects a replacement director. They expressed that their resignations were not the result of any disagreement on any matters relating to the Company's operations, policies or practices but were due to other personal and professional obligations and commitments. The Company thanked them for their service. The Board anticipates conducting an active search for qualified, independent director

candidates to begin filling the vacancies on the Board as a result of the foregoing resignations, with a view toward recruiting candidates with the requisite knowledge and experience to serve as audit committee members.

284. On August 3, 2017, the Company filed a Current Report with the SEC on Form 8-K. Therein, the Company, in relevant part, stated:

*Audit and Restatements Update*

As previously disclosed, the Company's senior management, in consultation with the Board of Directors and its Audit Committee, determined that the Company's previously issued consolidated financial statements for (i) the fiscal years ended December 31, 2014 and 2015 (and the quarterly periods within such fiscal years) and (ii) the fiscal quarter ended March 31, 2016 should be restated to reflect the impact of certain errors involving revenue recognition. The Company continues to review its revenue recognition for prior accounting periods and has not yet definitively quantified the adjustments to net sales and corresponding items. Nor can the Company provide assurance that other kinds of errors will not be identified or impact prior accounting periods.

The Company continues to work diligently to prepare its restated and post-2016 first quarter delinquent financial statements which are subject to audit or review by its independent registered public accounting firm. The Company's senior management, in consultation with the Company's independent registered public accounting firm, has identified various material weaknesses in internal control over financial reporting that impede the Company's ability to produce reliable financial statements. As a consequence, it has been taking more time than originally anticipated to complete the restated and delinquent financial statements, which delay is also expected to result in further delays in the completion of the related audit or reviews. Accordingly, the Company is unable at this time to predict with certainty when the restated and delinquent financial statements will be completed and audited or reviewed by its independent registered public accounting firm.

As previously disclosed, the Board's Audit Committee has been recently reconstituted and is now comprised of three recently appointed independent directors.

## XIII. <u>CLASS ACTION ALLEGATIONS</u>

285. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired PSI securities between February 27, 2014, and February 2, 2017, inclusive (the "Class

Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

286. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PSI's securities were actively traded on the NASDAQ Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of PSI shares were traded publicly during the Class Period on the NASDAQ. As of May 5, 2016, PSI had 10,879,194 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by PSI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

287. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

288. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

289. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as

alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PSI; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

290. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. ADDITIONAL SCIENTER AND CONTROL PERSON ALLEGATIONS

291. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding PSI, his/her control over, and/or receipt and/or modification of PSI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning PSI, participated in the fraudulent scheme alleged herein.

A. **RSM's Resignation as PSI's Auditor**

292. As described above, PSI announced on February 3, 2017 that RSM had sent a letter dated January 27, 2017 notifying PSI's Audit Committee of its resignation as the Company's independent registered public accounting firm ("RSM Letter").

293. The RSM Letter confirmed not only that there are material weaknesses in the Company's internal control over revenue recognition and, more broadly, in its overall control environment and that the financial statements for FY 2014, but that RSM could no longer rely on management representations. Specifically, the RSM Letter stated, in relevant part:

> … As of the date of this letter, we have not completed our interim reviews for the quarters ended June 30 and September 30, 2016. Additionally, we have not completed the audit procedures on the 2016 financial statements and have not issued any reports in connection with the 2016 engagement.
>
> Based on the information provided by the Audit Committee resulting from its independent investigation, ***we have concluded that there are material weaknesses in the Company's internal control over revenue recognition and, more broadly, in its overall control environment. Furthermore, we have concluded that, in our professional judgment, we can no longer rely on management representations.*** Accordingly, pursuant to the terms of the arrangement letters, we hereby resign as the Company's independent registered public accounting firm. We also hereby recall our February 26, 2016 reports on the Company's 2015 financial statements and internal control over financial reporting and our March 13, 2015 reports on the Company's 2014 financial statements and internal control over financial reporting. We also revoke our consents to incorporate these reports by reference in any and all registration statements or other public filings.
>
> Finally, we are providing notice pursuant to Item 4.02(b) of Form 8-K that the Company should disclose that no reliance should be placed upon (i) the Report of Independent Registered Public Accounting Firm dated March 13, 2015 relating to the Company's consolidated financial statements for the year ended December 31, 2014, and (ii) the completed interim review for the period ended March 31, 2015.

294. Accordingly, the fact that RSM had not only resigned as independent accountants, RSM concluded that management's representations were not truthful. That RSM could not rely on PSI's senior management to provide accurate representations with respect to revenue

recognition strongly supports an inference of scienter.

### B. The Resignations of Defendants Winemaster, Lewis, Hansen, Hoffing, and Vogt

295. The resignations of senior management and the Audit Committee also strengthen the inference of scienter given the facts, timing, and circumstances of Defendants' Winemaster, Lewis, Hansen, Hoffing, and Vogt's departures from the Company.

296. On February 1, 2017, Defendant Lewis agreed to take a leave of absence and relinquish his CFO duties until further notice, and on that same date, Defendant Lewis also submitted a letter to the Company noticing his intent to resign his employment with the Company, effective March 4, 2017. Given this came immediately after the Company's announcements revealing that the Company would have to restate its financials due to revenue recognition issues, and the RSM Letter resigning as auditor and stating that RSM could no longer rely on management representations, the timing strongly supports an inference of scienter. Moreover, the Audit Committee's independent review recommended "replacement of the chief financial officer and the appointment of an interim chief financial officer."

297. Moreover, on April 7, 2017, the Company announced additional information about the anticipated restatements and revealed that Defendant Winemaster had resigned as CEO, President, and director of PSI. The Company specifically noted that this was to facilitate PSI's remedial measures to address the weak internal controls and revenue recognition problems, stating in relevant part:

> In order to facilitate certain remedial measures adopted by the Company in connection with the previously announced independent internal review by the Audit Committee, Gary Winemaster resigned as chief executive officer and president of the Company effective April 6, 2017, and has transitioned to a new non-executive role as chief strategy officer focused on developing and facilitating the Company's relationship with Weichai Power Co., Ltd., an affiliate of Weichai, under the Strategic Collaboration Agreement that was entered into in connection

> with the Purchase Agreement. Mr. Winemaster also has resigned from the Company's Board of Directors effective April 6, 2017.

298. Additionally, on May 17, 2017, Defendants Hansen, Hoffing, and Vogt notified the Board of their resignation as directors, including as members of the audit committee of the Board, effective as of May 31, 2017 or earlier if the Company elects a replacement director. Given this announcement came shortly after the Audit Committee completed its duties to review the fraud, and that all three members of the Audit Committee resigned at the same time, the timing raises a strong inference that Defendants Hansen, Hoffing, and Vogt's resignations "due to other personal and professional obligations and commitments" was simply a pretext.

### C. PSI's Delayed Notification of the SEC Subpoena

299. The Company reported on January 5, 2017 that SEC had issued a subpoena related to the SEC investigation, stating:

> The SEC's enforcement staff informed the Company that it was conducting an investigation and issued a subpoena requiring the production of documents and information. Based on the subpoena, the Company believes the focus of the inquiry concerns, among other things, revenue recognition practices which resulted in the accounting errors giving rise to the restatements reported herein. The Company, at the direction of the Audit Committee and with the assistance of independent counsel and the forensic accounting professionals engaged by it, is cooperating fully with the SEC enforcement staff's investigation.

300. The above disclosure fails to state when PSI first received notice of an SEC investigation, subpoena, or other action and PSI did not disclose any notice of an SEC investigation, subpoena, or other action until January 5, 2017. However, according to CW3, the SEC investigation began in June 2016 because shortly after Cohen's termination, Cohen reported information regarding the revenue recognition scheme to the SEC. Accordingly, Defendants appear to have delayed its notification of the SEC investigation and/or subpoena.

# XV. ADDITIONAL BACKGROUND ALLEGATIONS

## A. PSI's Daily Operations

301. According to CW1, after Power Solutions went public, Gary Winemaster and Ken Winemaster continued to run the Company like it was still privately owned and kept increasing its forecasts even after the forecasts had become unrealistic.

302. According to CW1, senior management at PSI was very hands on and "wanted their fingers in everything." For example, CW1 stated that PSI had three daily meetings, two of which were attended by SVP Kenneth Winemaster. The first meeting was held at approximately 8:30 a.m. every day that lasted for approximately one hour and focused on sales and production issues. According to CW1, Kenneth Winemaster, Director of Facilities Legler (and later Director of Materials McCormick), VP of Operations Christman, Director of Sales Craig Davis ("Davis"), CW1 (until spring of 2014), and other sales people would attend these meetings, although Davis did not always attend. CW2 stated that about 20 to 30 people attended this meeting, including Kenneth Winemaster, Legler, sales people, and accounting department personnel. According to CW1, during these morning meetings, Kenneth Winemaster put pressure on Davis and the sales people to make the forecasted numbers.

303. According to CW2, this morning meeting was focused on production, projected sales, current sales status, *i.e.*, "where we are at", and how to fill any gaps in sales targets. According to CW1 and CW2, during this meeting, a spreadsheet which had been produced by sales people using the Epicor Enterprise Resource Planning ("Epicor") system was used. According to CW1, the spreadsheet contained details regarding engines, engine parts, international and domestic orders, orders for parts, customers, letters of credit, and shipping dates. CW2 stated that spreadsheets from Epicor also contained the number of engines, the

model numbers, the part numbers, and the customer's name. According to CW2, sales forecasts would be projected during the meetings for everyone to see.

304. Another daily meeting occurred at 9 or 10 a.m. that CW1 usually attended. CW1 stated that this was a shipping meeting which included the sales people at the supervisor level and shipping clerks, to confirm what would go out the door that day and the next day.

305. CW1 stated that the third daily meeting occurred around 3 p.m. which Davis and Kenneth Winemaster attended, and focused on shipping, general problems on the production line, and parts availability. According to CW1, this meeting covered issues a few days or a week down the line and also recapped the morning. CW2 confirmed that Kenneth Winemaster usually attended the afternoon meeting, which focused more on specific production issues.

306. In addition to these daily meetings, PSI had monthly sales meetings which occurred at 7:30 AM at 201 Mittel Drive, Wood Dale, IL 60191 in the middle of the month. CW3 regularly attended these and was therefore privy to various discussions regarding sales. During the December 2015 sales meeting, the sales group talked about year-end objectives and what they needed from engineering to support them. Gary and Kenneth Winemaster also attended the meeting, run by Davis. There were about 25 people attending, including all of the sales department either in person or a few sales people had to call into the meeting.

307. According to CW1, each sales person would enter information in the Epicor system and then a report would be generated in an excel spreadsheet. CW1 said that Erika Galvan would send the shipping schedule out as an email attachment every morning. CW1 explained that it was challenging to efficiently schedule the right number of trucks because the shipping schedules would change almost daily, even international shipments would get moved around. CW1 said that the shipping schedule would show the movement of orders but the

shipping department did not have access to change specific details of a sales order so anything that was created or changed with the customer was done by sales. In fact, according to CW1 everything was filtered through the sales department, even if it involved a carrier.

308. CW2 confirmed that every day, an email with the "ship list" containing the sales order, the types of engines, the customer's information, the final delivery destination, and the name of the carrier was sent to the shipping department, the sales department, and Kenneth Winemaster. This spreadsheet was controlled by the sales department.

309. CW3 also attended irregularly timed "leadership" meetings in which all directors and above were required to attend. According to CW3, about 40 people were present at these meetings and the purpose of the meetings was to discuss the Company's performance by looking back about 8 weeks to see what needed to be done going forward. CW3 stated that Defendant Lewis led some of these meetings. According to CW3, because so many people attended these meetings, they were held in the training center at 101 Mittel Drive, which housed production, shared services, finance, and purchasing. Normally the executives were located at 201 Mittel Drive.

## B. Relevant Internal Controls Standards

310. Management plays a critical role in the operation and growth of a company, such as establishing the internal control environment within which employees function. The Committee of Sponsoring Organizations ("COSO") of the Treadway Commission Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. COSO Report, Executive Summary.

311. To prepare financial statements in conformity with GAAP, management's responsibility is acknowledged in a set of standards known as generally accepted auditing standards ("GAAS"). COSO Report, Executive Summary. GAAS outlines the responsibilities of an auditor, but also explains that management is responsible for its own financial reporting:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***.

AU §110.03 (emphasis added).

312. It is also management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. Companies are required by the SEC to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with GAAP. Section 13(b) 2 of the Exchange Act, entitled *Periodical and Other Reports*, states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–
>
> i. transactions are executed in accordance with management's general or specific authorization;

ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

iii. access to assets is permitted only in accordance with management's general or specific authorization; and

iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

313. Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

314. The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

315. Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with US GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and
- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

316. Everyone in an organization has responsibility for internal controls. However, the chief executive officer sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. . . . The influence of the CEO on an entire organization cannot be overstated." COSO Report, Chapter 8, p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

**C. <u>PSI's Code of Conduct</u>**

317. The Individual Defendants, as well as all employees, directors and officers of the Company, were and are required to comply with the Power Solutions International, Inc. Code of Business Conduct and Ethics (the "Code of Conduct"). The purpose of the Code of Conduct is, *inter alia*, to "ensure that all of the Company's directors, officers and employees observe the highest standards of ethics in the conduct of the Company's business, avoiding even the appearance of impropriety."

318. The Code of Conduct provides that:

> It is the responsibility of every officer, employee and director, and the policy of the Company to encourage its officers, employees and directors, to ask questions, seek guidance, and report in good faith (a) any questionable accounting, financial, or auditing matters, including, without limitation, any (i) fraud, deliberate error or misrepresentations in the preparation, evaluation, review or audit of any financial statements of the Company, (ii) fraud, deliberate error or misrepresentation in the recording and maintaining of financial records of the Company, (iii)

> noncompliance with the Company's internal accounting controls, or (iv) misrepresentation or false statements to or by a senior officer or accountant of the Company regarding a matter contained in the Company's financial records, financial reports or audit reports, or (b) any known or possible violations of this Code, other Company policies or compliance programs, or applicable law.

319. Defendants Winemaster, Gorey, and Lewis, as former CEO and CFOs, are also subject to the Power Solutions International, Inc. Code of Ethics for Principal and Senior Financial Officers (the "Financial Officer Code of Conduct"), which states that "[t]he Company strives to maintain the highest standards of accuracy, completeness and integrity in its financial dealings, records and reports."

320. The Financial Officer Code of Conduct required Defendants Winemaster, Gorey, and Lewis comply with the following:

> 1. Honest and Ethical Conduct
>
> The Senior Officers will exhibit and promote honest and ethical conduct by:
>
> ◦ Encouraging and rewarding professional integrity and eliminating barriers to responsible behavior.
>
> ◦ Promoting the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.
>
> ◦ Respecting the confidentiality of information acquired in the course of work, except when authorized or otherwise legally obligated to disclose such information.
>
> ◦ Periodically communicating these ethical standards throughout the organization.
>
> 2. Financial Records and Periodic Reports
>
> The Senior Officers will establish and manage the enterprise transaction and reporting systems and procedures to provide that:
>
> ◦ Business transactions are properly authorized and accurately and timely recorded on the Company's books and records in accordance with U.S. generally accepted accounting principles (GAAP) and policies established by the Company.

◦ False or artificial statements are not made in the Company's books and records, financial statements or related communications.

◦ The retention or proper disposal of Company records shall be in accordance with applicable legal and regulatory requirements and any records retention policies established by the Company.

◦ Reports and documents filed by the Company with, or submitted by the Company to, the Securities and Exchange Commission, as well as other public communications made by the Company, will include full, fair, accurate, timely and understandable disclosure.

3. Compliance with Applicable Laws, Rules and Regulations

The Senior Officers will establish mechanisms to:

◦ Educate Company employees about applicable governmental laws, rules and regulations.

◦ Monitor compliance with applicable governmental laws, rules and regulations.

321. Defendants Winemaster, Gorey, and Lewis were also required to promptly bring matters of non-compliance to the attention of the Audit Committee, including:

◦ Material information that calls into question disclosures made by the Company in its filings with, or submissions to, the Securities and Exchange Commission or in other public communications.

◦ Information concerning significant deficiencies or material weaknesses in the design or operation of the Company's "internal control over financial reporting" (as defined in Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended) or other factors that could adversely affect the Company's ability to record, process, summarize and report financial data on a timely basis.

◦ Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting.

◦ Information concerning a violation of this Code or any other Company conduct codes, including any actual or apparent conflicts of interest between personal and professional relationships, involving management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting.

> ◦ Evidence of a material violation of applicable governmental laws, rules or regulations by the Company or its employees or agents.

322. In addition to their duties as Board members, defendants Hansen, Hoffing, and Vogt had certain duties as members of PSI's Audit Committee. According to the Audit Committee Charter, the purpose of the Audit Committee is to assist the Board:

> …in overseeing (1) the integrity of the Company's financial statements; (2) the Company's compliance with legal and regulatory requirements; (3) the qualifications and independence of the registered public accounting firm that audits the Company's financial statements (the "Auditors"); (4) the performance of the Auditors and of the Company's internal audit function (if applicable); and (5) the Company's internal accounting and financial reporting controls.

323. Among the "primary recurring duties and responsibilities" of the Audit Committee is selecting, engaging, monitoring the performance and independence of, and approving services of the Company's independent auditors. In addition, the Audit Committee is required to:

> (d) Audit Plan and Conduct. The Committee shall review with the Auditors and management (including the Company's chief financial officer and principal accounting officer) the audit plan of the Auditors, including the scope of their audit and general audit approach. The Committee shall discuss with the Auditors the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, and Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1 AU Section 380), as adopted by the PCAOB in Rule 3200T, which matters include the Auditors' responsibilities under generally accepted auditing standards, significant accounting policies, the process used by management in formulating accounting estimates and the basis for the Auditors' conclusions regarding the reasonableness of these estimates, significant audit adjustments, the Auditors' responsibilities for other information in documents containing audited financial statements, any procedures performed and the results thereof, disagreements with management, significant matters that were the subject of management's consultation with other accountants, major issues that were discussed with management in connection with the initial or recurring retention of the Auditors, and difficulties encountered by the Auditors in dealing with management related to the performance of its audit.

(e) Establishment of Internal Audit Function. If not already established, the Committee shall periodically evaluate whether the Company should establish an internal audit function (with Company personnel and/or on an outsourced basis), and if the Committee determines that an internal audit function should be established, the Committee shall oversee that the Company takes such steps with respect to the establishment of such function as deemed appropriate by the Committee. The Committee may decide to outsource all or part of such internal audit function. The director of the internal audit function (if any) shall report directly to the Committee, and shall also report to the Company's chief financial officer for administrative purposes. If an internal audit function is established, the Committee shall periodically (1) review with the Company's management, as well as the persons performing the Company's internal audit function, the plans, activities, staff, organizational structure and effectiveness of the internal audit function, and (2) review findings and recommendations from completed internal audits.

(f) Review of Auditor Report. The Committee shall obtain and review a report from the Auditors at least annually as to (1) all critical accounting policies and practices to be used, (2) all alternative treatments of financial information within GAAP that have been discussed with management, including the ramifications of such alternative disclosures and treatments and the treatment preferred by the Auditors, and (3) any other material written communications between the Auditors and management, including management letters and schedules of unadjusted audit differences.

(g) Confirmation Regarding Illegal Acts. Promptly after the completion of each audit of the Company conducted by the Auditors, the Committee shall obtain from the Auditors confirmation that the Auditors have not detected or otherwise become aware of information indicating that an illegal act has or may have occurred, pursuant to Section 10A(b) of the Exchange Act.

(h) Committee Meetings with Auditors. The Committee shall conduct meetings with the Auditors, without management present, to discuss candidly any audit problems or difficulties and management's responses to the Auditors' efforts to resolve such problems.

324. The Audit Committee is also responsible for oversight of the Company's internal controls and compliance. Specifically, this includes:

(a) Review of Internal Controls and Accounting/Financial Resources. The Committee shall review and discuss with the Auditors, financial and accounting personnel and the internal auditors (if applicable) (i) the quality and depth of staffing in, and resources of, the Company's accounting, information services and financial departments, as needed, and (ii) the adequacy of the Company's internal control over financial reporting and disclosure controls and procedures, including

controls and security procedures with respect to the Company's information systems and the Company's process for assessing risk of fraudulent financial reporting and detecting major control weaknesses, and any related significant findings and recommendations of the Auditors and the internal auditors (if applicable) (e.g., regarding deficiencies, significant deficiencies or material weaknesses), together with management's responses thereto, and the adequacy of disclosures about changes in internal control over financial reporting. The Committee shall also review with the Auditors, the internal auditors (if applicable) and management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented.

(b) Management's Internal Controls Report. The Committee shall review and discuss with the Auditors and management the report of management on the Company's internal control over financial reporting to be included when required in the Company's Annual Report on Form 10-K prior to filing such Annual Report on Form 10-K with the SEC.

(c) Submission of Complaints. The Committee shall establish procedures for (1) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, (2) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters, and (3) the dissemination of the procedures developed pursuant to clause (2) above in a manner reasonably calculated to make them known to all Company employees. The Committee shall monitor and promote the Company's adherence to these procedures.

(d) Financial Risk Exposure and General Compliance. The Committee shall discuss and review with management the Company's major financial risk exposure and the steps management takes to implement plans to monitor and mitigate such risks, including risk assessment and management policies. Such risks and exposures include, but are not limited to, threatened and pending litigation, claims against the Company, any published reports that raise material issues regarding the Company's financial statements or accounting policies, tax matters, legal and regulatory compliance and correspondence between the Company and any regulatory or governmental authorities, and matters that could materially impact the Company's internal control over financial reporting, disclosure controls and procedures and financial reporting. The Committee shall review the Company's procedures for monitoring compliance with laws and regulations; as well as the Company's code of conduct and other policies relating to compliance with laws and regulations, throughout the Company.

(e) Debt Instruments. The Committee shall review and discuss with the Auditors and management the Company's compliance with financial covenants in its credit facility and other material outstanding debt instruments, as well as any material debt instruments issued by any of the Company's subsidiaries.

> (f) Related Party Transactions and Conflicts of Interest. The Committee shall review and approve (or deny) related party transactions and resolve conflicts of interest questions involving Board members or management and review, and monitor compliance with, any written policies of the Company regarding related party transactions or conflicts of interest.

325. With respect to PSI's financial reporting, the Audit Committee's duties are as follows:

> (a) Financial Statement Review. The Committee shall review and discuss with management and the Auditors the Company's annual audited and quarterly unaudited financial statements, including the Auditors' audit reports and the results of the Auditors' review of the quarterly financial statements (as applicable), as well as the related "Management's Discussion and Analysis of Financial Condition and Results of Operations," in each case prior to filing the financial statements with the SEC. The Committee shall recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10- K filed with the SEC. The Committee shall also authorize the filing by the Company of each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q containing the Company's financial statements.
>
> (b) Earnings Release Review. Prior to their release, the Committee shall review all of the Company's earnings releases.
>
> (c) Disclosure Principles and Practices. The Committee shall discuss with the Auditors their judgments about the quality, not just the acceptability, of the Company's accounting principles and financial disclosure practices used or proposed and the appropriateness of significant management judgments. The Committee shall discuss with the Auditors and management the effect of regulatory and accounting initiatives, as well as any off balance sheet structures, on the Company's financial statements.
>
> (d) Fraud Certification Disclosures. The Committee shall review and discuss disclosures made to the Committee by the Company's chief executive officer and chief financial officer during the certification process for the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q about the effectiveness of the Company's disclosure controls and procedures, any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees having a significant role in the Company's internal control over financial reporting.

> (e) Audit Committee Report. Based upon discussions with, and reliance upon, the Auditors and management, the Committee shall annually review and approve the report required by SEC rules to be included in the Company's annual proxy statement. In addition, the Committee will review any other audit committee-related disclosure in the Company's filings with the SEC or otherwise as required by applicable securities laws, rules and regulations or, if the Company's securities have become listed on a national securities exchange, by the rules of such exchange.

## XVI. UNDISCLOSED ADVERSE FACTS

326. The market for PSI's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, PSI's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired PSI's securities relying upon the integrity of the market price of the Company's securities and market information relating to PSI, and have been damaged thereby.

327. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PSI's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about PSI's business, operations, and prospects as alleged herein.

328. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PSI's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an

unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XVII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

329. The market for PSI's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, PSI's securities traded at artificially inflated prices during the Class Period. On May 6, 2014, the Company's stock closed at a Class Period high of $86.46 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of PSI's securities and market information relating to PSI, and have been damaged thereby.

330. During the Class Period, the artificial inflation of PSI's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PSI's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of PSI and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities

at such artificially inflated prices, and each of them has been damaged as a result.

331. At all relevant times, the market for PSI's securities was an efficient market for the following reasons, among others:

(a) PSI stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, PSI filed periodic public reports with the SEC and/or the NASDAQ;

(c) PSI regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) PSI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

332. As a result of the foregoing, the market for PSI's securities promptly digested current information regarding PSI from all publicly available sources and reflected such information in PSI's stock price. Under these circumstances, all purchasers of PSI's securities during the Class Period suffered similar injury through their purchase of PSI's securities at artificially inflated prices and a presumption of reliance applies.

333. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material

misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XVIII. NO SAFE HARBOR

334. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PSI who knew that the statement was false when made.

## XIX. COUNTS

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and

**Rule 10b-5 Promulgated Thereunder**
**Against PSI and the Officer Defendants**

335. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

336. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase PSI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

337. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PSI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

338. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PSI's financial well-being and prospects, as specified herein.

339. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PSI's value and

performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about PSI and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

340. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

341. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing PSI's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

342. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PSI's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired PSI's securities during the Class Period at artificially high prices and were damaged thereby.

343. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that PSI was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their PSI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

344. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

345. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against the Individual Defendants

346. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

347. The Individual Defendants acted as controlling persons of PSI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

348. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

349. As set forth above, PSI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

350. This claim is only asserted against the Outside Director Defendants with respect to the alleged false or misleading statements identified at ¶¶183-86, 189-92. This claim is asserted against the Officer Defendants with respect to all of the alleged false or misleading statements.

## XX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XXI. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

**GLANCY PRONGAY & MURRAY LLP**

Dated: September 15, 2017

Respectfully submitted,

By: *s/ Jason L. Krajcer*

Lionel Z. Glancy
Robert V. Prongay
Jason L. Krajcer
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
info@glancylaw.com

*Attorneys for Lead Plaintiff Richard Giunta, Named Plaintiff David Leibowitz, and the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com

- and -

Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
Email: pdahlstrom@pomlaw.com

*Additional Counsel*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 15, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Illinois, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 15, 2017.

*s/ Jason L. Krajcer*
Jason L. Krajcer

# Mailing Information for a Case 1:16-cv-08253 Guinta v. Power Solutions International, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas P. Cimino , Jr**
  tcimino@vedderprice.com,ecfdocket@vedderprice.com,bhahn@vedderprice.com
- **Peter E. Cooper**
  pcooper@lksu.com,shennessey@lksu.com,aterry@lksu.com
- **Rachel T. Copenhaver**
  rcopenhaver@vedderprice.com,ewatt@vedderprice.com,ecfdocket@vedderprice.com
- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com,mjsteven@pomlaw.com
- **Rebecca Lynn Dandy**
  rdandy@vedderprice.com,ecfdocket@vedderprice.com,trobinson@vedderprice.com
- **Theresa Lynn Davis**
  tdavis@reedsmith.com,theresa-davis-4143@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com,kgord@reedsmith.com
- **Michael J. Diver**
  michael.diver@kattenlaw.com,rosie.gradilla@kattenlaw.com,ecf.docket@kattenlaw.com
- **Marielise Fraioli**
  mfraioli@lksu.com,jjones@lksu.com,aterry@lksu.com
- **Allison Marz Freedman**
  allison.freedman@kattenlaw.com,kimberly.perez@kattenlaw.com,ecfdocket@kattenlaw.com,chicago.arc21@kattenlaw.com
- **Mitchell Benjamin Goldberg**
  mgoldberg@lksu.com,jjones@lksu.com
- **Jason L. Krajcer**
  jkrajcer@glancylaw.com
- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com
- **Michael James Lohnes**
  michael.lohnes@kattenlaw.com,rosie.gradilla@kattenlaw.com,ecfdocket@kattenlaw.com
- **Louis Carey Ludwig**
  lcludwig@pomlaw.com
- **Elizabeth Camper Lyons**
  elyons@lksu.com,shennessey@lksu.com,aterry@lksu.com
- **Steven Alan Miller**
  samiller@reedsmith.com,reed-smith-2312@ecf.pacerpro.com,jlong@reedsmith.com,steve-miller-7673@ecf.pacerpro.com
- **John Scott Monical**
  jmonical@lksu.com,jjones@lksu.com,aterry@lksu.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com

- **Junaid A Zubairi**
  jzubairi@vedderprice.com,shampton@vedderprice.com,ecfdocket@vedderprice.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**J. Alexander Hood , III**
Pomerantz LLP
600 Third Avenue
20th Floor
New York, NY 10016